**JUDGE KARAS**

# 14 CV 1049

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY CAMP and JC REAL ESTATE FUND, LLC, | :    Index No. |
| *Plaintiffs,* | : |
| v. | :    **COMPLAINT** |
| ROBERT BERMAN, ROBERT WONG and AVON ROAD ROCK HILL, LLC, | : |
| *Defendants.* | :    **JURY TRIAL DEMANDED** |

FILED
U.S. DISTRICT COURT
2014 FEB 20 AM 11: 57
S.D. OF N.Y.

THE FLEISCHMAN LAW FIRM
Keith M. Fleischman
Ananda Chaudhuri
Julia Sandler
565 Fifth Avenue, Seventh Floor
New York, New York 10017

Plaintiffs Jeffrey Camp and JC Real Estate Fund I, LLC ("Camp" and "JC REF", collectively "Plaintiffs") by their undersigned counsel, bring this action based upon personal knowledge as to matters concerning Plaintiffs and their own acts, and upon information and belief as to all other matters.

## INTRODUCTION

1.  This action concerns a brazen fraud perpetrated by Defendants Robert Berman ("Berman") and Robert Wong ("Wong"), in which Defendants induced Plaintiffs to purchase an interest in Berman's development company, then schemed to deprive Plaintiffs of the value of their investment.

2.  In 2005, Berman formed RH Land with the intention of acquiring undeveloped land in the town of Thompson, New York. The Town of Thompson was predicted to be a potential hub of future development in New York. To that end, RH Land purchased and assembled fourteen parcels amounting to over five hundred acres of land in Thompson (the "Thompson Land"), incurring a $5.8 million mortgage (the "Mortgage"). This property was RH Land's sole asset.

3.  In October 2009, RH Land failed to repay the Mortgage on the Thompson Land and consequently defaulted on its loan, which carried a personal guarantee by Berman. Desperate for cash and struggling to retain his personal assets, Berman approached Camp and presented RH Land as a prudent investment opportunity. Berman, aided by his colleague Wong, represented to Camp that Berman's company, Avon Road Rock Hill, LLC ("Avon Rock Hill"), had contributed $2.96 million in capital to acquire a 48.73% interest in RH Land. This large capital contribution created the impression that RH Land was a healthy, well-capitalized company, and artificially inflated its value. Based on this representation, on or around February 10, 2010, JC REF,

1

Camp's wholly owned company, purchased a 5.85% interest in RH Land from Avon Rock Hill in exchange for $500,000.

      4.     In reality, unbeknownst to Plaintiffs, Avon Rock Hill had only contributed $1.139 million to RH Land. Moreover, Plaintiffs were wholly unaware that the Mortgage on the Thompson Land was in default – a fact that Berman and Wong deliberately concealed from Plaintiffs. Consequently, at the time of Plaintiffs' investment in RH Land, the mortgage holder had the right to foreclose on the Company's only asset.

      5.     After fraudulently inducing Plaintiffs to invest in RH Land, Berman conspired to appropriate the value of the Thompson Land for himself and his business associate, at Plaintiffs' expense. On July 8, 2013, while Camp was still unaware that the Mortgage was in default, attorneys for the mortgage holder wrote to Berman stating that the holder was seeking to sell the Mortgage. Berman never disclosed the existence of this letter to Plaintiffs. Rather, Berman devised a scheme to enable his longtime business associate, Samuel Eisenberg ("Eisenberg"), to acquire the Mortgage at a reduced price, without competing bids from Plaintiffs.

      6.     Specifically, in an August 1, 2013 letter to attorneys for the mortgage holder, Berman, through his counsel, made a low-ball, stalking horse offer to purchase the Mortgage for $225,000 and threatened frivolous litigation if the deal was not accepted. Camp was not informed about this offer. As Berman planned, the mortgage holder rejected the offer. Then, Eisenberg, an associate of Berman, made a better offer through Mount Carmel Equities, LLC ("Mount Carmel"). The mortgage holder accepted this offer, and Mount Carmel acquired the Mortgage at a substantial discount.

7.      Because the Mortgage is in default, Eisenberg -- working in concert with Berman -- has complete discretion to foreclose and seize the property from RH Land at any time. Accordingly, RH Land has been rendered worthless to Plaintiffs.

