Kim J. Landsman
Beth Nagalski
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, NY 10022
Tel: (212) 907-7368
E-mail: klandsman@golenbock.com

*Attorneys for Defendants and Counterclaim Plaintiff Robert Berman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

|  |  |  |
|---|---|---|
| JEFFREY CAMP and JC REAL ESTATE FUND, LLC, | : | Case No. 14-CV-1049 (KMK) |
| Plaintiffs, | : | |
| v. | : | **ANSWER AND COUNTERCLAIMS** |
| ROBERT BERMAN, ROBERT WONG, and AVON ROAD ROCK HILL, LLC, | : | |
| Defendants, | : | |
| and | : | |
| CINIUM FINANCIAL SERVICES CORPORATION, JOEL ASEN, JAMES ROBERTS, MICHAEL MICHIGAMI, and BDO USA, LLP, | : | |
| Additional Defendants on the Counterclaims. | : | |

-------------------------------------------------------------------X

Defendants Robert Berman, Robert Wong, and Avon Road Rock Hill, LLC, for

their Answer and Counterclaims to the correspondingly numbered paragraphs of the Complaint,

allege as follows:

1.    Deny.

2.    Deny, but aver that RH Land Development LLC, through Glen Wild Land

Company, LLC ("Glen Wild"), purchased and continued the assembly of the Thompson Land,

and that Glen Wild entered into a Loan Agreement wherein the lender obligated itself to lend up to $5.8 million.

3.      Deny, except admit, with a correction, that Berman accurately informed Camp that Avon Road Rock Hill, LLC ("Avon Rock Hill"), wholly owned by Avon Road Partners, L.P., of which Berman is the General Partner, had contributed $2.96 million in capital (of which $921,000 was transferred from the interest held by Scott Kaniewski's entity as part of an agreement between Berman and Kaniewski) to RH Land Development, LLC ("RH Land"), which resulted in Avon Rock Hill having a 48.73% interest in RH Land, and that Glen Wild did not repay the Mortgage in October 2009.

4.      Deny.

5.      Deny.

6.      Deny, except admit that RH Land's counsel Joseph Bernstein sent a letter dated August 1, 2013, to the attorneys for the mortgage holder offering to purchase the mortgage for $225,000 and otherwise threatening litigation, and deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the activities of Eisenberg and how precisely Mount Carmel Equities, LLC ("Mount Carmel") came to acquire the Mortgage.

7.      Deny.

8.      Deny, except admit (with correction) that in November 2013, the State of New York approved a constitutional amendment that would legalize casino gambling in certain areas and thereby permit the potential expansion of casinos in the area of the Thompson Land.

9.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Camp has been the chief financial officer of Cinium Financial Services Corporation since July 2011.

1993747

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that JC Real Estate Fund I, LLC ("JC REF") owns a 5.85% interest in RH Land.

11.     Admit, except deny that Berman is currently the Chief Executive Officer of Cinium, since he was wrongfully terminated through the actions and false allegations of Camp and others.

12.     Admit, with the correction that Robert Wong served as President of UHNIC from November 2010 to March 2013, and Chief Operating Officer of Cinium from January 2011 to July 2011 and again from June 2012 to March 2013..

13.     Admit, except deny that Avon Rock Hill is headquartered in Monticello, New York.

14.     Deny, except admit that Plaintiffs have alleged diversity of citizenship.

15.     Admit.

16.     Admit.

17.     Admit that there is personal jurisdiction over Avon Rock Hill, but deny that it is a New York company.

18.     Admit insofar as what is alleged.

19.     Admit, except deny that RH Land was created in April 2005.

20.     Admit, with the clarification that the obligation of Bear Stearns, with which it did not comply, was to lend up to $5.8 million.

21.     Admit.

3

22.     Deny, except admit that the Amended Operating Agreement named KF Rock Hill, LLC, through its member Scott Kaniewski, as the managing member in charge of the day-to-day affairs of RH Land.

23.     Deny.

24.     Admit, with the correction that Kaniewski was President of UHNIC from 2006 to 2008 and Berman succeeded him as President until sometime in 2010, Wong was corporate secretary of UHNIC from 2007 to 2010, and Wong was Cinium's Chief Operating Officer from January 2011 to July 2011 and from June 2012 to March 2013.

25.     Admit.

26.     Admit.

27.     Deny, except admit that Kaniewski transferred his interest to Berman in 2008.

28.     Deny, except admit that AMS Capital Holdings Corp. made a deposit of $2.75 million pursuant to an agreement to purchase Upper Hudson.

29.     Deny, except admit that Upper Hudson terminated the agreement with Miller after he defaulted.

30.     Deny, except admit that Upper Hudson did not return the remainder of Miller's payment and aver that it was originally booked as a contingent liability pending closing of the transaction and then, after Miller's conviction, it was converted to a long-term capital gain pursuant to the advice of the tax accountant.

31.     Deny, except admit that the letter was sent with the language quoted.

32.     Deny.

1993747

33.     Deny, except admit that by a Transfer, Loan Assignment and Indemnification Agreement effective August 27, 2008, all interests of Scott A. Kaniewski, Stacey B. Kaniewski, and the Kaniewski Family Limited Partnership in RH Land and numerous other companies were assigned to Berman and respectfully refer to that agreement for its terms.

34.     Deny, except admit that between April 2008 and December 31, 2009, UHNIC purchased a 16.87% membership interest in RH Land from Avon Rock Hill that, with subsequent capital calls, culminated in a total of $1,024,035 being invested in that period.

35.     Deny, except admit that Glen Wild did not repay the $4.6 million principal of the Mortgage by the extended maturity date of October 1, 2009, and aver that the mortgagee had previously defaulted on its commitment under the loan to provide an additional $1.2 million in funds to be drawn by Glen Wild under the loan documents.

36.     Deny, except admit that Alston & Bird notified Glen Wild of the Mortgage default by letter dated October 9, 2009, and deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the amount of additional letters.

37.     Deny, except admit that Avon Rock Hill sold an additional portion of its interest in RH Land to JC REF, that Camp loaned money to Upper Hudson in 2009 in the form of a senior secured Note with one-year maturity, and that Camp was not then an officer of Upper Hudson.

38.     Deny, except admit that in March 2010, Camp decided to convert his Cinium debt into equity, and aver that Camp was involved in trying to raise capital for Upper Hudson, opened and ran its Miami office, and developed a business segment related to what is known as commercial (as opposed to contract) surety.

5

39.     Deny, except admit that in October 2009, Berman and Camp discussed the latter investing in RH Land, aver that Camp approached Berman about using Upper Hudson as an anchor to raise money for his private investment funds, and admit that Wong e-mailed to Camp six documents relating to RH Land on February 9, 2010.

40.     Deny, except admit that JC REF purchased a 5.85% interest in RH Land from Avon Rock Hill for $500,000, and respectfully refer to the Agreement of Transfer of Membership Interest that is Exhibit A for its terms.

41.     Admit.

42.     Admit, and aver that Eisenberg's options to purchase interests in RH Land expired no later than December 25, 2011.

43.     Admit.

44.     Admit, except deny that by 2013 RH Land was negotiating term sheets.

45.     Admit.

46.     Deny, and aver that Berman informed Camp by Brosix internal Cinium communication at 10:23 a.m. on July 9, 2013, that, "the lender is going to commence a sale of the note through CBRE," and this communication was immediately forwarded by Camp at 10:27 a.m. to Emily Asen with a copy to Joel Asen.

47.     Deny.

48.     Admit that the letter was sent, respectfully refer to the letter for its terms, and deny that the letter was sent without informing Plaintiffs.

49.     Deny, except deny knowledge or information sufficient to form a belief as to the allegations concerning what precisely Eisenberg did, and aver that Eisenberg's options to invest in RH Land expired no later than December 25, 2011.

1993747

50.    Admit.

51.    Deny, except admit that an audit committee of Cinium was formed that purported to investigate Berman's financial activities.

52.    Deny, except aver that Berman informed the committee that Wong was the custodian and had access to documents pertaining to RH Land and its business plans.

53.    Deny, and aver as an example of plaintiff's knowledge that the mortgage was considered in default that Berman forwarded to Camp in an e-mail on February 15, 2011, more than two years before Camp's alleged first knowledge of the default, an e-mail from the lender with a "Draft of the Forebearance Agreement with respect to the RH Land transaction."

54.    Deny, and aver that Camp should know, as a sophisticated business person and Chartered Financial Analyst, that RH Land's K1s do not show the actual amounts contributed.

55.    Admit that the 2009 tax return provides the information about the capital accounts of the partners of RH Land under tax accounting principles, and aver that it does not show what capital contributions were made.

56.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

57.    Repeat and reallege their responses to paragraphs 1 through 56 above as if fully set forth herein.

58.    Deny.

59.    Deny.

60.    Deny.

61.    Deny.

62.     Deny.

63.     Deny.

64.     Repeat and reallege their responses to paragraphs 1 through 63 above as if fully set forth herein.

65.     Deny, but admit that Avon Rock Hill is the managing member of RH Land.

66.     Deny, but admit that the quoted language is in the RH Land Operating Agreement.

67.     Deny.

68.     Deny.


**AFFIRMATIVE DEFENSES**

69.     The claims are barred in whole or in part by one or more of the doctrines of acquiescence, estoppel, and laches.

70.     Plaintiffs' fraud claim must be dismissed because Plaintiffs as sophisticated investors cannot allege or prove the element of reasonable reliance.