8.      In October 2013, New York approved a constitutional amendment to legalize casino gambling and expand the number of casinos in the area of the Thompson Land. As a direct result of Berman's misconduct, Plaintiffs have sustained millions of dollars in damages.

## PARTIES

9.      Plaintiff Jeffrey Camp is the sole member of JC Real Estate Fund I, LLC and is a resident of Miami, Florida. Since July 2011, Camp has been the chief financial officer of Cinium Financial Services Corporation ("Cinium").

10.     Plaintiff JC Real Estate Fund I, LLC ("JC REF") is an entity owned by Camp. JC REF owns a 5.85% interest in RH Land. JC REF is incorporated in Delaware and headquartered in Miami, Florida.

11.     Defendant Robert Berman is the General Partner of Avon Road Partners, LP ("Avon Road Partners"). Berman is also the chief executive officer of Cinium and a director of Upper Hudson National Insurance Company ("UHNIC"), a New York insurance carrier subsidiary of Cinium. Berman is a resident of New Hope, Pennsylvania.

12.     Defendant Robert Wong was the President of UHNIC from 2009 to early 2013, and chief operating officer of Cinium from 2009 to July 2011 and again from June 2012 to March 2013. Wong is a resident of Sullivan County, New York.

13.     Defendant Avon Road Rock Hill, LLC ("Avon Rock Hill") is wholly owned by Avon Road Partners and controlled by Berman. Avon Rock Hill owns 42.88% of RH Land and

3

is the managing member of RH Land. Avon Rock Hill is a New York company, headquartered in Monticello, New York.

**JURISDICTION AND VENUE**

14. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

15. This Court has personal jurisdiction over Defendant Berman because he does business in the State of New York and because this action arises out of conduct that took place in the State of New York.

16. This Court has personal jurisdiction over Defendant Wong because he is a resident of the State of New York and does business in the State of New York, and because this action arises out of conduct that took place in the State of New York.

17. This Court has personal jurisdiction over Avon Rock Hill because it is a New York corporation that does substantial business in the State of New York.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the subject matter of the claim, the Thompson Land, is located in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and each defendant is subject to personal jurisdiction in this district.

**STATEMENT OF FACTS**

**I.      BACKGROUND ON RH LAND**

19. In April 2005, Berman created RH Land to purchase the Thompson Land through Glen Wild Land Company, LLC ("Glen Wild"), a wholly owned subsidiary of RH Land.

4

20.    On or about December 23, 2005, a loan agreement was executed between Glen Wild and Bear Stearns Commercial Mortgage, Inc. ("Bear Stearns") for a $5.8 million Mortgage on the Thompson Land. The original maturity date on the Mortgage was January 1, 2007.

21.    Also on December 23, 2005, RH Land entered into an Amended and Restated Operating Agreement setting forth the purported capital contributions of each member:

| Member | Signatory | Interest Owned | Capital Contribution |
|--------|-----------|----------------|----------------------|
| Avon Road Rock Hill, LLC | Robert Berman | 47% | $1,000,000 |
| KF Rock Hill, LLC | Scott Kaniewski | 19.6% | $400,000 |
| Vida Properties, LLC | Vida Tahbaz | 14.7% | $300,000 |
| Mattlyn Rock Hill, LLC | James Hisiger | 14.7% | $300,000 |
| WC88 Rock Hill, LLC | Robert Wong | 4% | 0 |

22.    The Amended Operating Agreement named KF Rock Hill, LLC, through its member Scott Kaniewski ("Kaniewski"), as the managing member in charge of the day-to-day affairs of RH Land. Despite the language in the operating agreement, Berman exercised control over the Company.

23.    At the time of RH Land's formation, Wong and Kaniewski worked under Berman at Cinium, then known as Upper Hudson Holdings, LLC ("Upper Hudson"), and its subsidiary UHNIC. Cinium acted as a middleman between project owners and contractors, ensuring that project owners' capital was efficiently deployed. Berman was, and remains, Cinium's President and chief executive officer.

24.     From 2004 to 2008, Kaniewski was the President of UHNIC. Berman became President of UHNIC from 2008-2009, during which time Wong was UHNIC's corporate secretary. Wong was President of UHNIC from 2009 to early 2013. Wong was also Cinium's chief operating officer from 2009 to July 2011 and from June 2012 to March 2013.