71.     Any alleged damages claimed to be owed by defendant Robert Berman are offset by the damage Plaintiffs and Counterclaim Defendants have caused and are continuing to cause Berman by reason of their wrongful conduct as set forth in the counterclaims herein.

1993747

**COUNTERCLAIMS OF ROBERT BERMAN FOR
(A) BREACH OF EMPLOYMENT AGREEMENT AGAINST CINIUM, AND
(B) TORTIOUS INTEFERENCE WITH BERMAN'S EMPLOYMENT AGREEMENT
AGAINST CAMP, ASEN, MICHIGAMI, ROBERTS, AND BDO USA, LLP**

1.     Plaintiff Camp and the Cinium directors who are Additional Defendants on the
Counterclaims conspired to seize control of Cinium and the stock held by its largest shareholder
by trumping up charges against Berman of misappropriating company property and purporting to
terminate his employment by Cinium for "cause."  None of the accusations against Berman are
true, and none would, in any event, meet the standard for misappropriation of corporate assets.

2.     Cinium's auditor, the BDO USA, LLP accounting firm, played a crucial role in
the scheme by misrepresenting what it was aware of from prior audits and by lending the
credibility of a purportedly independent -- but in fact utterly partisan -- auditor to the lies
generated by the other additional defendants on the counterclaims.  The accounting firm
presented what it later characterized as a preliminary report to the State agency charged with
regulating Cinium in an attempt to obtain the agency's imprimatur on the scheme to force out
Berman.  The accounting firm later withdrew the report and withdrew from the representation,
but not before serious harm had been done.   After quickly compensating the accounting firm for
its hatchet job, Camp and the other Cinium directors relied heavily on its report to validate their
decision to terminate Berman's employment.

3.     Cinium's breach of its Employment Agreement with Berman was without cause
or justification, and the actions of the counterclaim defendants were not motivated by any desire
to conduct an objective investigation on behalf of the corporation.  Those actions were instead
the culmination of a premeditated, malicious, self-interested grab for corporate assets and
control.

**Parties and Jurisdiction**

4.      Counterclaim plaintiff Robert Berman ("Berman") is an individual residing in New Hope, Pennsylvania.  Avon Road Partners, L.P., a New York Limited partnership of which Berman is General Partner, wholly owns Avon Road Rock Hill, LLC ("Avon Rock Hill") and owns 60% of the voting common shares and 45% of the outstanding common shares of Cinium Financial Services Corporation.

5.      Counterclaim defendant Jeffrey Camp ("Camp") is an individual residing in Miami, Florida.  He has been the Chief Financial Officer of Cinium Financial Services Corporation since July 2011, a member of Cinium's board of directors since its formation in January 2011, and was voted Chief Executive Officer at an October 25, 2013, board meeting.

6.      Additional defendant on the counterclaims Cinium Financial Services Corporation ("Cinium") is a privately held corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters at all relevant times in Rock Hill, New York.

7.      Upon information and belief, additional defendant on the counterclaims Joel Asen ("Asen") is an individual residing in Fairfield, Connecticut, who has been a director of Cinium since January 2012.

8.      Upon information and belief, additional defendant on the counterclaims James Roberts ("Roberts") is an individual residing in Fairfield, Connecticut, who is the Senior Vice President, Corporate Chief Underwriting Officer, of the Tower Group Companies and regularly works in its office at 120 Broadway, New York, New York.  Roberts has been a director of Cinium since June 2012.

1993747

9.     Upon information and belief, additional defendant on the counterclaims Michael Michigami is an individual residing in Greenwich, Connecticut, who has been a director of Cinium since February 2012.

10.     Upon information and belief, additional defendant on the counterclaims BDO USA, LLP ("BDO") is a Delaware limited liability partnership with its principal place of business at 100 Park Avenue, New York, New York.

11.     The tortious acts alleged herein were committed within the State of New York and were intended to and did have impact in New York.  With respect to any non-resident additional defendant on the counterclaims, and to the extent that tortious acts were committed outside New York, each of those persons does business in New York, intended and should reasonably expect the acts to have consequences in the state, and derives substantial revenue from interstate or international commerce.

12.     This Court has subject matter jurisdiction over the counterclaims pursuant to Fed. R. Civ. P. 13 as permissive or compulsory counterclaims.

**Cinium, UHNIC, and the Tower Group's Acquisition of an Interest in Them**

13.     Cinium was formed as of January 7, 2011, and merged on January 29, 2011, with Upper Hudson Holdings, LLC ("Upper Hudson").  Cinium then became a holding company for various subsidiaries of Upper Hudson engaged in the ownership, operation, and development of insurance and related activities that provide specialty insurance, financing, and working capital to small business clients.

14.     One of Cinium's principal subsidiaries from the merger with Upper Hudson is Upper Hudson National Insurance Company ("UHNIC"), which was acquired by Upper Hudson in 2006.  UHNIC is a New York insurance company that conducts a commercial insurance and

surety business as a property & casualty insurance carrier licensed and admitted in 16 states, including New York.

15.     UHNIC is authorized to issue a vast range of insurance products, including Surety and Fidelity, Fire, Property, Casualty, Worker's Compensation, Employers' Liability, Marine and Inland Marine, and Legal Services Insurance.  Its primary business is issuing surety bonds to contractors of construction projects where a surety bond is a requirement for the contractor to secure the work.

16.     Cinium and UHNIC are regulated by New York State's Department of Financial Services ("DFS").  The DFS must approve the "controlling person" of such entities, and Berman is the only person who has been formally approved as a "controlling person" of Cinium and UHNIC.

17.     UNHIC also acts as reinsurer for Tower Insurance Company of New York and its affiliate, CastlePoint Insurance Company ("CastlePoint"), which provide a specialty surety market in 50 states for all of Cinium's ancillary financial products and administrative services.

18.     CastlePoint and Cinium are parties to a $7 million convertible Senior Note issued on June 14, 2012, in accordance with a Note Purchase Agreement dated May 15, 2012.

19.     CastlePoint, Cinium and all of the shareholders of Cinium are also parties to a June 14, 2012, Securityholders' Agreement among Cinium Financial Services Corporation, CastlePoint Insurance Company, and the Stockholders of the Company Named on the Signature Pages Hereof ("Cinium Securityholders' Agreement").

20.     Under the Cinium Securityholders' Agreement, the number of directors of Cinium is fixed at six.  CastlePoint has the right to designate one of the six directors, and numerous actions specified in Schedule A of the Cinium Securityholders' Agreement require the vote of

the director appointed by CastlePoint, which effectively gives CastlePoint a right to block those actions.  In June 2012 CastlePoint appointed Roberts as its designated director on the Cinium board.

21.     The other five current directors of Cinium are Asen, Berman, Camp, Michigami, and Dennis Vacco, formerly Attorney General of the State of New York (1995-1998) and U.S. Attorney for the Western District of New York (1988-1993).

22.     CastlePoint moved to solidify its control over the board by buying all of Camp's preferred and common shares in Cinium on August 23, 2013, for the nominal sum of $100. Inasmuch as Camp paid $3 million for that investment in 2010, it is obvious that other consideration for the purchase of the shares occurred.  Requests of Camp, Roberts, and Tower to disclose all side deals to that stock purchase and to BDO as auditor to investigate the transaction have been refused.

23.     As a result of CastlePoint's blocking rights under the Cinium Securityholders' Agreement, and the agreement of Cinium directors Asen, Camp, Michigami and Roberts to work together with CastlePoint as a control group, it has effectively controlled Cinium and UHNIC, notwithstanding Avon Road Partners, L.P.'s ownership of 60% of the voting shares of Cinium and the fact that the DFS has not approved CastlePoint as a control group as required by New York Insurance Law.

**Berman's Employment and Wrongful Termination by Cinium**

24.     Berman was employed by Upper Hudson and subsequently by Cinium as Chief Executive Officer.  On June 14, 2012, the same day that the parties executed the Securityholders' Agreement, Cinium entered into an Employment Agreement with Berman for an "Initial Term" to continue until July 1, 2018.

13

25.     Pursuant to Section 5 of the Employment Agreement, Berman's employment was terminable only upon his death or disability, termination by him at will after the end of the Initial Term, in the Event of a defined Change in Control, or for "Cause."  Section 5(b), which is the provision for "Termination for Cause," provides as follows:

> Termination for Cause. At any time during the Term of this Agreement, the Company shall have the right and power to immediately terminate the Executive's employment under this Agreement, for "Cause", which is defined to include only the following: Executive's conviction of any felony or any other crime involving fraud, misrepresentation or theft; or misappropriation or embezzlement of the Company's funds, assets or property.

26.     At a meeting on October 25, 2013, Cinium's Board of Directors terminated Berman's employment for cause "immediately" pursuant to paragraph 5(b) of the Employment Contact based on its conclusion that Berman "misappropriated Cinium's funds and assets."  At the same meeting, the board elected Camp Chief Executive Officer.  Implementation of the decision was delayed by litigation in Delaware Chancery Court.  Camp informed Berman in a letter dated March 7, 2014, however, that the termination of his employment was effective March 7, 2014.

27.     The meeting of the Cinium Board of Directors referenced in Camp's letter was held at Tower's Offices in New York City.  Present were directors Camp, Asen, Roberts, Michigami, and John Crowe, an attorney who is corporate secretary.