25.     The By-Laws of UHNIC provide for "the duties of the President to include, without limitation: the preparation, maintenance and filing of the books, report, statements and certificates required by law."

26.     In January 2007, the parties to the Mortgage agreed to exercise the Mortgage's Extension Option, which extended the repayment date from January 1, 2007 to January 1, 2008. In the spring of 2008, when Bear Stearns collapsed, the Federal Reserve Bank of New York created Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 ("Maiden Lane") to acquire assets of Bear Stearns, including the Mortgage, in connection with its purchase by JP Morgan. The Mortgage repayment was subsequently extended to January 1, 2009, and finally to October 1, 2009.

## II.     KANIEWSKI EXITS RH LAND AFTER LEARNING OF ASSET FORFEITURE INVESTIGATION AGAINST HIMSELF, BERMAN, AND CINIUM

27.     In 2008, Kaniewski transferred his interest in RH Land to Berman after the U.S. Attorney's Office in the Middle District of Florida began investigating Berman and Kaniewski in connection with their attempt to recover the ill-gotten gains of Ray Miller ("Miller"), a former business associate of Berman.

28.     In late 2007, Miller, through AMS Capital Holdings Corp. ("AMS"), made a deposit of $2.75 million in cash pursuant to an agreement to purchase Upper Hudson for $11 million. At the time, Miller was the chief operating officer of Upper Hudson Holdings.

29.     In January 2007, Upper Hudson terminated the deal with Miller after Miller pled guilty to one count of mail and wire fraud for issuing fraudulent surety bonds. Surety bonds are three party bonding agreements in construction projects where the "surety company" (the insurer) assures the "oblige" (the project owner) that the "principal" (typically the contractor) will perform a construction contract. Only surety companies that go through a rigorous approval process may issue surety bonds to the federal government. Miller allegedly issued fraudulent surety bonds to the government by representing that companies that he controlled had the power to issue surety bonds.

30.     After Miller pleaded guilty and the deal to purchase Upper Hudson was terminated, Upper Hudson did not return the remainder of Miller's cash payment. Rather, unbeknownst to Plaintiffs, Miller's entire $2.75 million deposit was booked as a long term capital gain and distributed primarily to Berman and entities that he controlled as a dividend.

31.     In 2008, the federal government commenced a forfeiture investigation against Berman and Upper Hudson to recover the proceeds of Miller's fraudulent surety bond scheme, including the $2.75 million that Miller transferred to Upper Hudson pursuant to the Purchase Agreement. In a letter to Berman's counsel, the United States Attorney for the Middle District of Florida alleged that Berman was the primary beneficiary of Miller's fraud, stating: "Our investigation to date has determined that most of the fraud proceeds provided to your client were immediately transferred to other accounts controlled by your client, used to satisfy debt obligations or were otherwise used to the benefit of your client."

32.     In and around this time, Berman was experiencing severe pressure on his personal finances. He could not maintain his lavish lifestyle and was in jeopardy of losing his private

aircraft and other real estate properties that he owned. Also, around this time, Kaniewski noticed that Berman had developed a reckless streak with respect to his investments.

33.     In August 2008, fearing personal liability from the Miller matter and growing increasingly alarmed by Berman's recklessness, Kaniewski entered into a termination agreement with Berman in which he transferred his interest in RH Land and other co-investments with Berman to Berman in exchange for, *inter alia*, $1 and indemnification on matters relating to the funds received from Miller. After Kaniewski exited RH Land, Avon Road Partners, Berman's entity, became the managing member of RH Land under the Operating Agreement.

### III.     BERMAN DUMPS HIS INTEREST IN RH LAND ON UHNIC AND CAUSES GLEN WILD TO DEFAULT ON THE MORTGAGE

34.     Beginning around April 2, 2008, Berman began selling Avon Rock Hill's interest in RH Land to Cinium subsidiary UHNIC. Berman was on both sides of the transaction because he controlled both UHNIC and Avon Rock Hill. At the time, Berman was UHNIC's President, managing member and 95% owner. He was also the managing member and owner of Avon Rock Hill (through Avon Road Partners). Between April 2, 2008 and December 31, 2009, Berman caused UHNIC to purchase a 16.87% interest in RH Land from Avon Rock Hill for $1,039,155. Due to the self-dealing nature of this transaction, Berman did not seek New York Department of Financial Services ("NYDFS") approval for the transaction, as required under New York law. Furthermore, he and Wong, along with non-defendant Donald Appel ("Appel"), UHNIC's Treasurer and director, actively misrepresented the investment to the NYDFS and UHNIC's auditors until the scheme was revealed in 2013.