28.     According to the transcript of the board meeting, the alleged misappropriation consisted of "the failure to disclose the mortgage, the failure to disclose the recourse nature of the mortgage, the self-dealing transactions on or around the mortgage going into default, the valuation implied by those transactions all are tantamount to a misappropriation of funds on the part of Mr. Berman from the company."

14

29.     None of the accusations are true and none, even if true, constitutes "misappropriation or embezzlement of the Company's funds, assets or property."

30.     The "mortgage" referred to is presumably a loan agreement dated December 23, 2005, between Glen Wild and Bear Stearns Commercial Mortgage, Inc.  ("Bear Stearns") that required the latter to lend $5.8 million.  Only $4.6 million was in fact lent to Glen Wild before Bear Stearns collapsed in March 2008, after which Bear Stearns defaulted by failing to perform and fund the balance of the mortgage loan commitment.

31.     Upon the demise of Bear Stearns, the mortgage was assigned by the Federal Reserve as a so-called "toxic" asset to Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 ("Maiden Lane"), despite the fact that Glen Wild was not in default under the mortgage.

32.     As a result of the transfer of the mortgage to Maiden Lane, Glen Wild had no mortgagee with which to deal for quite some time.  Ultimately, Maiden Lane advised Glen Wild that Maiden Lane would not honor the obligation of Bear Stearns to fund an additional $1.2 million, which constituted a default by Maiden Lane as the then mortgagee.  That and other defenses will preclude the mortgagee from foreclosing on the property notwithstanding the fact that Glen Wild has not paid off the loan.

33.     The mortgage was again assigned in August 2013, and in March 2014 the entity claiming to be the current mortgagee, Mount Carmel Equities, LLC, commenced a foreclosure proceeding against Glen Wild in the Supreme Court of the State of New York, Sullivan County.

34.     Jeff Camp and Cinium's auditor, BDO, have known or could with any reasonable inquiry have known of the loan, defaults alleged by the mortgagee, the plan of the prior

mortgagee to sell it, and any other relevant information concerning the mortgage at all relevant times.

35.     An example of blatantly false accusations made against Berman is Camp's statement at the October 25, 2013, board meeting that he was never informed by Berman that the mortgage was being put up for sale.  That accusation is refuted by documentary evidence that on July 9, 2013, Camp sent an email to Asen forwarding within five minutes Berman's e-mail of the same day in which Berman informed Camp that "the lender is going to commence a sale of the note through CBRE."  Berman also stated in the e-mail Camp forwarded to Asen that "[a]ny buyer would have to deal with us and the counterclaims."  Camp and Asen are experienced investors and businesspeople.  Nevertheless, at the Cinium board meeting on October 25 2013, they denied having had such prior knowledge.  Moreover, Camp and Asen misrepresented to the DFS and Cinium's auditor BDO that they did not know there was a mortgage on the RH Land property. Camp also misrepresented to the DFS and BDO that the mortgage was recourse to UHNIC.

36.     In addition to the fact that the allegations against Berman are false, the existence of facts surrounding the mortgage and certain directors' or auditor's knowledge or lack thereof does not constitute "misappropriation or embezzlement of the Company's funds, assets or property" by Berman.

37.     The actual motion passed by the board at the October 25, 2013, was "that the board announce a determination that Robert Berman's actions with respect to RH Land and UHNIC represent a misappropriation of the company's property and assets."  This presumably refers to a transaction on April 2, 2008 -- more than 2 ½ years before Cinium existed and more than four years before Berman's Employment Agreement was signed -- in which UHNIC, then

wholly owned by Upper Hudson, bought from Avon Rock Hill a 15.674% interest in RH Land for $750,000.

38.     The company that bought the interest from Avon Rock Hill was not Cinium, but UHNIC, which was not acquired by Cinium until years later, in January 2011, when Cinium was formed and merged with Upper Hudson.  Further, at the time of the transaction in April 2008, all of the shareholders of Upper Hudson approved the transaction and none of the parties to this litigation had any ownership interest in Upper Hudson.

39.     The purchase price of $750,000 was based on Avon Rock Hill's actual capital contributions to RH Land.  In addition, UHNIC acquired priority 9% accruals on the Avon Rock Hill capital account transferred to UHNIC.  Camp asserted at the October 25, 2013, board meeting that the UHNIC purchase price "gave an implied equity value [of RH Land] at the time of that transaction of $4.8 million" and accused Berman of selling UHNIC "a bunch of worthless real estate."

40.     In fact, on March 14, 2008, Berman met with representatives of the DFS and informed them of the proposed transaction.  Integra Realty Resources – New York, a Certified General Real Estate Appraiser engaged by Bear Stearns, had assessed the market value of the undeveloped property as of March 18, 2008 -- just two weeks before the Avon Rock Hill/UHNIC transaction -- at $9.6 million.  That was $5 million more than the then mortgage balance of $4.6 million that had been funded by Bear Stearns, which would give an implied equity value for RH Land of no less than $5 million above the $4.6 million mortgage balance.  At that time, the mortgage was fully performing and interest payments were current.  The independent appraiser commissioned by Bear Stearns found that with certain approvals that were then in the process of

being completed, the land's appraised value was $11.3 million – an implied equity value for RH Land of at least $6.7 million above the mortgage balance.

41.     As of the April 2, 2008, date of the transaction between UHNIC and Avon Rock Hill, Avon Road Partners, L.P. owned 80% of Upper Hudson, with VDACK, LLC, a company owned by Dennis Vacco, owning 5%, and Scott Kaniewski directly or indirectly owning the remaining 15% of Upper Hudson.  Avon Road Partners, L.P. then owned 100% of Avon Rock Hill, which at the time owned 70% of RH Land.

42.     The transaction was considered an advantageous deal for both entities, and was approved by the shareholders of both companies. As such, it was not and could not have possibly been a "misappropriation or embezzlement of the Company's funds, assets or property." Moreover, there is no connection between the Avon Rock Hill/UHNIC transaction and the default in the mortgage more than 1-1/2 years later.

43.     Finally, the sale to Upper Hudson long before Cinium even existed could not constitute "misappropriation or embezzlement of the Company's funds, assets or property."

44.     Berman has not misstated the assets of Cinium to its auditor, investors, or anyone else.  All relevant persons, including but not limited to Camp and Cinium's auditor at BDO, John Green, have been aware of the debt of RH Land, including from K-1's distributed to the members and filed with RH Land's tax returns for a number of years, that it was assigned as a so-called "toxic asset" – notwithstanding the fact that it was in good standing and had valuable property as collateral – after the collapse of Bear Stearns, that Bear Stearns failed to provide all the funds it was required to provide, that Maiden Lane declared the agreement to be in default, and that Maiden Lane decided to sell the mortgage, as those events have occurred or at least when disclosure would have been considered required.  Furthermore, even if there had been a

18

failure to make necessary disclosures, any inadequacies in such disclosures would not constitute "misappropriation or embezzlement of the Company's funds, assets or property."

45.     In sum, there has been no "misappropriation or embezzlement of the Company's funds, assets or property" by Berman.  The termination of his employment therefore constituted a breach of the Employment Agreement by Cinium.

46.     Moreover, the termination was not the result of a good-faith mistake as to the facts.  To the contrary, the reasons stated at the October 25, 2013, board meeting for terminating Berman's employment were all pretexts to cover for the plan of Camp and other self-interested directors to seize control and ownership of Cinium for their own benefit.

**Tortious Interference by Camp, Asen, Roberts, Michigami, and BDO
with Berman's Employment Agreement with Cinium**

47.     As more fully set forth below, Camp, Asen, Roberts, and Michigami interfered with and caused Cinium to breach Berman's Employment Agreement through a deliberate, thought-out plan to get rid of Berman so that they and CastlePoint could take control of Cinium and force the transfer of stock in Cinium held by Berman's family or others connected with him.

48.     The four directors solicited information from Scott Kaniewski, a former Berman colleague, to use against Berman and obtained the valuable assistance of BDO auditor John Green, who was required to be independent but in fact actively assisted the counterclaim defendants to fabricate and disseminate information about Berman that they knew was false or for which they acted in reckless disregard of the information's truth or falsity.

49.     In 2011 and continuing into 2012, defendant Robert Wong ("Wong"), who was then President of UHNIC and COO of Cinium, became aware of Camp's desire to take control of Cinium from Berman.  Camp tried to enlist Wong in this endeavor, but Wong declined the overture and advised Berman of it.

19

50.     Understanding that Camp was deliberately trying to undermine Berman with other staff members at Cinium and that resistance to those tactics was making his working conditions increasingly difficult, Wong decided in November 2012 to resign as President of UHNIC to try to avoid the nastiness that would follow Camp's plan to take control of Cinium.  Wong agreed to remain as President of UHNIC until March 2013 in order to have a smooth transition of the insurance carrier.

51.     On June 1, 2013, Camp forwarded an internal, board member communication to his ex-wife, noting to her that the email was setting the stage for Camp to fire Berman in three years: "This isn't directed at me - it [sic] from Joel and to Robert and is setting the eventual firing of Robert by me in 3 yrs. this is the PG version."