35.     At the same time that Berman was dumping his interest in RH Land on UHNIC, the Mortgage on the Thompson Land was going into default. Glen Wild failed to repay the $5.8

million Mortgage by the maturity date of October 1, 2009 and consequently defaulted on the loan.

36.     Alston & Bird LLP ("Alston & Bird"), counsel for the lender, notified Glen Wild and Berman of the Mortgage default via letter dated October 9, 2009.  Lender's counsel sent several letters from 2009 to 2013 to the attention of Berman and Kaniewski regarding the defaulted Mortgage.  Neither party informed Plaintiffs about the event of default.

## IV.     PLAINTIFFS INVEST IN RH LAND

37.     In early 2010, Berman, in need of cash and in furtherance of his scheme to defraud, sold an additional portion of his interest in RH Land to Plaintiffs.  In 2009, Camp loaned money to Cinium (then Upper Hudson), in the form of a senior secured Note with one-year maturity.  Camp relied solely on Berman's representations about the operations and finances of Cinium when investing.  Camp was not an executive of Cinium at this time, nor did he have any managerial responsibility at Cinium.

38.     In March of 2010, Camp decided to convert his Cinium debt into Cinium equity. On occasion, in 2010, Camp assisted Berman with Cinium operations at Berman's request.

39.     In October 2009, Berman approached Camp about investing in RH Land.  During these discussions, Berman falsely stated that Avon Rock Hill had contributed $2.96 million to RH Land.  When Camp asked to review various documents related to RH Land, Berman emailed Wong and instructed him to provide the requested documents.  On February 9, 2010, Wong emailed Camp six documents relating to RH Land.  These documents reiterated Berman's misrepresentation concerning the amount of his capital contribution to RH Land.  Moreover, while the documents disclosed the existence of the Glen Wild Mortgage, they failed to disclose the crucial fact that Glen Wild had defaulted on the Mortgage just a few months earlier, in October 2009.  Berman and Wong were well aware of the true status of the Mortgage, yet

deliberately withheld and concealed this fact to induce Plaintiffs to purchase an interest in RH

Land. In fact, six weeks after Camp's investment, Berman sent an email to Camp confirming

that the loan was current and that all real estate taxes had been paid.

40.       In reliance on these material omissions and false statements, on or about February

10, 2010, JC REF, which is owned and operated by Camp, purchased a 5.85% interest in RH

Land from Avon Rock Hill in exchange for $500,000. *See* Exhibit A: Assignment of

Membership Interest Agreement between Avon Rock Hill and JC Real Estate (the "JC Real

Estate Assignment Agreement"). Reiterating Berman's misrepresentation concerning Avon

Rock Hill's capital contributions to RH Land, the JC Real Estate Assignment Agreement

explicitly states that "[Avon Road Rock Hill, LLC] holds a 48.73% percentage interest in RH

Land and has made capital contributions in the aggregate amount of $2,957,964 to RH Land

which…amounts to a preferred capital balance of $4,162,319."

41.       On or about January 30, 2012, the members of RH Land entered into the Second

Amended and Restated Operating Agreement, setting forth the interests and capital contributions

of each member:

| Member | Signatory | Interest Owned | Capital Contribution |
|---|---|---|---|
| Avon Road Rock Hill, LLC | Robert Berman | 42.88% | $2,496,393.98 |
| UHNIC | Robert Wong | 19.6% | $1,039,155.04 |
| Vida Properties, LLC | Vida Tahbaz | 14.7% | $865,028.57 |
| Mattlyn Rock Hill, LLC | James Hisiger | 14.7% | $865,028.00 |
| JC Real Estate Fund I, LLC | Jeff Camp | 5.85% | $505,250 |
| WC88 Rock Hill, LLC | Robert Wong | 4% | 0 |

V.     **EISENBERG ACQUIRES AN OPTION TO PURCHASE AN INTEREST IN RH LAND**

42.     On December 24, 2009, RH Land entered into an option agreement ("Option Agreement") that gave Eisenberg the option to purchase 1.67% of RH Land for $1,000 ("Option I") and the option to purchase 33.33% of RH Land for the "Excise Price" in tranches of no less than 2.5%.