52.     Also in June 2013, Camp advised Asen that upon the termination of Berman's Employment Agreement, the Cinium Securityholders' Agreement provided a formula under which Avon Road Partners, L.P.'s interests in Cinium could be redeemed at the election of Cinium without any payment to Avon Road Partners, L.P. -- with the result that the equity interests of the other shareholders in Cinium would increase pro rata by approximately 45%, an amount equivalent to Avon Road Partners, L.P.'s interest in Cinium that would be redeemed. The purchase price for Avon Road Partners, L.P.'s shares upon such election to redeem all of its shares would be zero, notwithstanding its original investment of $10 million, based on a formula in the Cinium Securityholders' Agreement.

53.     CastlePoint would only be able to share in this benefit if it first converted its Senior Note to equity prior to the time the Avon Road Partners, L.P. shares were redeemed. CastlePoint did indeed apply to the DFS to take control of Cinium by converting the Senior Note in a "Form A" submitted on August 29, 2013, thirteen (13) years ahead of the maturity date for

20

conversion.  Upon such conversion, CastlePoint's Senior Note would have been terminated and its newly acquired equity interests in Cinium would have been subordinated to third party liabilities and the interests of preferred shareholders.  Therefore, the principal reason CastlePoint would want to convert and dilute its senior position in the capital structure of Cinium would be to share the spoils of the redemption of Avon Road Partners, L.P.'s 45% interest in Cinium. With the Form A submission on August 29, 2013, CastlePoint submitted a "Supplemental Information" PowerPoint presentation that contained false allegations of criminal conduct against Berman and stated that the sole purpose of the Form A submission to take control by converting its debt to equity was to terminate Berman as CEO and install Camp in his place. The result of such termination would be an increase in the equity interests of CastlePoint post-conversion due to Cinium's right under the Cinium Securityholders' Agreement to redeem a terminated employee's shares upon such termination.

54.     Camp accelerated his timetable in June 2013 and concocted a scheme with the other directors to undermine Berman's authority and to terminate Berman as CEO so that Camp could take his place as soon as possible.   In early July 2013, he distributed to Asen a presentation they called the "TIME LINE ACTION PLAN."  It was a plan to get rid of Berman and have Cinium redeem Avon Road Partners, L.P.'s shares for no compensation that Camp, together with the other three aligned board members, proceeded to implement with the assistance of Cinium's auditor, John Green of BDO, and Scott Kaniewski.

55.     The TIME LINE ACTION PLAN included a chart with a schedule of events that started with initiation of an investigation of Berman by the Audit Committee (i.e., by interested directors Asen and Roberts) starting in mid-July 2013 with an anticipated, predetermined outcome that the board would terminate Berman's Employment Agreement by Labor Day 2013.

Litigation among the parties in the Delaware Chancery Court that began in August 2013, however, delayed consummation of the TIME LINE ACTION PLAN beyond the originally planned completion date of Labor Day 2013.



56.     In July 2013, Camp also circulated to the three other directors a "Cinium Restructuring Plan" in which the offices and remaining staff members would all be moved to Miami, Florida, where he lives.

57.     Additional TIME LINE ACTION PLAN documents reveal that upon the redemption of Avon Road Partners, L.P.'s interests in Cinium, Camp, Asen, and Michigami would benefit from the redemption of Avon Road Partners, L.P.'s shares, as their respective percentage interests in Cinium would be increased pro rata by Avon Road Partners, L.P.'s redeemed interest.

58.     In July 2013, following the TIME LINE ACTION PLAN, Asen and Roberts, as members of Cinium's Audit Committee, working closely with Camp as CFO, proceeded to try to

1993747

unearth anything that might possibly be perceived to discredit Berman within the company and with its auditor and the DFS.  The degree of desperation in this attempt and the extent to which any sense of proportion was thrown out the window is revealed in an e-mail Camp sent Asen with a copy to Roberts on August 31, 2013:  "I pretty much want to know if anyone so much a[s] got a glass of water at the house of someone's cousin who worked at a company for a day in which someone who owned just one share of [Cinium] had even a fleeting interest."

59.     The TIME LINE ACTION PLAN's *predetermined outcome* of ousting Berman for cause from inception of the plan in July 2013 predated commencement of the Audit Committee investigation against Berman. The Audit Committee would simply go through the motions to arrive at Berman's eventual condemnation by the board.  The "Supplemental Information" submitted to the DFS with CastlePoint's Form A application on August 29, 2013, included charges against Berman by the Cinium Audit Committee before its investigation moved forward.  Berman was not informed by the committee that it had lodged any charges against him with the DFS, nor was this action submitted for Cinium Board review or approval.

60.     The scheme also involved enlisting John Green of BDO, the company's auditor, in fabricating charges of misappropriation against Berman and an attempt, with the greater credibility than self-interested directors of what should have been but was not an independent auditor, to persuade the DFS to withdraw its approval of Berman as a "controlling person" of Cinium and UHNIC.  If the DFS could be persuaded to take action, that would, of course, make the actions at the October 25, 2013, meeting of the Cinium Board of Directors seem to merely follow what its auditor insisted on and DFS required.

61.     BDO prepared a report to the Audit Committee dated October 17, 2013, that it presented to and discussed with the DFS before it was final and before it had been presented to

23

Cinium's board and Chief Executive Officer.  Prior to the issuance of the BDO report, Camp and members of the Audit Committee discussed with John Green what his report should contain. In addition, on October 11, 2013, less than a week before BDO issued the report, Camp authorized a Cinium payment to BDO of $110,000 within 47 minutes of John Green's email request. BDO's e-mail to Camp enclosing the e-mail stated:  "Given the circumstances, we need to have this invoice [for $100,000] paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work. There are wire instructions on the invoice for your convenience."

62.     The individual in charge of the Cinium audit, John Green, had recently moved to BDO from Marcum LLP, which had performed the Cinium and UHNIC audits for 2010 and 2011.  He was therefore well aware of issues concerning RH Land and, specifically, concerning the status of the loan agreement for its real estate asset.

63.     The BDO report contained numerous false accusations that Berman had concealed matters that BDO – especially by virtue of the fact that its audit partner John Green had performed previously audits of Cinium – knew to be false or, acting with reasonable professional diligence, would have known to be false or unsupported.

64.     Worse, BDO threatened before the DFS and to Cinium to withdraw prior audit opinions and to withdraw as auditor unless Berman was removed as an officer and director of Cinium.  In other words, BDO told the DFS and Cinium's board that it had to get rid of Berman or get rid of the auditor.

65.     As this indicates, Camp, Asen, and Roberts attempted to have BDO do their dirty work and persuade the DFS to take action against Berman that they could then claim to rely on at the October 25, 2013, board meeting.

66.     Messrs. Berman and Vacco both responded to the October 17, 2013, BDO report and pointed out to John Green its numerous false statements and failure to investigate with professional diligence.  Mr. Berman's letter dated October 29, 2013, and Mr. Vacco's letter dated November 6, 2013, are attached hereto as Exhibits A and B, respectively.

67.     Among the false statements in the BDO report pointed about by Mr. Vacco, a former New York State Attorney General and former United States Attorney for the Western District of New York, was BDO's assertion that

> [t]he existence of an asset forfeiture proceeding against the Company and certain officers and directors by the Federal Government that commenced in 2008 was not previously disclosed to the auditors.  At a minimum, the circumstances of this matter require disclosure in the financial statements. We do not have sufficient information to conclude on the current the status of this matter including whether the statute of limitations has run.

Mr. Vacco noted in his letter that he had already pointed out to BDO in a lengthy telephone conversation with Mr. Green that no such asset forfeiture proceeding ever existed and that his law firm had shared with the Audit Committee and the corporation's counsel on July 12, 2013, a legal memorandum concluding that the statute of limitations had expired on any such claim.

68.     Among the false statements refuted by Berman were BDO's statements concerning the mortgage on the asset of RH Land that

> [t]he existence of the mortgage alone, for amounts that exceed the equity of RH Land Development LLC, requires this investment to be a non-admitted asset for regulatory purposes, which means it has no value. The value for GAAP purposes at this time is also zero because the Company has failed to provide the appropriate supporting documentation to justify the carrying value at anything else but zero. The question as to whether the mortgage is recourse to UNIC [sic] has not been answered.

69.     As to the first point, Berman pointed out to John Green of BDO that

> Management has provided to you (during Marcum's audit of the 2010 financial statements) a copy of the appraisal by Integra Realty Resources dated March 18, 2008 performed for and addressed to Bear Stearns Commercial Mortgage, Inc., the then existing lender on RHLD's project. The market value cited

in that appraisal exceeded the combined basis of the mortgage and the total equity invested— appraised value of $11.3 million against a combined cost basis in RHLD to date of $10.8 million, which <u>includes</u> the $4.6 million mortgage.

As was stated in the management representation letters to you and Marcum for the 2010 and 2011 audits of Cinium and its predecessor, Upper Hudson Holdings LLC ("UHH"),

*"29. Real estate held for investment has been recorded at cost, which we believe is less than the fair value of the property based on a formal appraisal obtained in 2008. Because of market conditions, there is uncertainty as to the amount the Company would realize if the Company were required to sell the asset in the near future. We believe that the investment will ultimately be sold for an amount that exceeds book value."*

70.    As to the second point, Berman pointed out that Green had previously been advised that the loan on the Glen Wild property was recourse to RH Land but not to the members of RH Land – i.e., not to UHNIC.  Berman's attorney, Joseph Bernstein, had separately informed Mr. Green of these facts in separate conversations and suggested that Mr. Green review the loan documents, which he apparently chose not to do.