43.     The "Excise Price" is defined to be:

(a) the percentage of the membership interests being purchased multiplied by the cash investments made by all of the members of RH Land, other than Eisenberg, plus (b) a nine percent (9%) annual cumulative return on each cash investment made by the members of RH Land, other than Eisenberg, calculated from the date each such investment was made, compounded annually, until the date(s) Eisenberg exercises each tranche granted under Option II.

According to a letter dated March 16, 2010 from Eisenberg to Berman, Eisenberg formed Cheskas Habatim Educational Heritage to raise funds to develop the Thompson Land for an orthodox community. The letter referenced Eisenberg's and Berman's business relationship and urged Berman to continue to seek appropriate permits and create a sales and information center for prospective community members.

VI.    **BERMAN COLLUDES WITH EISENBERG TO RIG AUCTION OF THE MORTGAGE**

44.     By 2013, the economic value in RH Land had become much more apparent. The casino law's passage appeared to be imminent, and RH Land was already negotiating term sheets for the property's development.

45.     On or about July 8, 2013, Berman received a letter from Alston & Bird ("July 8, 2013 Letter") stating that Maiden Lane intended to sell the Mortgage on the Thompson Land. The July 8, 2013 Letter stated:

[P]lease forward a copy of this letter to any and all members, principals and direct and indirect investors of Borrower who may be interested in knowing of the Loan Sale including, but not limited to RH Land Development LLC and Scott Kaniewski.

46.     Despite this request, Berman concealed the existence of the letter from Plaintiffs, and failed to notify them that a sale of the Mortgage was imminent.

47.     Instead, Berman and Eisenberg conspired to induce Maiden Lane to sell the Mortgage to Eisenberg at a discount. The scheme enriched Eisenberg and Berman at Plaintiffs' expense. Eisenberg wanted to acquire an interest in the land without paying the Excise Price. Berman, who had recourse liability under the Mortgage under certain circumstances, was highly incentivized to find a purchaser of the Mortgage who was friendly to him.

48.     In response to the July 8, 2013 letter, Berman's attorney sent a letter dated August 1, 2013 ("August 1, 2013 Letter") to Alston & Bird, without informing Plaintiffs. In this letter, Berman's counsel made an offer on behalf of Glen Wild to purchase the Mortgage for $225,000 and threatened litigation seeking $25 million in damages against Maiden Lane for listing the Mortgage as a toxic asset.

49.     After Berman threatened litigation and questioned the enforceability of the Mortgage, Eisenberg made a competing offer and purchased the Mortgage at a discount. Eisenberg, through Mount Carmel Equities, LLC, will therefore be able to acquire the Thompson Land without Eisenberg exercising his purchase option and making a capital contribution to RH Land. Plaintiffs' investment in RH Land will be virtually worthless if Mount Carmel forecloses on the Mortgage.

## VII.     PLAINTIFFS DISCOVER THE FRAUD

50.     On June 13, 2013, Miller filed a *pro se* complaint against Berman, Cinium, Kaniewski, Camp and virtually every individual and entity associated with Cinium to recoup, *inter alia*, the majority of his $2.75 million initial investment in Upper Hudson. Despite naming

Camp as a Defendant, there were no factual allegations in the complaint directed towards Camp who had no involvement, either as an investor or as a member of management, at the time of the Miller involvement.

51.     In July 2013, largely due to concerns raised by Miller's lawsuit, the Cinium Audit Committee (the "Audit Committee") commenced an investigation into Berman's financial activities, including his involvement with RH Land.  Plaintiff Camp, who had become president of UHNIC in March 2013 and was CFO of Cinium, assisted in this investigation.

52.     When the Audit Committee pressed Berman to provide answers concerning RH Land, Berman asked that they direct their inquiries to Wong, stating that Wong had control over all documents pertaining to RH Land and its business plans.

53.     During the course of its investigation, the Audit Committee discovered a letter from attorneys for Maiden Lane, Alston & Bird, dated March 13, 2013 ("March 13, 2013 Letter") stating that the Mortgage had been in default since October 1, 2009.  The March 13, 2013 Letter references four other previous letters sent by Alston & Bird concerning the default dated October 9, 2009, June 3, 2011, February 9, 2012 and October 18, 2012.  Prior to the summer of 2013, however, Plaintiffs were not aware of these letters or that the Mortgage was in default.