71.    After being confronted by Berman and his attorneys, BDO resigned from its engagement as auditor of Cinium and UHNIC in a letter dated November 5, 2013, and withdrew its 2012 opinion letter for the UHNIC audit.    The reason it gave was "a lack of independence due to these threats of imminent litigation."  It was in fact BDO's lack of independence that engendered the threats of litigation.

72.    BDO's response to the point-by-point refutation of its report by Messrs. Berman and Vacco was to attempt to distance itself from the  report it had submitted to the DFS and Cinium's Audit Committee with the following statement sent to the DFS on November 25, 2013:

As indicated in the presentation materials, its statements reflect "preliminary results of [BDO's] audit procedures," which would have required the performance of additional procedures to confirm prior to issuance of a report. Further, as stated on the face of the presentation, it "was prepared as part of our audit, has consequential limitations, and is

intended solely for the information and use of those charged with
governance (e.g., Board of Directors and Audit Committee) and, if
appropriate, management of the Company and is not intended and shall
not be used by anyone other than those specified parties." At the time of
the Audit Committee meeting, and now with the benefit of additional
information received by BDO, including the information set forth in the
Disagreement Letter, BDO lacks sufficient information to reach final
conclusions with respect to the issues raised in the presentation, and BDO
has not performed the necessary procedures to issue an audit opinion with
respect to the financial statements of the Companies.

73.     The harm from the BDO report had already, however, been done, and Camp,

Asen, Roberts, and Michigami proceeded to bring their plan to fruition at the October 25, 2013,

board meeting that proceeded inexorably to a vote to terminate Berman's employment  with

carefully scripted questions, statements, and findings by the attending board members.  For the

first time, a Cinium board meeting was transcribed.

74.     The directors voting at the October 25, 2013, board meeting emphasized many

times the extent to which they were relying on Cinium's "independent" auditor (BDO).  By

providing the board's self-interested directors with the appearance of legitimate accusation by a

supposedly independent auditor, BDO deliberately made itself an essential element of the

wrongful termination of Berman's employment.

**The Unlawful Plan to Seize the Cinium Stock of Avon Road Rock Hill**

75.     In furtherance of their scheme to use Berman's firing to seize Cinium stock,

Camp, Asen, Roberts, and Michigami have called a meeting of the Board of Directors of Cinium

for April 27, 2014.  The principal items on the distributed agenda are "review of [Cinium]

Capital Structure" and "Authorization for Stock Repurchase Pursuant to Securityholders'

Agreement After the Termination of Robert Berman's Employment by Cinium."

76.     Cinium has no right under the Cinium Securityholders' Agreement to repurchase

stock held by Avon Road Partners, L.P.  That is clear in its explicit language, and Cinium, Camp,

27

Asen, Roberts, and Michigami have been warned by letter from Berman's counsel to counsel for Cinium and for Camp, Asen, and Roberts that the actions they intend have no legal basis.

77.    Section 6(a) of the Cinium Securityholders' Agreement gives Cinium a "Company Call Right" as follows:

> (a) <u>Right to Purchase</u>. Upon the termination of any Employee Stockholder's employment by the Company or its Subsidiaries for any reason, including as a result of the death or Disability of such Employee Stockholder, or for cause or without cause, or as a result of a voluntary resignation by such Employee Stockholder, the Company may elect to repurchase all or any portion of the Stock held by such Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees for the "<u>Employee Termination Price</u>" which will be determined and applied as set forth in Section 6(d) below.

78.    Pursuant to that provision, Cinium can purchase the stock of a terminated "Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees." Neither entity in which Berman has an interest that is a Stockholder of Cinium, -- that is, neither Avon Road Partners, L.P., nor the Robert A. Berman Family Trust -- is an "Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees."

79.    Berman was not an Employee Stockholder of Cinium, because he has never been a Stockholder of Cinium.

80.    Non-Investor Stockholders are defined in the preamble as the Stockholders of the Company named on the signature page of the Securityholders' Agreement and any other persons who become Stockholders and party to the Agreement. Berman is not one of the Non-Investor Stockholders named on the signature page. The inclusion of the Robert A. Berman Family Trust and of Avon Road Partners, L.P., of which Berman is a General Partner, does not include Berman as an individual.

81.     Avon Road Partners, L.P. is not a "Family or Estate-Planning Transferees or

Involuntary Transferees," which is defined in the preamble to the Cinium Securityholders'

Agreement as follows:

> "Family or Estate-Planning Transfer" means, with respect to any Non-
> Investor Stockholder who is a natural person, a transfer[ee] of Stock held
> by such Non-Investor Stockholder (a) to a trust under which the
> distribution of such Stock may be made only to such Non-Investor
> Stockholder and/or Family Members of such Non-Investor Stockholder,
> (b) to a charitable remainder trust, the income from which will be paid to
> such Non-Investor Stockholder during his or her life, (c) to a corporation,
> the stockholders of which are only such Non-Investor Stockholder and/or
> Family Members such Non-Investor Stockholder, (d) to a partnership or
> limited liability company, the partners or members of which are only such
> Non-Investor Stockholder and/or Family Members of such Non-Investor
> Stockholder, or (e) by will or by the laws of interstate succession, to such
> Non-Investor Stockholder's executors, administrators, testamentary
> trustees, legatees or beneficiaries, provided in the case of the foregoing
> clauses (a) – (d) that such Non-Investor Stockholder has sole control of the
> entity referred to. "Family or Estate-Planning Transferee" shall have a
> corresponding meaning.

82.     The definition of a Family or Estate Planning Transferee does not apply to any of

the Stockholders on the Agreement because they are not the transferees of a natural person who

was a Non-Investor Stockholder.  They are not transferees of any Stockholder at all, whether

natural or not, because they are the initial Stockholders, not transferees.

83.     Additionally, Section 6(b) requires that any exercise of an election to purchase

stock pursuant to Section 6(a) be exercised by notice "within 90 days after the termination of such

Employee Stockholder's employment."  Since the Cinium Board terminated Berman's employment

effective immediately on October 25, 2013, the ninety-day period within which it could exercise an

election to purchase his stock – if that were appropriate under Section 6(a) – has expired.

84.     Accordingly, even if Berman had been lawfully terminated as Chief Executive

Officer of Cinium (and, as shown above, he was not), Cinium would still have no right to purchase

the shares of any Stockholder of Cinium as a result of the termination.

**FIRST COUNTERCLAIM**
**(By Berman against Cinium for Breach of the Employment Agreement)**

85.    Berman repeats and realleges paragraphs 1 through 84 above as if fully set forth herein.

86.    By reason of the foregoing, Cinium breached Berman's Employment Agreement.

87.    By reason of the foregoing, Berman has been damaged in an amount not currently ascertainable and to be determined by the trier of fact, and the threatened breach of the Securityholders' Agreement threatens additional and irreparable harm.

**SECOND COUNTERCLAIM**
**(By Berman against Camp, Asen, Roberts, Michigami, and BDO for**
**Tortious Interference with Berman's Employment Agreement)**

88.    Berman repeats and realleges paragraphs 1 through 84 above as if fully set forth herein.

89.    By reason of the foregoing Camp, Asen, Roberts, Michigami, and BDO intentionally interfered with Berman's Employment Agreement and induced Cinium's breach of it.  The individual directors did so with malice, for personal gain or otherwise to serve interests other than those of the corporation.  In doing so they acted outside the scope of any employment or status as directors and through wrongful means.  BDO did so without economic justification and contrary to its professional duties to the corporation.

90.    But for the actions of each of Camp, Asen, Roberts, Michigami and BDO, Cinium would not have breached Berman's Employment Agreement.

91.    By reason of the foregoing, Berman has been damaged in an amount not currently ascertainable and to be determined by the trier of fact; the threatened breach of the Securityholders' Agreement following the wrongful termination threatens irreparable harm.

1993747

WHEREFORE, defendants and counterclaim plaintiff respectfully request that the Court enter judgment as follows:

A.      Dismissing the complaint with prejudice;

B.      Awarding Berman compensatory damages on his counterclaims in an amount to be determined by the trier of fact;

C.      Awarding Berman punitive damages against all counterclaim for their deliberate, malicious, fraudulent scheme against Berman, in an amount to be determined by the trier of fact;

D.      Awarding Berman prejudgment interest on his counterclaims according to law;

E.      Awarding defendants and counterclaim plaintiff their costs and attorneys' fees; and

F.      Awarding defendants and counterclaim plaintiff such other and further relief as may be just and equitable under the circumstances.

## JURY TRIAL DEMAND

Defendants and counterclaim plaintiff demand trial by jury of all issues so triable.

Dated:  April 25, 2014

_____

Kim J. Landsman
Beth Nagalski
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
437 Madison Avenue
New York, NY 10022
Tel: (212) 907-7368

*Attorneys for Defendants and*
*Counterclaim Plaintiff Robert Berman*

31

1993747

# EXHIBIT A

## TRANSFER, LOAN ASSIGNMENT AND INDEMNIFICATION AGREEMENT

This Transfer, Loan Assignment and Indemnification Agreement ("Agreement") effective the 27th day of August, 2008, is made and entered into by and between **Robert A. Berman**, residing at 7611 Fisher Island Drive, Miami, Florida, 33109 ("Berman"), **Avon Road Partners, L.P.**, having an address of 4446 State Route 42, Suite B, Monticello, New York 12701 ("Avon Road") and **Stacey B. Kaniewski**, residing at 2412 Central Park Avenue, Evanston, Illinois 60201 ("Stacey"), **Scott A. Kaniewski**, residing at 2412 Central Park Avenue, Evanston, Illinois 60201 ("Scott"), **KFP Trust**, having an address of 2412 Central Park Avenue, Evanston, Illinois 60201 ("KFP"), and **Kaniewski Family Limited Partnership**, having an address at 2412 Central Park Avenue, Evanston, Illinois 60201 ("KFLP"; "Stacey", "Scott", "KFP" and "KFLP" are hereinafter referred to in the aggregate as "Kaniewski").