54.     Also, during the course of investigating Berman, Camp discovered the 2009 tax return for RH Land.  It showed that Avon Rock Hill did not make a $2.96 million capital contribution to RH Land as Berman represented to Plaintiff, but only made a $1.139 million capital contribution to RH Land.

55.     The 2009 tax return provides the following overview of the partners' capital accounts:

| Partner | Beginning Capital Account | Capital Contributed During Year | Current Year Increase (Decrease) | Ending Capital Account |
|---|---|---|---|---|
| Avon Rock Hill | $1,078,972 | $321,000 | ($260,224) | $1,139,748 |
| Mattlyn Rock Hill, LLC | $250,782 | $116,678 | ($71,850) | $295,610 |
| WC88 Rock Hill, LLC | ($72,524) | -- | -- | ($72,524) |
| Vida Properties, LLC | $250,787 | $116,929 | ($71,850) | $295,866 |
| UHNIC | $753,359 | $227,500 | ($75,082) | $905,777 |

56.     Additionally, during the course of the investigation, the Audit Committee discovered the July 8, 2013 Letter and response letter by Berman's attorney. Consequently, through Camp's investigation into Berman's dealings with RH land, Camp learned that Plaintiffs were deceived into purchasing RH Land and that Berman had engaged in a scheme to deprive Plaintiffs from receiving any value from their investment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Fraudulent Inducement
### (Berman, Wong and Avon Rock Hill)

57.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

58.     Berman and Wong induced Plaintiffs to enter into the JC Real Estate Assignment Agreement by making untrue statements of material facts, omitting to state other facts necessary to make the statements made not misleading, and/or concealing material facts.

59.     Specifically, Defendants Berman and Wong deliberately failed to disclose and/or concealed the fact that the Mortgage was in default and grossly misrepresented the amount of Avon Rock Hill's capital contributions to RH Land in order to induce Camp to purchase an interest RH Land.

14

60.     Camp justifiably relied on the representations made by Berman, the managing member of RH Land through his company Avon Rock Hill, during negotiations to purchase an interest in RH Land.  Camp's reliance on Wong's representations during these negotiations was also justifiable.

61.     Defendants Berman and Wong knew that their representations and omissions were false and/or misleading at the time they were made, and made such false representations and omissions with the intent to defraud Camp.

62.     Camp would not have entered into the JC Real Estate Assignment Agreement and purchased an interest in RH Land had he known the truth about the matters discussed above.

63.     As a result of Defendant Berman and Defendant Wong's false and misleading statements and omissions, Camp has suffered damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Breach of Operating Agreement – Direct**
**(Berman and Avon Rock Hill)**

64.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

65.     Defendant Robert Berman, through his company Avon Rock Hill, is the managing member of RH Land.

66.     As managing member of RH Land, Defendant Berman had certain management obligations pursuant to the terms of the RH Land Operating Agreement.  Specifically, the RH Land Operating Agreement stated:

> A vote of no less than 72% of the Members' Percentage
> Interests in the Company is required to take any of the
> following actions:
>
> a)  causing the Company or Glen Wild Land Company,
>     LLC to become insolvent;…or

15

       h) taking any action or causing the Company or Glen Wild
         Land Company, LLC to take any action in furtherance
         of any of the foregoing.

Article III, Paragraph 3 of the Operating Agreement.

     67.    Berman violated his management obligations under the RH Land Operating

Agreement by allowing the Mortgage to go into default and allowing the Mortgage to be sold off

without first informing Plaintiffs and allowing the members of RH Land to vote on these actions.

     68.    As a result of Berman's breach of the Operating Agreement, Plaintiffs have

suffered damages.

## PRAYER FOR RELIEF

     WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

     1.    For an award of compensatory damages against Defendants in favor of Plaintiffs

for damages sustained as a result of Defendants' wrongdoing;

     2.    For an award of punitive damages as permitted by common law and statute;

     3.    For an award to Plaintiffs of its costs and disbursements in this suit, including

reasonable attorney's fees and expert fees; and

     4.    For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

     Plaintiffs demand a trial by jury.