**WHEREAS**, Kaniewski and/or some of them are members or partners, as the case may be, or otherwise have or may claim an interest, in Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Vista NMS Holding LLC, and Upper Hudson Holdings, LLC, and

**WHEREAS**, Kaniewski and/or some of them have made loans to Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Cinium Corporation, and Watertone Holdings L.P., and

**WHEREAS**, Berman, individually and/or through entities in which he has an interest, has a membership, stock and/or partnership interest in and to Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Vista NMS Holding LLC, Upper Hudson Holdings, LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Avon Road Partners, L.P., and Cinium Corporation, and

**WHEREAS**, the United States Attorney's Office (hereinafter "USAO") and the Federal Bureau of Investigation in the Middle District of Florida are presently investigating alleged wrongdoings involving Ray Miller, of 6917 Timber Creek Court, Clarksville, Maryland 21029 ("Miller") in connection with actions and/or omissions of Miller in connection with and allegedly on behalf of Upper Hudson Holdings, LLC in which Berman and Kaniewski (and/or some of them) own an interest, and

**WHEREAS**, the USAO has made a demand for the return of $3.8 million in cash from Berman and Kaniewski pursuant to the theory that Miller, over time distributed to Berman and Kaniewski $5.052 million (hereinafter the "Miller Proceeds") which is considered by the USAO to be proceeds of Miller's criminal conduct and therefore subject to forfeiture by the Federal government, and

**WHEREAS,** Berman has had discussions with Kaniewski and has offered for Kaniewski to remain as a member and limited partner, as the case may be, of the entities referred to above while Berman continues to take steps to improve the financial condition of the entities and/or the members and limited partners who have invested in them and to resist and defend against the demands of the USAO as to the Miller Proceeds, and

**WHEREAS,** Kaniewski has decided, after careful consideration, that the costs and benefits in separating themselves from the entities and obtaining the indemnification and release set forth in this Agreement outweighs the costs and benefits of remaining as members and limited partners, as the case may be, of such entities, and

**WHEREAS**, Kaniewski is desirous of transferring their membership and limited partnership interest, as the case may be, in and to Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Vista NMS Holding LLC, and Upper Hudson Holdings, LLC (common

and preferred interests) and to assign to Berman loans made to Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Cinium Corporation and Watertone Holdings, L.P. in exchange for (i) the indemnification by Berman and Avon Road of Kaniewski for all claims, damages, judgments, amounts paid in settlement, lawsuits, costs and/or expenses arising out of the potential forfeiture of the Miller Proceeds, (ii) the indemnification by Berman and Avon Road of Kaniewski for any and all claims, damages, costs and/or expenses arising out of or referable to the debts, obligations and/or liabilities of Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Vista NMS Holding LLC, and Upper Hudson Holdings, LLC which existed prior to the effective date of this Agreement, including liability arising from any guaranties executed by Kaniewski and/or some and/or any of them regardless of when any claim or action with respect to such guaranty arises or is commenced, if such guaranty was executed prior to the effective date of this Agreement, and (iii) the exchange of general releases by and between Berman, Avon Road and Kaniewski (with the sole exception being the indemnification provided as set forth above), and

**WHEREAS**, Berman is willing to accept the transfer of the membership and partnership interests and the assignment of the aforementioned loans in exchange for he and Avon Road providing the indemnifications and exchanging general releases, as aforesaid.

**NOW, THEREFORE,** in consideration of the premises and the sum of One Dollar and 00/100 ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    All of the above "WHEREAS" clauses are incorporated into and made a part of this Agreement, and each of the recitals and agreements therein set forth are agreed to by the parties.

2.      Kaniewski hereby transfers to Berman all of Kaniewski's right, title and interest in and to the following entities: Vista Capital Partners, LLC - 20% Membership Interest; BKB L.L.C.- 25% Membership Interest; Watertone Holdings, L.P. - 10.95% Limited Partnership Interest; BBF Land Holding LLC - 35% Membership Interest; Watermark Communications LLC - 50% Membership Interest; RH Land Development LLC - 20% Membership Interest; Upper Hudson Holdings LLC - 15% Common Membership Interest and Preferred Membership Interest in the principal amount of $1,075,568.00; Vista NMS Holding LLC - 10.2%; Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company) - any and all interest or claimed interest; together with any and all interest and/or other emoluments accrued and/or due and owing in connection with any of the foregoing.

3.      Kaniewski hereby represents to Berman that all of the aforementioned membership and limited partnership interests hereby transferred to Berman pursuant to paragraph 2 of this Agreement are free and clear of all liens, encumbrances, charges, attachments and pledges, other than the interest in Watermark Communications LLC, which is the subject of a pledge to Berkshire Bank, for which Berman and Avon Road jointly indemnify Kaniewski as set forth in paragraph 8 of this Agreement.

4.      Kaniewski hereby assigns to Berman the following loans, together with all accrued interest, any and all late charges and/or other fees or charges due and owing in connection therewith: loans from Scott to Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company) - $496,409.16; loan from Scott to Cinium Corporation - $50,000.00; loan from KFP to Watertone Holdings, L.P. - $59,000.00; loan from KFLP to Watertone Holdings, L.P. - $66,000.00; and loan from KFP to Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company) - $41,000.00. Kaniewski shall provide to Berman any and all original documentation and evidence (promissory notes, etc.) of said loans and the sums due and owing with respect thereto and will make such

notations upon such documentation and execute such other documentation as requested by Berman to confirm the assignment of same to Berman.

5.      Berman and Avon Road hereby jointly defend, indemnify and hold harmless Stacey, Scott, KFP Trust and KFLP from and against for all claims, damages, judgments, amounts paid in settlement, lawsuits, costs and/or expenses arising out of the potential forfeiture of the Miller Proceeds.

6.      Berman and Avon Road hereby jointly defend, indemnify and hold harmless Stacey, Scott, KFP and KFLP from and against any and all claims, demands, investigations, orders, decrees, directions, notices, actions, proceedings, settlements, judgments, verdicts, fines, penalties, costs and expenses (including but not limited to reasonable attorneys' fees and disbursements) arising out of or in connection with any and all debts, obligations and/or liabilities of Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Vista NMS Holding LLC, and Upper Hudson Holdings, LLC which existed prior to the effective date of this Agreement, including  liability arising from any guaranties executed by Kaniewski and/or some and/or any of them regardless of when any claim or action with respect to such guaranty arises or is commenced, if such guaranty was executed prior to the effective date of this Agreement.

7.      By this Agreement, Stacey, Scott, KFP and KFLP hereby resign from any and all positions or offices held by any of them as officers, directors, managers and/or tax matter representatives (where applicable) of Vista Capital Partners, LLC, BKB, L.L.C., Watertone Holdings, L.P., BBF Land Holding LLC, Watermark Communications LLC, RH Land Development LLC, Upper Hudson Holdings, LLC, Vista Development LLC (f/k/a Vista Strategic Advisory, LLC, a Delaware limited liability company), Vista NMS Holding LLC, and Cinium Corporation.

8.      Berman hereby assumes all responsibility, liability and risk of obtaining the required consents and/or approvals (if any) for the transfers by Kaniewski of its membership and limited partnership interests, whichever is applicable, in and to the aforementioned entities, and Berman and Avon Road hereby jointly defend, indemnify and hold harmless Stacey, Scott, KFP Trust and KFLP from and against all claims, damages, judgments, fines, amounts paid in settlement, lawsuits, costs and/or expenses arising out of the transfers by Kaniewski of its membership and limited partnership interests, whichever is applicable, in and to the aforementioned entities.

9.      Subject only to the indemnification provisions of this Agreement and the representations of Kaniewski set forth in paragraph 3 of this Agreement, each party to this Agreement hereby releases and discharges the other and their respective heirs, executors, administrators, successors and assigns from all actions, causes of action, suit, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law, admiralty or equity, which against the other the releasing party, its successors and assigns, ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the effective date of this Agreement.

10.      All prior understandings, agreements, representations and warranties, oral or written, between the parties with respect to the subject matter of this Agreement are merged in this Agreement, which completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this Agreement.

11.      This Agreement may not be modified, changed, amended, altered, supplemented, waived, cancelled, terminated and/or rescinded, in whole or in part, except by a writing executed by the parties hereto.

12.     This Agreement is binding upon the respective heirs, distributees, legal representatives, members, partners, trustees, successors and assigns of the parties hereto.

13.     This Agreement shall be construed and enforced solely in accordance with the internal laws of the State of New York with respect to agreements entered into and to be performed solely within the State of New York, without regard to conflict of law principles.

14.     Any dispute arising out of or referable to this Agreement, including but not limited to the enforcement thereof, shall be decided solely by a Court of competent jurisdiction sitting in Sullivan County, New York, without a jury, which each party waives the right to request and/or receive. Each party hereby waives any objection to the laying of venue in Sullivan County, New York and waives any claim of forum non conveniens or lack of personal jurisdiction.