Dated: February 20, 2014

16

THE FLEISCHMAN LAW FIRM
Keith M. Fleischman
Ananda Chaudhuri
Julia Sandler
565 Fifth Avenue, Seventh Floor
New York, New York 10017

*Counsel for Plaintiffs*

17

## AGREEMENT OF TRANSFER OF MEMBERSHIP INTEREST

**THIS AGREEMENT** is made and entered into on February *18* , 2010 between Avon Road Rock Hill, LLC, a New York limited liability company having an address at 735 Starlight Drive, Monticello, New York 12701 (the "Seller"), and JC Real Estate Fund I, LLC, a Delaware limited liability company having an address at 7621 Fisher Island Drive, Miami, Florida 33109 (the "Purchaser").

**WHEREAS,** Seller is a member in RH Land Development, LLC, a New York limited liability company (the "Company") in accordance with the terms of the Amended and Restated Operating Agreement of RH Land Development, LLC dated December 23, 2005, and the First and Second Amendments thereto, effective July 25, 2007 and December 20, 2007, respectively, (as may be further amended, modified and supplemented from time to time, collectively the "LLC Agreement");

**WHEREAS,** Seller desires to transfer a portion of its membership interest in the Company to Purchaser by way of an Assignment of Membership Interest dated February *18* , 2010 (the "Assignment");

**WHEREAS,** Purchaser desires to purchase a portion of Seller's membership interest in the Company from Seller by way of the Assignment; and

**NOW THEREFORE,** in consideration of the mutual covenants contained in this agreement, the parties agree as follows:

The Seller shall sell to the Purchaser, and the Purchaser shall purchase from the Seller, Seller's "Membership Interest", as such term is defined in the Assignment, for the purchase price of five hundred thousand dollars ($500,000) (the "Purchase Price"). The Purchase Price for the Membership Interest shall be payable by bank or certified check or by wire transfer of immediately available funds to an account designated by the Purchaser.

Purchaser shall receive all rights, title, and interest in Seller's Membership Interest, and shall be entitled to participate equally in the Company's distributions as a substituted member in exchange for payment of the Purchase Price. Purchaser specifically assumes all obligations and liability, if any, for which Purchaser, as a member of the Company, would be subject to under the LLC Agreement.

Within forty five (45) days of the date of this agreement, Seller shall induce the members of RH Land to, and Purchaser shall agree to, amend the LLC Agreement to provide for the consent of a majority of the Members' Percentage Interest in RH Land in lieu of the unanimous consent wherever such unanimous consent is required.  Such amendments will include, but may not be limited to the following, to effectuate such changes:

(a) deleting the second line of Article II, Section 2 and substituting "a majority of the Members' Percentage Interest in the Company (other than WC Rock Hill LLC) and upon compliance with the provisions of this" shall be substituted in its place and stead.

1

(b) deleting the second line of Article III, Section 2 and substituting "Agreement, only by a majority vote of the Members' Percentage Interest (other than WC88 Rock Hill LLC) in the Company" in its place and stead;

(c) deleting the third line of Article III, Section 3 and substituting "A vote of a majority of the Members' Percentage Interests in the Company is required to take any of the following actions:" in its place and stead;

(d) deleting the first line of Article IV, Section 3 and substituting "[u]pon a vote of a majority of the Members' Percentage Interests in the Company, the" in its place and stead;

(e) substituting the word *majority* for *unanimous* in Article V, Section 2;

(f) adding at the end of the first sentence of Article VIII, Section 3, the words and punctuation ' *Percentage Interests in the Company*; and

(g) adding after the word [m]embers in the second line of Article X, Section 1, the words and punctuation ' *Percentage Interests in the Company.*

Each party hereto warrants that is has all requisite authority, power and ability to execute and perform this Agreement. This Agreement, upon execution, will constitute legal, valid and binding obligations of each Seller and Purchaser.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of laws principles.

Execution of this Agreement shall be deemed an execution of the LLC Agreement by the Purchaser, and Purchaser shall be bound by all the terms and conditions of the LLC Agreement as though Purchaser were an original party to that LLC Agreement.

[Signature Page Follows]

2

**IN WITNESS WHEREOF**, the parties have executed this agreement as of the day of the year first above written.

Avon Road Rock Hill, LLC

By: Avon Road Partners, LP
By: Robert Berman
Its: General Partner

JC Real Estate Fund I, LLC

By: Jeffrey Camp
Its: Managing Member

3