15.     No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of the other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

16.     The parties acknowledge that this Agreement has been the product of negotiations between them and/or counsel and, as a result thereof, any ambiguity existing or claimed to exist with respect to any provision of this Agreement (or portion thereof) shall not be construed in favor of or against any party to this Agreement.

17.     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

18.     Each party agrees, upon reasonable request of any other party, to execute any further or other documents in order to effectuate the purpose and provisions of this Agreement.

19.     Berman has been represented in connection with the negotiation, preparation and execution of this Agreement by Stoloff & Silver, LLP. Kaniewski has had the opportunity to be represented by counsel in connection with the negotiation, preparation and execution of this Agreement but has voluntarily chosen not to do so.  Kaniewski acknowledges that Stoloff & Silver, LLP has represented and presently represents numerous of the entities referenced in this Agreement and Kaniewski acknowledges that said law firm is not acting as counsel for Kaniewski in connection with the negotiation, preparation and/or execution of this Agreement. Kaniewski further waives any conflict of interest which exists or may be claimed to exist as a result of the representation of Berman by Stoloff & Silver, LLP in connection with the negotiation, preparation and execution of this Agreement.

20.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same integrated instrument.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the effective date first above written.

### SEE SEPARATE SIGNATURE PAGE

ROBERT A. BERMAN

AVON ROAD PARTNERS, L.P.

By: _____
Robert A. Berman, General Partner

STACEY B. KANIEWSKI

SCOTT A. KANIEWSKI

KFP TRUST

By: _____
Stacey B. Kaniewski, Trustee

KANIEWSKI FAMILY LIMITED PARTNERSHIP

By: _____
Scott A. Kaniewski, General Partner

STOLOFF & SILVER, L.L.P.
ATTORNEYS AND COUNSELLORS AT LAW
26 HAMILTON AVENUE - P. O. BOX 1129
MONTICELLO, NEW YORK 12701
(845) 794-4300
—
FAX 845-794-1371

RICHARD A. STOLOFF
GARY D. SILVER
———

August 26, 2008

**VIA UPS OVERNIGHT MAIL**

**Robert A. Berman**
**7611 Fisher Island Drive**
**Miami, Florida 33109**

Re:    Berman with Kaniewski

Dear Robert:

Enclosed please find four (4) copies of the Transfer, Loan Assignment and Indemnification Agreement as signed by Stacey B. Kaniewski, Scott A. Kaniewski, KFP Trust and Kaniewski Family Limited Partnership. Please sign all four (4) copies and return three (3) fully signed copies to me (retaining one for your records). I will then date the Agreement (please advise as to the date that you sign the Agreement, which will be the date of the Agreement). I will then forward one copy to Scott and one copy to Dennis, retaining one copy for my file.

Very truly yours,

STOLOFF & SILVER, LLP

By:   _____
          Gary D. Silver

GDS/jag
encs.

# FedEx Express US Airbill

Sender's FedEx Tracking Number: **8665 4842 887b**

**1 From** Please print and press hard.
Date: 12/27/08
Sender's Name: Xaviera Akerson
Sender's FedEx Account Number:
Phone: 973 493 5706
Company: Tell Fisher Island Drive
Address:
City: Miami   State: FL   ZIP: 33109

**2 Your Internal Billing Reference**
OPTIONAL

**3 To**
Recipient's Name: Gary Silver   Phone: 845 794 4500
Company: Solone & Silver
Address: 26 Hamilton Avenue
City: Monticello   State: NY   ZIP: 12701

**4a Express Package Service**
[✓] FedEx Priority Overnight

**5 Packaging**
[✓] FedEx Envelope

**6 Special Handling**

**7 Payment** Bill to:
[✓] Sender

Total Packages   Total Weight   Total Declared Value
3 3 2 5 2 9 6 1

**8 Residential Delivery Signature Options**

520

Ship and track packages at fedex.com
Simplify your shipping. Manage your account. Access all the tools you need.

# EXHIBIT B



## Lippes **Mathias** Wexler **Friedman** LLP

*Dennis C. Vacco*
Partner
dvacco@lippes.com

November 6, 2013

**Via Electronic &
UPS Overnight Delivery**
Mr. John Green
Partner, BDO
100 Park Avenue
New York, New York 10017
jgreen@bdo.com

**Re:**    BDO USA ("BDO") Report to the Audit Committee of Cinium Financial
Services       Corporation (CFSC)

Dear Mr. Green:

I am in receipt of your October 17, 2013 BDO Report ("Report") to the CFSC Audit
Committee. I also have received a copy of correspondence from BDO to Messrs. Asen,
Berman and Camp dated November 5, 2013 (enclosed). In this correspondence, which
was not signed by any official of BDO, the aforementioned individuals were informed
that "BDO resigns from (the) engagement because of the lack of independence due to
(the) threat of imminent litigation." In this same letter BDO informed CFSC that it was
withdrawing the audit report dated December 31, 2012. I am writing to now demand that
BDO withdraw its October 17th Report. My demand is based on several reasons which I
will address below. Taken together the conduct of BDO described below leads me to the
conclusion that BDO lost its independence long before the threats of litigation from Mr.
Berman and his attorney, Mr. Bernstein. Indeed it was the lack of BDO independence
which lead to the threat of litigation.

MILLER MATTER:
On page 8 of your Report, in a section labeled Disclosure Issues you state, "The existence
of an asset forfeiture proceeding against the Company and certain officers and directors
by the Federal Government ....commenced in 2008 was not previously disclosed to the
auditors." Your reference to a "forfeiture proceeding" is either an unprofessional attempt
to mislead the audit committee or a purposeful falsehood to advance a pre-determined
outcome.

You might recall that on October 11th you and I had a telephone conversation which
lasted nearly an hour. During that call I gave you an extensive explanation of the so-
called Miller matter and my contact with the federal prosecutors in Florida concerning the
prosecution of Miller. During this portion of the discussion I informed you that there was
never a formal claim or proceeding initiated by the federal government against Upper



Hudson National Insurance Company (UHNIC), Robert Berman, Scott Kaniewski or any other entity or individual associated with them. It was evident that you had reviewed the federal court filing system known as PACER, because you disagreed with my assertion that Miller had agreed at the time of his conviction to a forfeiture of 23 million dollars. (For your information I have enclosed a copy of Miller's plea agreement wherein the 23 million dollars forfeiture is referenced.) You asserted that Miller only agreed to forfeit about 3 million dollars claiming you had reviewed a document which disclosed this amount. I disagreed with your assessment and have subsequently reviewed PACER. The document which you were apparently referring to (also enclosed) is an order directing restitution in the amount of $3,243,890.62, but the fact remains that the plea agreement clearly states that Miller agreed to forfeit to the federal government 23 million dollars.

I raise this exchange with you for several reasons. First during our discussion on the topic of forfeiture you clearly revealed you had done independent due diligence on the topic but it is clear from the fact that you were unaware of the plea document that your due diligence was incomplete. The other reason I raise this exchange is that if you were sophisticated enough to employ PACER, then it would have been easy for you to have continued your research to determine that no forfeiture proceeding had ever been initiated against UHNIC, Berman or anyone else associated with the company. On the other hand, if your statement about the forfeiture proceeding was based upon what some other source, besides me, told you, then it is equally clear that you failed to substantiate that information through independent due diligence.

Lastly, regarding Miller, you addressed the question of a statute of limitations wherein you wrote: "We do not have sufficient information to conclude on (sic) the current the status of this matter including whether the statute of limitations has run". By taking this position you totally ignored a legal memorandum prepared by my law firm and shared with Joel Asen, the audit committee and John Crowe on July 12, 2013. Either you did not review the audit committee records or you choose to omit reference to this memorandum which asserted, as I did in our conversation on October 11th, that the statute of limitations for a forfeiture proceeding against UHNIC or related individuals had expired. Again I have to wonder if your work product is sloppy or intentionally misleading, because it does not accurately state the facts in regard to the forfeiture proceeding or the statute of limitations.

KANIEWSKI LEGAL FEES:
Under the heading of Kaniewski/Legal Fees and Capital Contributions you make a ridiculous and unprofessional statement about my representation of Robert Berman and the company. Again repeating what you wrote: "Vacco was retained by Robert Berman, CEO and Chairman, for reasons that do not make sense to defend the Company and him. I have reread your report carefully several times and this sentence is the first time you refer to me, albeit in an unprofessional and casual manner as "Vacco"! You were well aware at the time of our conversation on October 11[th] that I was the Attorney General of New York State in the 1990's and a former United States Attorney. You also were informed that I was a member of the Board and a shareholder in CFSC. Your casual reference to me as simply "Vacco" is undignified and leads me to wonder if your position



on joint representation wasn't personally motivated.  In our conversation on October 11th you asked me whether there was a conflict of interest in the joint representation and I told you no.  At the time you even recognized the delicate nature of your question because you apologized for having to ask it.  Nonetheless, I told you there was no conflict because the interests of UHNIC and Berman were aligned in the litigation commenced by Kaniewski. It is startling to me that you chose not to offer a legal opinion about the statute of limitations, yet you felt qualified enough to comment on the question of a legal conflict. Not only did you fail to reference our conversation in this regard, but without any further due diligence or reference to other sources you chose to accuse me of unethical conduct. If there is any unethical conduct associated with this matter is being perpetrated by you and BDO.

Disturbingly, contemporaneously with the issuance of your Report, you and Jeff Camp arranged for an immediate payment of BDO's fees.  I wonder if your misstatement of the foregoing facts and other misstatements in the report were affected by the fact that shortly before you contacted me on October 11 to discuss the Miller matter, you requested payment of $110,000 "**immediately**" from the CFO of CFSC, Mr. Jeffrey Camp.  In an email to Mr. Camp, you wrote: "Thanks for your cooperation and understanding.  I'm about to get on the phone with Vacco.  I'll let you know how it goes."  Mr. Camp rushed the payment of $110,000 to you from CFSC in less than one hour, without review or authorization of the Board of CFSC, nor of Mr. Berman as CEO, apparently in order to obtain your continuing cooperation in issuing a report to the CFSC audit committee based on unsubstantiated facts that were apparently provided to you by Mr. Camp and other persons working with him. The email exchange with Mr. Camp about an immediate payment of BDO fees coupled with the aforementioned misleading statements in your report simply highlight your lack of independence, unprofessionalism, undue influence and bias in connection with the issuance of the report. The below emails (annexed as Exhibit A) are additional evidence of your and BDO USA's "clandestine" dealings with Mr. Camp and others working with him in an unlawful scheme to remove Mr. Berman from his rightful position as CEO of CFSC, including by presenting the report to other members of the Board of CFSC to the exclusion of Mr. Berman and me, and meeting with the New York Department of Financial Services to condemn Mr. Berman without providing Mr. Berman or me a copy of the report or courtesy notice of the meeting with DFS.

### $110,000 PAYMENT TO BDO USA
The two email threads below on October 11, 2013 - one between you and Mr. Camp, and the other between you and Mr. Joseph Bernstein, legal counsel to Mr. Berman, (Exhibit A) indicate that Mr. Camp transferred $110,000 from CFSC to BDO *within less than one hour of receiving your invoice by email, without review or authorization of the CEO or the consent of the Board*, and without sufficient time to review the amount and propriety of the invoice and backup to total amounts billed.  I have confirmed that the $110,000 payment was transferred by CFSC to BDO USA on October 11th.

At 9:31 a.m. on October 11, you sent an email to Mr. Camp enclosing your invoice. You copied Mr. Bernstein on this email



At 9:37 a,m., realizing you mistakenly copied the Camp email to Mr. Bernstein, you sent an email to Mr. Bernstein asking him to delete the first email, which he confirmed he would at 10:03 a.m., but Mr. Bernstein had already forwarded your email to Mr. Berman before you made the deletion request.

At 9:46 a.m., you apologized to Mr. Camp for the mistake and informed him you had intended to send a copy of the original email to Mr. Joel Asen: "My apologies – this is the problem with trying to do things quickly. I was trying to cc Joel (which in retrospect was probably not necessary anyway) Dennis, of course, pushed the call back to 2:30." (That you were trying to cc Joel Asen clearly means Mr. Asen was part of whatever arrangements you, Mr. Camp and Mr. Asen had concluded in consideration of the immediate, in full payment of your $110,000 invoice.)

At 10:18 am, only 47 minutes after your email sending the invoice, Mr. Camp emailed you that, "This was taken care of."

At 10:20 a.m., you sent an email to Mr. Camp to thank him for the money and to inform him that Mr. Bernstein had agreed to delete the email: "Thanks. Bernstein agreed to delete the email. Hopefully he's honorable. Sorry for the headache."

While it is clear you mistakenly sent Mr. Bernstein the invoice email, it is curious why you would be so concerned about him and by extension, Mr. Berman knowing about the request for payment. It is obvious to me that you did not want Mr. Berman, myself of any other principals of CFSC, not aligned with Messrs. Asen, Camp and Tower, to know that you had requested an immediate payment of $110,000 just prior to the issuance of the Report. It is my understanding that you have a long history of working with CFSC and UHNIC therefore you should have known that Mr. Berman was the person, through Avon Road Partners, who was approved as the controlling person by DFS. Again your failure to provide the invoice to the person authorized to be in control and your cover-up once you realized your email mistake, go to the heart of why you and BDO lost its independence long before the threat of litigation.

I again demand the complete retraction of the October 17, 2013 BDO USA report to the CFSC audit committee, absent which we will move forward accordingly.

Sincerely,

LIPPES MATHIAS WEXLER FRIEDMAN LLP

Dennis C. Vacco

Enc.



cc:    Wayne Berson (via electronic mail)
Jeffrey Weiner (via electronic mail)
James Meehan (via electronic mail)
Eugene Benger (via electronic mail)
Paul Cohen (via electronic mail)
Rolf Kaumann (via electronic mail)
James Davis (via electronic mail)
Theresa Ogudebe (via electronic mail)
Leonard Purzner (via electronic mail)
Robert Oseitutu (via electronic mail)
Michael Campanelli (via electronic mail)
Timothy Hoeffner (via electronic mail)
Robert Berman (via electronic mail)
Joel Asen (via electronic mail)
Jeffrey Camp (via electronic mail)

# Exhibit A

**EXHIBIT A – John Green's Emails With Joseph Bernstein and Jeffrey Camp**
**Between 9:31 a.m. and 10:20 a.m. on October 11, 2013**


**From:** John Green <jgreen@bdo.com>
**Date:** Friday, October 11, 2013 10:20 AM
**To:** Jeffrey Camp <JCamp@cinium.com>
**Subject:** RE: Latest Invoice for Cinium


Thank you.

Bernstein agreed to delete the email.  Hopefully he's honorable.

Sorry for the headache.





**From:** Joseph Bernstein [mailto:joebernstein@me.com]
**Sent:** Friday, October 11, 2013 10:03 AM
**To:** John Green
**Subject:** Re: Latest Invoice for Cinium

Sure

Joe Bernstein
iPhone: 917.365.3651
Fax: 847.589.3877

On Oct 11, 2013, at 9:37 AM, John Green <jgreen@bdo.com> wrote:

Joe,

I sent this to you in error.  Would you please delete.

Thank you for your assistance

<image701882.GIF>


**From:** John Green
**Sent:** Friday, October 11, 2013 9:31 AM
**To:** 'Jeff Camp'
**Cc:** 'Joseph Bernstein'; Raul Miranda
**Subject:** Latest Invoice for Cinium

Jeff,

As we discussed earlier this week, the time is rapidly accumulating on Cinium.  Attached is an invoice for our time through September 30 as well as the expected time to complete our work on the matters with RH land and the various litigation matters and report to the audit committee and the board.  In terms of the time on the cinium audit, the actual time spent through September 30 is approximately $100,000.  We were accumulating at 80% of standard and I took another 20% off.

Given the circumstances, we need to have this invoice paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work.  There are wire instructions on the invoice for your convenience.

Thanks for your cooperation and understanding.  I'm about to get on the phone with Vacco.  I'll let you know how it goes.

Regards,


**John Green**
Partner
212-885-8174 (Direct)    305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

IMPORTANT NOTICES

The contents of this email and any attachments to it may contain privileged and confidential information from BDO USA, LLP. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to BDO USA, LLP or destroyed and, in either case, this e-mail and all attachments to this e-mail must be immediately deleted from your computer without making any copies hereof. If you have received this e-mail in error, please notify BDO USA, LLP by e-mail immediately.

*To ensure compliance with Treasury Department regulations, we wish to inform you that, unless expressly stated otherwise in this communication (including any attachments) any tax advice that may be contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.*

<Cinium Financial Svcs #000381829.pdf>

**From:** Jeff Camp [mailto:JCamp@cinium.com]
**Sent:** Friday, October 11, 2013 10:18 AM
**To:** John Green
**Subject:** RE: Latest Invoice for Cinium

John,

This was taken care of

Jeff

Jeffrey Camp, CFA
Chief Financial Officer

T (786) 353-0301 x6030
F (305) 675-2434
E jcamp@cinium.com

Cinium Financial Services Corporation
444 Brickell Avenue | Suite 701
Miami, FL 33131

**From:** John Green <jgreen@bdo.com>
**Date:** Friday, October 11, 2013 9:46 AM
**To:** Jeffrey Camp <JCamp@cinium.com>
**Subject:** Invoice

Jeff,

My apologies – this is the problem with trying to do things quickly.  I was trying to cc Joel (which in retrospect was probably not necessary anyway)

Dennis, of course, pushed the call back to 2:30.


**John Green**
Partner
212-885-8174 (Direct)    305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com




BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.
BDO is the brand name for the BDO network and for each of the BDO Member Firms.

**From:** John Green [mailto:jgreen@bdo.com]
**Sent:** Friday, October 11, 2013 9:31 AM
**To:** Jeff Camp
**Cc:** Joseph Bernstein; Raul Miranda
**Subject:** Latest Invoice for Cinium

Jeff,

As we discussed earlier this week, the time is rapidly accumulating on Cinium.  Attached is an invoice for our time through September 30 as well as the expected time to complete our work on the matters with RH land and the various litigation matters and report to the audit committee and the board.  In terms of the time on

the cinium audit, the actual time spent through September 30 is approximately $100,000.  We were accumulating at 80% of standard and I took another 20% off.

Given the circumstances, we need to have this invoice paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work.  There are wire instructions on the invoice for your convenience.

Thanks for your cooperation and understanding.  I'm about to get on the phone with Vacco.  I'll let you know how it goes.

Regards,


**John Green**
Partner
212-885-8174 (Direct)     305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com



Joe Bernstein
iPhone: 917.365.3651
Fax: 847.589.3877