Kim J. Landsman
Beth Nagalski
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, NY 10022
Tel: (212) 907-7368
E-mail: klandsman@golenbock.com

*Attorneys for Defendants and Counterclaim Plaintiff Robert Berman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY CAMP and JC REAL ESTATE FUND, LLC<br><br>              Plaintiffs,<br><br>      - against -<br><br>ROBERT BERMAN, ROBERT WONG, and AVON ROAD ROCK HILL, LLC,<br><br>             Defendants,<br><br>ROBERT BERMAN,<br><br>             Counterclaim-Plaintiff,<br><br>      - against -<br><br>JEFFREY CAMP, CINIUM FINANCIAL SERVICES CORPORATION, JOEL ASEN, JAMES ROBERTS, MICHAEL MICHIGAMI, and BDO USA, LLP,<br><br>             Counterclaim-Defendants. | Case No. 14-CV-1049 (KMK)<br><br>**AMENDED ANSWER WITH COUNTERCLAIMS** |

        Defendants Robert Berman, Robert Wong, and Avon Road Rock Hill, LLC, for their Answer and Counterclaims to the correspondingly numbered paragraphs of the Complaint, allege as follows:

        1.     Deny.

2.      Deny, but aver that RH Land Development LLC, through Glen Wild Land Company, LLC ("Glen Wild"), purchased and continued the assembly of the Thompson Land, and that Glen Wild entered into a Loan Agreement wherein the lender obligated itself to lend up to $5.8 million.

3.      Deny, except admit, with a correction, that Berman accurately informed Camp that Avon Road Rock Hill, LLC ("Avon Rock Hill"), wholly owned by Avon Road Partners, L.P., of which Berman is the General Partner, had contributed $2.96 million in capital (of which $921,000 was transferred from the interest held by Scott Kaniewski's entity as part of an agreement between Berman and Kaniewski) to RH Land Development, LLC ("RH Land"), which resulted in Avon Rock Hill having a 48.73% interest in RH Land, and that Glen Wild did not repay the Mortgage in October 2009.

4.      Deny.

5.      Deny.

6.      Deny, except admit that RH Land's counsel Joseph Bernstein sent a letter dated August 1, 2013, to the attorneys for the mortgage holder offering to purchase the mortgage for $225,000 and otherwise threatening litigation, and deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the activities of Eisenberg and how precisely Mount Carmel Equities, LLC ("Mount Carmel") came to acquire the Mortgage.

7.      Deny.

8.      Deny, except admit (with correction) that in November 2013, the State of New York approved a constitutional amendment that would legalize casino gambling in certain areas and thereby permit the potential expansion of casinos in the area of the Thompson Land.

9.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Camp has been the chief financial officer of Cinium Financial Services Corporation since July 2011.

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that JC Real Estate Fund I, LLC ("JC REF") owns a 5.85% interest in RH Land.

11.     Admit, except deny that Berman is currently the Chief Executive Officer of Cinium, since he was wrongfully terminated through the actions and false allegations of Camp and others.

12.     Admit, with the correction that Robert Wong served as President of UHNIC from November 2010 to March 2013, and Chief Operating Officer of Cinium from January 2011 to July 2011 and again from June 2012 to March 2013..

13.     Admit, except deny that Avon Rock Hill is headquartered in Monticello, New York.

14.     Deny, except admit that Plaintiffs have alleged diversity of citizenship.

15.     Admit.

16.     Admit.

17.     Admit that there is personal jurisdiction over Avon Rock Hill, but deny that it is a New York company.

18.     Admit insofar as what is alleged.

19.     Admit, except deny that RH Land was created in April 2005.

20.     Admit, with the clarification that the obligation of Bear Stearns, with which it did not comply, was to lend up to $5.8 million.

21.    Admit.

22.    Deny, except admit that the Amended Operating Agreement named KF Rock Hill, LLC, through its member Scott Kaniewski, as the managing member in charge of the day-to-day affairs of RH Land.

23.    Deny.

24.    Admit, with the correction that Kaniewski was President of UHNIC from 2006 to 2008 and Berman succeeded him as President until sometime in 2010, Wong was corporate secretary of UHNIC from 2007 to 2010, and Wong was Cinium's Chief Operating Officer from January 2011 to July 2011 and from June 2012 to March 2013.

25.    Admit.

26.    Admit.

27.    Deny, except admit that Kaniewski transferred his interest to Berman in 2008.

28.    Deny, except admit that AMS Capital Holdings Corp. made a deposit of $2.75 million pursuant to an agreement to purchase Upper Hudson.

29.    Deny, except admit that Upper Hudson terminated the agreement with Miller after he defaulted.

30.    Deny, except admit that Upper Hudson did not return the remainder of Miller's payment and aver that it was originally booked as a contingent liability pending closing of the transaction and then, after Miller's conviction, it was converted to a long-term capital gain pursuant to the advice of the tax accountant.

31.    Deny, except admit that the letter was sent with the language quoted.

32.    Deny.

1993747

33.     Deny, except admit that by a Transfer, Loan Assignment and Indemnification Agreement effective August 27, 2008, all interests of Scott A. Kaniewski, Stacey B. Kaniewski, and the Kaniewski Family Limited Partnership in RH Land and numerous other companies were assigned to Berman and respectfully refer to that agreement for its terms.

34.     Deny, except admit that between April 2008 and December 31, 2009, UHNIC purchased a 16.87% membership interest in RH Land from Avon Rock Hill that, with subsequent capital calls, culminated in a total of $1,024,035 being invested in that period.

35.     Deny, except admit that Glen Wild did not repay the $4.6 million principal of the Mortgage by the extended maturity date of October 1, 2009, and aver that the mortgagee had previously defaulted on its commitment under the loan to provide an additional $1.2 million in funds to be drawn by Glen Wild under the loan documents.

36.     Deny, except admit that Alston & Bird notified Glen Wild of the Mortgage default by letter dated October 9, 2009, and deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning the amount of additional letters.

37.     Deny, except admit that Avon Rock Hill sold an additional portion of its interest in RH Land to JC REF, that Camp loaned money to Upper Hudson in 2009 in the form of a senior secured Note with one-year maturity, and that Camp was not then an officer of Upper Hudson.

38.     Deny, except admit that in March 2010, Camp decided to convert his Cinium debt into equity, and aver that Camp was involved in trying to raise capital for Upper Hudson, opened and ran its Miami office, and developed a business segment related to what is known as commercial (as opposed to contract) surety.

39.     Deny, except admit that in October 2009, Berman and Camp discussed the latter investing in RH Land, aver that Camp approached Berman about using Upper Hudson as an anchor to raise money for his private investment funds, and admit that Wong e-mailed to Camp six documents relating to RH Land on February 9, 2010.

40.     Deny, except admit that JC REF purchased a 5.85% interest in RH Land from Avon Rock Hill for $500,000, and respectfully refer to the Agreement of Transfer of Membership Interest that is Exhibit A for its terms.

41.     Admit.

42.     Admit, and aver that Eisenberg's options to purchase interests in RH Land expired no later than December 25, 2011.

43.     Admit.

44.     Admit, except deny that by 2013 RH Land was negotiating term sheets.

45.     Admit.

46.     Deny, and aver that Berman informed Camp by Brosix internal Cinium communication at 10:23 a.m. on July 9, 2013, that, "the lender is going to commence a sale of the note through CBRE," and this communication was immediately forwarded by Camp at 10:27 a.m. to Emily Asen with a copy to Joel Asen.

47.     Deny.

48.     Admit that the letter was sent, respectfully refer to the letter for its terms, and deny that the letter was sent without informing Plaintiffs.

49.     Deny, except deny knowledge or information sufficient to form a belief as to the allegations concerning what precisely Eisenberg did, and aver that Eisenberg's options to invest in RH Land expired no later than December 25, 2011.

6

50.     Admit.

51.     Deny, except admit that an audit committee of Cinium was formed that purported to investigate Berman's financial activities.

52.     Deny, except aver that Berman informed the committee that Wong was the custodian and had access to documents pertaining to RH Land and its business plans.

53.     Deny, and aver as an example of plaintiff's knowledge that the mortgage was considered in default that Berman forwarded to Camp in an e-mail on February 15, 2011, more than two years before Camp's alleged first knowledge of the default, an e-mail from the lender with a "Draft of the Forebearance Agreement with respect to the RH Land transaction."

54.     Deny, and aver that Camp should know, as a sophisticated business person and Chartered Financial Analyst, that RH Land's K1s do not show the actual amounts contributed.

55.     Admit that the 2009 tax return provides the information about the capital accounts of the partners of RH Land under tax accounting principles, and aver that it does not show what capital contributions were made.

56.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations.

57.     Repeat and reallege their responses to paragraphs 1 through 56 above as if fully set forth herein.

58.     Deny.

59.     Deny.

60.     Deny.

61.     Deny.

62.     Deny.

63.     Deny.

64.     Repeat and reallege their responses to paragraphs 1 through 63 above as if fully set forth herein.

65.     Deny, but admit that Avon Rock Hill is the managing member of RH Land.

66.     Deny, but admit that the quoted language is in the RH Land Operating Agreement.

67.     Deny.

68.     Deny.


## AFFIRMATIVE DEFENSES

69.     The claims are barred in whole or in part by one or more of the doctrines of acquiescence, estoppel, and laches.

70.     Plaintiffs' fraud claim must be dismissed because Plaintiffs as sophisticated investors cannot allege or prove the element of reasonable reliance.

71.     Any alleged damages claimed to be owed by defendant Robert Berman are offset by the damage Plaintiffs and Counterclaim Defendants have caused and are continuing to cause Berman by reason of their wrongful conduct as set forth in the counterclaims herein.

1993747

## COUNTERCLAIMS OF ROBERT BERMAN FOR
## (A) BREACH OF EMPLOYMENT AGREEMENT AGAINST CINIUM, AND
## (B) TORTIOUS INTEFERENCE WITH BERMAN'S EMPLOYMENT AGREEMENT
## AGAINST CAMP, ASEN, MICHIGAMI, ROBERTS, AND BDO USA, LLP

1.     Plaintiff Camp and the Cinium directors who are Additional Defendants on the Counterclaims conspired to seize control of Cinium and the stock held by its largest shareholder by trumping up charges against Berman of misappropriating company property and purporting to terminate his employment by Cinium for "cause."  None of the accusations against Berman are true, and none would, in any event, meet the standard for misappropriation of corporate assets.

2.     Cinium's auditor, the BDO USA, LLP accounting firm, played a crucial role in the scheme by misrepresenting what it was aware of from prior audits and by lending the credibility of a purportedly independent -- but in fact utterly partisan -- auditor to the lies generated by the other additional defendants on the counterclaims.  The accounting firm presented what it later characterized as a preliminary report to the State agency charged with regulating Cinium in an attempt to obtain the agency's imprimatur on the scheme to force out Berman.  The accounting firm later withdrew the report and withdrew from the representation, but not before serious harm had been done.   After quickly compensating the accounting firm for its hatchet job, Camp and the other Cinium directors relied heavily on its report to validate their decision to terminate Berman's employment.

3.     Cinium's breach of its Employment Agreement with Berman was without cause or justification, and the actions of the counterclaim defendants were not motivated by any desire to conduct an objective investigation on behalf of the corporation.  Those actions were instead the culmination of a premeditated, malicious, self-interested grab for corporate assets and control.

**Parties and Jurisdiction**

4.      Counterclaim plaintiff Robert Berman ("Berman") is an individual residing in New Hope, Pennsylvania.  Avon Road Partners, L.P., a New York Limited partnership of which Berman is General Partner, wholly owns Avon Road Rock Hill, LLC ("Avon Rock Hill") and owns 60% of the voting common shares and 45% of the outstanding common shares of Cinium Financial Services Corporation.

5.      Counterclaim defendant Jeffrey Camp ("Camp") is an individual residing in Miami, Florida.  He has been the Chief Financial Officer of Cinium Financial Services Corporation since July 2011, a member of Cinium's board of directors since its formation in January 2011, and was voted Chief Executive Officer at an October 25, 2013, board meeting.

6.      Additional defendant on the counterclaims Cinium Financial Services Corporation ("Cinium") is a privately held corporation organized and existing under the laws of the State of Delaware, with its corporate headquarters at all relevant times in Rock Hill, New York.

7.      Upon information and belief, additional defendant on the counterclaims Joel Asen ("Asen") is an individual residing in Fairfield, Connecticut, who has been a director of Cinium since January 2012.

8.      Upon information and belief, additional defendant on the counterclaims James Roberts ("Roberts") is an individual residing in Fairfield, Connecticut, who is the Senior Vice President, Corporate Chief Underwriting Officer, of the Tower Group Companies and regularly works in its office at 120 Broadway, New York, New York.  Roberts has been a director of Cinium since June 2012.

9.      Upon information and belief, additional defendant on the counterclaims Michael Michigami is an individual residing in Greenwich, Connecticut, who has been a director of Cinium since February 2012.

10.      Upon information and belief, additional defendant on the counterclaims BDO USA, LLP ("BDO") is a Delaware limited liability partnership with its principal place of business at 100 Park Avenue, New York, New York.

11.      The tortious acts alleged herein were committed within the State of New York and were intended to and did have impact in New York.  With respect to any non-resident additional defendant on the counterclaims, and to the extent that tortious acts were committed outside New York, each of those persons does business in New York, intended and should reasonably expect the acts to have consequences in the state, and derives substantial revenue from interstate or international commerce.

12.      This Court has subject matter jurisdiction over the counterclaims pursuant to Fed. R. Civ. P. 13 as permissive or compulsory counterclaims.

**Cinium, UHNIC, and the Tower Group's Acquisition of an Interest in Them**

13.      Cinium was formed as of January 7, 2011, and merged on January 29, 2011, with Upper Hudson Holdings, LLC ("Upper Hudson").  Cinium then became a holding company for various subsidiaries of Upper Hudson engaged in the ownership, operation, and development of insurance and related activities that provide specialty insurance, financing, and working capital to small business clients.

14.      One of Cinium's principal subsidiaries from the merger with Upper Hudson is Upper Hudson National Insurance Company ("UHNIC"), which was acquired by Upper Hudson in 2006.  UHNIC is a New York insurance company that conducts a commercial insurance and

surety business as a property & casualty insurance carrier licensed and admitted in 16 states, including New York.

15.     UHNIC is authorized to issue a vast range of insurance products, including Surety and Fidelity, Fire, Property, Casualty, Worker's Compensation, Employers' Liability, Marine and Inland Marine, and Legal Services Insurance.  Its primary business is issuing surety bonds to contractors of construction projects where a surety bond is a requirement for the contractor to secure the work.

16.     Cinium and UHNIC are regulated by New York State's Department of Financial Services ("DFS").  The DFS must approve the "controlling person" of such entities, and Berman is the only person who has been formally approved as a "controlling person" of Cinium and UHNIC.

17.     UNHIC also acts as reinsurer for Tower Insurance Company of New York and its affiliate, CastlePoint Insurance Company ("CastlePoint"), which provide a specialty surety market in 50 states for all of Cinium's ancillary financial products and administrative services.

18.     CastlePoint and Cinium are parties to a $7 million convertible Senior Note issued on June 14, 2012, in accordance with a Note Purchase Agreement dated May 15, 2012.

19.     CastlePoint, Cinium and all of the shareholders of Cinium are also parties to a June 14, 2012, Securityholders' Agreement among Cinium Financial Services Corporation, CastlePoint Insurance Company, and the Stockholders of the Company Named on the Signature Pages Hereof ("Cinium Securityholders' Agreement").

20.     Under the Cinium Securityholders' Agreement, the number of directors of Cinium is fixed at six.  CastlePoint has the right to designate one of the six directors, and numerous actions specified in Schedule A of the Cinium Securityholders' Agreement require the vote of

the director appointed by CastlePoint, which effectively gives CastlePoint a right to block those actions.  In June 2012 CastlePoint appointed Roberts as its designated director on the Cinium board.

21.      The other five current directors of Cinium are Asen, Berman, Camp, Michigami, and Dennis Vacco, formerly Attorney General of the State of New York (1995-1998) and U.S. Attorney for the Western District of New York (1988-1993).

22.      CastlePoint moved to solidify its control over the board by buying all of Camp's preferred and common shares in Cinium on August 23, 2013, for the nominal sum of $100. Inasmuch as Camp paid $3 million for that investment in 2010, it is obvious that other consideration for the purchase of the shares occurred.  Requests of Camp, Roberts, and Tower to disclose all side deals to that stock purchase and to BDO as auditor to investigate the transaction have been refused.

23.      As a result of CastlePoint's blocking rights under the Cinium Securityholders' Agreement, and the agreement of Cinium directors Asen, Camp, Michigami and Roberts to work together with CastlePoint as a control group, it has effectively controlled Cinium and UHNIC, notwithstanding Avon Road Partners, L.P.'s ownership of 60% of the voting shares of Cinium and the fact that the DFS has not approved CastlePoint as a control group as required by New York Insurance Law.

**Berman's Employment and Wrongful Termination by Cinium**

24.      Berman was employed by Upper Hudson and subsequently by Cinium as Chief Executive Officer.  On June 14, 2012, the same day that the parties executed the Securityholders' Agreement, Cinium entered into an Employment Agreement with Berman for an "Initial Term" to continue until July 1, 2018.

13

25.     Pursuant to Section 5 of the Employment Agreement, Berman's employment was terminable only upon his death or disability, termination by him at will after the end of the Initial Term, in the Event of a defined Change in Control, or for "Cause."  Section 5(b), which is the provision for "Termination for Cause," provides as follows:

> Termination for Cause. At any time during the Term of this Agreement, the Company shall have the right and power to immediately terminate the Executive's employment under this Agreement, for "Cause", which is defined to include only the following: Executive's conviction of any felony or any other crime involving fraud, misrepresentation or theft; or misappropriation or embezzlement of the Company's funds, assets or property.

26.     At a meeting on October 25, 2013, Cinium's Board of Directors terminated Berman's employment for cause "immediately" pursuant to paragraph 5(b) of the Employment Contact based on its conclusion that Berman "misappropriated Cinium's funds and assets."  At the same meeting, the board elected Camp Chief Executive Officer.  Implementation of the decision was delayed by litigation in Delaware Chancery Court.  Camp informed Berman in a letter dated March 7, 2014, however, that the termination of his employment was effective March 7, 2014.

27.     The meeting of the Cinium Board of Directors referenced in Camp's letter was held at Tower's Offices in New York City.  Present were directors Camp, Asen, Roberts, Michigami, and John Crowe, an attorney who is corporate secretary.

28.     According to the transcript of the board meeting, the alleged misappropriation consisted of "the failure to disclose the mortgage, the failure to disclose the recourse nature of the mortgage, the self-dealing transactions on or around the mortgage going into default, the valuation implied by those transactions all are tantamount to a misappropriation of funds on the part of Mr. Berman from the company."

14

29.     None of the accusations are true and none, even if true, constitutes "misappropriation or embezzlement of the Company's funds, assets or property."

30.     The "mortgage" referred to is presumably a loan agreement dated December 23, 2005, between Glen Wild and Bear Stearns Commercial Mortgage, Inc.  ("Bear Stearns") that required the latter to lend $5.8 million.  Only $4.6 million was in fact lent to Glen Wild before Bear Stearns collapsed in March 2008, after which Bear Stearns defaulted by failing to perform and fund the balance of the mortgage loan commitment.

31.     Upon the demise of Bear Stearns, the mortgage was assigned by the Federal Reserve as a so-called "toxic" asset to Maiden Lane Commercial Mortgage-Backed Securities Trust 2008-1 ("Maiden Lane"), despite the fact that Glen Wild was not in default under the mortgage.

32.     As a result of the transfer of the mortgage to Maiden Lane, Glen Wild had no mortgagee with which to deal for quite some time.  Ultimately, Maiden Lane advised Glen Wild that Maiden Lane would not honor the obligation of Bear Stearns to fund an additional $1.2 million, which constituted a default by Maiden Lane as the then mortgagee.  That and other defenses will preclude the mortgagee from foreclosing on the property notwithstanding the fact that Glen Wild has not paid off the loan.

33.     The mortgage was again assigned in August 2013, and in March 2014 the entity claiming to be the current mortgagee, Mount Carmel Equities, LLC, commenced a foreclosure proceeding against Glen Wild in the Supreme Court of the State of New York, Sullivan County.

34.     Jeff Camp and Cinium's auditor, BDO, have known or could with any reasonable inquiry have known of the loan, defaults alleged by the mortgagee, the plan of the prior

mortgagee to sell it, and any other relevant information concerning the mortgage at all relevant times.

35.     An example of blatantly false accusations made against Berman is Camp's statement at the October 25, 2013, board meeting that he was never informed by Berman that the mortgage was being put up for sale.  That accusation is refuted by documentary evidence that on July 9, 2013, Camp sent an email to Asen forwarding within five minutes Berman's e-mail of the same day in which Berman informed Camp that "the lender is going to commence a sale of the note through CBRE."  Berman also stated in the e-mail Camp forwarded to Asen that "[a]ny buyer would have to deal with us and the counterclaims."  Camp and Asen are experienced investors and businesspeople.  Nevertheless, at the Cinium board meeting on October 25 2013, they denied having had such prior knowledge.  Moreover, Camp and Asen misrepresented to the DFS and Cinium's auditor BDO that they did not know there was a mortgage on the RH Land property. Camp also misrepresented to the DFS and BDO that the mortgage was recourse to UHNIC.

36.     In addition to the fact that the allegations against Berman are false, the existence of facts surrounding the mortgage and certain directors' or auditor's knowledge or lack thereof does not constitute "misappropriation or embezzlement of the Company's funds, assets or property" by Berman.

37.     The actual motion passed by the board at the October 25, 2013, was "that the board announce a determination that Robert Berman's actions with respect to RH Land and UHNIC represent a misappropriation of the company's property and assets."  This presumably refers to a transaction on April 2, 2008 -- more than 2 ½ years before Cinium existed and more than four years before Berman's Employment Agreement was signed -- in which UHNIC, then

16

wholly owned by Upper Hudson, bought from Avon Rock Hill a 15.674% interest in RH Land for $750,000.

38.     The company that bought the interest from Avon Rock Hill was not Cinium, but UHNIC, which was not acquired by Cinium until years later, in January 2011, when Cinium was formed and merged with Upper Hudson.  Further, at the time of the transaction in April 2008, all of the shareholders of Upper Hudson approved the transaction and none of the parties to this litigation had any ownership interest in Upper Hudson.

39.     The purchase price of $750,000 was based on Avon Rock Hill's actual capital contributions to RH Land.  In addition, UHNIC acquired priority 9% accruals on the Avon Rock Hill capital account transferred to UHNIC.  Camp asserted at the October 25, 2013, board meeting that the UHNIC purchase price "gave an implied equity value [of RH Land] at the time of that transaction of $4.8 million" and accused Berman of selling UHNIC "a bunch of worthless real estate."

40.     In fact, on March 14, 2008, Berman met with representatives of the DFS and informed them of the proposed transaction.  Integra Realty Resources – New York, a Certified General Real Estate Appraiser engaged by Bear Stearns, had assessed the market value of the undeveloped property as of March 18, 2008 -- just two weeks before the Avon Rock Hill/UHNIC transaction -- at $9.6 million.  That was $5 million more than the then mortgage balance of $4.6 million that had been funded by Bear Stearns, which would give an implied equity value for RH Land of no less than $5 million above the $4.6 million mortgage balance.  At that time, the mortgage was fully performing and interest payments were current.  The independent appraiser commissioned by Bear Stearns found that with certain approvals that were then in the process of

being completed, the land's appraised value was $11.3 million – an implied equity value for RH Land of at least $6.7 million above the mortgage balance.

41.     As of the April 2, 2008, date of the transaction between UHNIC and Avon Rock Hill, Avon Road Partners, L.P. owned 80% of Upper Hudson, with VDACK, LLC, a company owned by Dennis Vacco, owning 5%, and Scott Kaniewski directly or indirectly owning the remaining 15% of Upper Hudson.  Avon Road Partners, L.P. then owned 100% of Avon Rock Hill, which at the time owned 70% of RH Land.

42.     The transaction was considered an advantageous deal for both entities, and was approved by the shareholders of both companies. As such, it was not and could not have possibly been a "misappropriation or embezzlement of the Company's funds, assets or property." Moreover, there is no connection between the Avon Rock Hill/UHNIC transaction and the default in the mortgage more than 1-1/2 years later.

43.     Finally, the sale to Upper Hudson long before Cinium even existed could not constitute "misappropriation or embezzlement of the Company's funds, assets or property."

44.     Berman has not misstated the assets of Cinium to its auditor, investors, or anyone else.  All relevant persons, including but not limited to Camp and Cinium's auditor at BDO, John Green, have been aware of the debt of RH Land, including from K-1's distributed to the members and filed with RH Land's tax returns for a number of years, that it was assigned as a so-called "toxic asset" – notwithstanding the fact that it was in good standing and had valuable property as collateral – after the collapse of Bear Stearns, that Bear Stearns failed to provide all the funds it was required to provide, that Maiden Lane declared the agreement to be in default, and that Maiden Lane decided to sell the mortgage, as those events have occurred or at least when disclosure would have been considered required.  Furthermore, even if there had been a

18

failure to make necessary disclosures, any inadequacies in such disclosures would not constitute "misappropriation or embezzlement of the Company's funds, assets or property."

45.     In sum, there has been no "misappropriation or embezzlement of the Company's funds, assets or property" by Berman.  The termination of his employment therefore constituted a breach of the Employment Agreement by Cinium.

46.     Moreover, the termination was not the result of a good-faith mistake as to the facts.  To the contrary, the reasons stated at the October 25, 2013, board meeting for terminating Berman's employment were all pretexts to cover for the plan of Camp and other self-interested directors to seize control and ownership of Cinium for their own benefit.

**Tortious Interference by Camp, Asen, Roberts, Michigami, and BDO**
**with Berman's Employment Agreement with Cinium**

47.     As more fully set forth below, Camp, Asen, Roberts, and Michigami interfered with and caused Cinium to breach Berman's Employment Agreement through a deliberate, thought-out plan to get rid of Berman so that they and CastlePoint could take control of Cinium and force the transfer of stock in Cinium held by Berman's family or others connected with him.

48.     The four directors solicited information from Scott Kaniewski, a former Berman colleague, to use against Berman and obtained the valuable assistance of BDO auditor John Green, who was required to be independent but in fact actively assisted the counterclaim defendants to fabricate and disseminate information about Berman that they knew was false or for which they acted in reckless disregard of the information's truth or falsity.

49.     In 2011 and continuing into 2012, defendant Robert Wong ("Wong"), who was then President of UHNIC and COO of Cinium, became aware of Camp's desire to take control of Cinium from Berman.  Camp tried to enlist Wong in this endeavor, but Wong declined the overture and advised Berman of it.

19

50.     Understanding that Camp was deliberately trying to undermine Berman with other staff members at Cinium and that resistance to those tactics was making his working conditions increasingly difficult, Wong decided in November 2012 to resign as President of UHNIC to try to avoid the nastiness that would follow Camp's plan to take control of Cinium.  Wong agreed to remain as President of UHNIC until March 2013 in order to have a smooth transition of the insurance carrier.

51.     On June 1, 2013, Camp forwarded an internal, board member communication to his ex-wife, noting to her that the email was setting the stage for Camp to fire Berman in three years: "This isn't directed at me - it [sic] from Joel and to Robert and is setting the eventual firing of Robert by me in 3 yrs. this is the PG version."

52.     Also in June 2013, Camp advised Asen that upon the termination of Berman's Employment Agreement, the Cinium Securityholders' Agreement provided a formula under which Avon Road Partners, L.P.'s interests in Cinium could be redeemed at the election of Cinium without any payment to Avon Road Partners, L.P. -- with the result that the equity interests of the other shareholders in Cinium would increase pro rata by approximately 45%, an amount equivalent to Avon Road Partners, L.P.'s interest in Cinium that would be redeemed. The purchase price for Avon Road Partners, L.P.'s shares upon such election to redeem all of its shares would be zero, notwithstanding its original investment of $10 million, based on a formula in the Cinium Securityholders' Agreement.

53.     CastlePoint would only be able to share in this benefit if it first converted its Senior Note to equity prior to the time the Avon Road Partners, L.P. shares were redeemed. CastlePoint did indeed apply to the DFS to take control of Cinium by converting the Senior Note in a "Form A" submitted on August 29, 2013, thirteen (13) years ahead of the maturity date for

conversion.  Upon such conversion, CastlePoint's Senior Note would have been terminated and its newly acquired equity interests in Cinium would have been subordinated to third party liabilities and the interests of preferred shareholders.  Therefore, the principal reason CastlePoint would want to convert and dilute its senior position in the capital structure of Cinium would be to share the spoils of the redemption of Avon Road Partners, L.P.'s 45% interest in Cinium. With the Form A submission on August 29, 2013, CastlePoint submitted a "Supplemental Information" PowerPoint presentation that contained false allegations of criminal conduct against Berman and stated that the sole purpose of the Form A submission to take control by converting its debt to equity was to terminate Berman as CEO and install Camp in his place. The result of such termination would be an increase in the equity interests of CastlePoint post-conversion due to Cinium's right under the Cinium Securityholders' Agreement to redeem a terminated employee's shares upon such termination.

54.     Camp accelerated his timetable in June 2013 and concocted a scheme with the other directors to undermine Berman's authority and to terminate Berman as CEO so that Camp could take his place as soon as possible.   In early July 2013, he distributed to Asen a presentation they called the "TIME LINE ACTION PLAN."  It was a plan to get rid of Berman and have Cinium redeem Avon Road Partners, L.P.'s shares for no compensation that Camp, together with the other three aligned board members, proceeded to implement with the assistance of Cinium's auditor, John Green of BDO, and Scott Kaniewski.

55.     The TIME LINE ACTION PLAN included a chart with a schedule of events that started with initiation of an investigation of Berman by the Audit Committee (i.e., by interested directors Asen and Roberts) starting in mid-July 2013 with an anticipated, predetermined outcome that the board would terminate Berman's Employment Agreement by Labor Day 2013.

21

Litigation among the parties in the Delaware Chancery Court that began in August 2013, however, delayed consummation of the TIME LINE ACTION PLAN beyond the originally planned completion date of Labor Day 2013.



56.     In July 2013, Camp also circulated to the three other directors a "Cinium Restructuring Plan" in which the offices and remaining staff members would all be moved to Miami, Florida, where he lives.

57.     Additional TIME LINE ACTION PLAN documents reveal that upon the redemption of Avon Road Partners, L.P.'s interests in Cinium, Camp, Asen, and Michigami would benefit from the redemption of Avon Road Partners, L.P.'s shares, as their respective percentage interests in Cinium would be increased pro rata by Avon Road Partners, L.P.'s redeemed interest.

58.     In July 2013, following the TIME LINE ACTION PLAN, Asen and Roberts, as members of Cinium's Audit Committee, working closely with Camp as CFO, proceeded to try to

22

unearth anything that might possibly be perceived to discredit Berman within the company and with its auditor and the DFS.  The degree of desperation in this attempt and the extent to which any sense of proportion was thrown out the window is revealed in an e-mail Camp sent Asen with a copy to Roberts on August 31, 2013:  "I pretty much want to know if anyone so much a[s] got a glass of water at the house of someone's cousin who worked at a company for a day in which someone who owned just one share of [Cinium] had even a fleeting interest."

59.     The TIME LINE ACTION PLAN's *predetermined outcome* of ousting Berman for cause from inception of the plan in July 2013 predated commencement of the Audit Committee investigation against Berman. The Audit Committee would simply go through the motions to arrive at Berman's eventual condemnation by the board.  The "Supplemental Information" submitted to the DFS with CastlePoint's Form A application on August 29, 2013, included charges against Berman by the Cinium Audit Committee before its investigation moved forward.  Berman was not informed by the committee that it had lodged any charges against him with the DFS, nor was this action submitted for Cinium Board review or approval.

60.     The scheme also involved enlisting John Green of BDO, the company's auditor, in fabricating charges of misappropriation against Berman and an attempt, with the greater credibility than self-interested directors of what should have been but was not an independent auditor, to persuade the DFS to withdraw its approval of Berman as a "controlling person" of Cinium and UHNIC.  If the DFS could be persuaded to take action, that would, of course, make the actions at the October 25, 2013, meeting of the Cinium Board of Directors seem to merely follow what its auditor insisted on and DFS required.

61.     BDO prepared a report to the Audit Committee dated October 17, 2013, that it presented to and discussed with the DFS before it was final and before it had been presented to

Cinium's board and Chief Executive Officer.  Prior to the issuance of the BDO report, Camp and members of the Audit Committee discussed with John Green what his report should contain. In addition, on October 11, 2013, less than a week before BDO issued the report, Camp authorized a Cinium payment to BDO of $110,000 within 47 minutes of John Green's email request. BDO's e-mail to Camp enclosing the e-mail stated:  "Given the circumstances, we need to have this invoice [for $100,000] paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work. There are wire instructions on the invoice for your convenience."

62.     The individual in charge of the Cinium audit, John Green, had recently moved to BDO from Marcum LLP, which had performed the Cinium and UHNIC audits for 2010 and 2011.  He was therefore well aware of issues concerning RH Land and, specifically, concerning the status of the loan agreement for its real estate asset.

63.     The BDO report contained numerous false accusations that Berman had concealed matters that BDO – especially by virtue of the fact that its audit partner John Green had performed previously audits of Cinium – knew to be false or, acting with reasonable professional diligence, would have known to be false or unsupported.

64.     Worse, BDO threatened before the DFS and to Cinium to withdraw prior audit opinions and to withdraw as auditor unless Berman was removed as an officer and director of Cinium.  In other words, BDO told the DFS and Cinium's board that it had to get rid of Berman or get rid of the auditor.

65.     As this indicates, Camp, Asen, and Roberts attempted to have BDO do their dirty work and persuade the DFS to take action against Berman that they could then claim to rely on at the October 25, 2013, board meeting.

66.     Messrs. Berman and Vacco both responded to the October 17, 2013, BDO report and pointed out to John Green its numerous false statements and failure to investigate with professional diligence.  Mr. Berman's letter dated October 29, 2013, and Mr. Vacco's letter dated November 6, 2013, are attached hereto as Exhibits A and B, respectively.

67.     Among the false statements in the BDO report pointed about by Mr. Vacco, a former New York State Attorney General and former United States Attorney for the Western District of New York, was BDO's assertion that

> [t]he existence of an asset forfeiture proceeding against the Company and certain officers and directors by the Federal Government that commenced in 2008 was not previously disclosed to the auditors.  At a minimum, the circumstances of this matter require disclosure in the financial statements. We do not have sufficient information to conclude on the current the status of this matter including whether the statute of limitations has run.

Mr. Vacco noted in his letter that he had already pointed out to BDO in a lengthy telephone conversation with Mr. Green that no such asset forfeiture proceeding ever existed and that his law firm had shared with the Audit Committee and the corporation's counsel on July 12, 2013, a legal memorandum concluding that the statute of limitations had expired on any such claim.

68.     Among the false statements refuted by Berman were BDO's statements concerning the mortgage on the asset of RH Land that

> [t]he existence of the mortgage alone, for amounts that exceed the equity of RH Land Development LLC, requires this investment to be a non-admitted asset for regulatory purposes, which means it has no value. The value for GAAP purposes at this time is also zero because the Company has failed to provide the appropriate supporting documentation to justify the carrying value at anything else but zero. The question as to whether the mortgage is recourse to UNIC [sic] has not been answered.

69.     As to the first point, Berman pointed out to John Green of BDO that

> Management has provided to you (during Marcum's audit of the 2010 financial statements) a copy of the appraisal by Integra Realty Resources dated March 18, 2008 performed for and addressed to Bear Stearns Commercial Mortgage, Inc., the then existing lender on RHLD's project. The market value cited

25

in that appraisal exceeded the combined basis of the mortgage and the total equity invested— appraised value of $11.3 million against a combined cost basis in RHLD to date of $10.8 million, which <u>includes</u> the $4.6 million mortgage.

As was stated in the management representation letters to you and Marcum for the 2010 and 2011 audits of Cinium and its predecessor, Upper Hudson Holdings LLC ("UHH"),

*"29. Real estate held for investment has been recorded at cost, which we believe is less than the fair value of the property based on a formal appraisal obtained in 2008. Because of market conditions, there is uncertainty as to the amount the Company would realize if the Company were required to sell the asset in the near future. We believe that the investment will ultimately be sold for an amount that exceeds book value."*

70.     As to the second point, Berman pointed out that Green had previously been advised that the loan on the Glen Wild property was recourse to RH Land but not to the members of RH Land – i.e., not to UHNIC.  Berman's attorney, Joseph Bernstein, had separately informed Mr. Green of these facts in separate conversations and suggested that Mr. Green review the loan documents, which he apparently chose not to do.

71.     After being confronted by Berman and his attorneys, BDO resigned from its engagement as auditor of Cinium and UHNIC in a letter dated November 5, 2013, and withdrew its 2012 opinion letter for the UHNIC audit.   The reason it gave was "a lack of independence due to these threats of imminent litigation."  It was in fact BDO's lack of independence that engendered the threats of litigation.

72.     BDO's response to the point-by-point refutation of its report by Messrs. Berman and Vacco was to attempt to distance itself from the  report it had submitted to the DFS and Cinium's Audit Committee with the following statement sent to the DFS on November 25, 2013:

As indicated in the presentation materials, its statements reflect "preliminary results of [BDO's] audit procedures," which would have required the performance of additional procedures to confirm prior to issuance of a report. Further, as stated on the face of the presentation, it "was prepared as part of our audit, has consequential limitations, and is

26

intended solely for the information and use of those charged with governance (e.g., Board of Directors and Audit Committee) and, if appropriate, management of the Company and is not intended and shall not be used by anyone other than those specified parties." At the time of the Audit Committee meeting, and now with the benefit of additional information received by BDO, including the information set forth in the Disagreement Letter, BDO lacks sufficient information to reach final conclusions with respect to the issues raised in the presentation, and BDO has not performed the necessary procedures to issue an audit opinion with respect to the financial statements of the Companies.

73.     The harm from the BDO report had already, however, been done, and Camp, Asen, Roberts, and Michigami proceeded to bring their plan to fruition at the October 25, 2013, board meeting that proceeded inexorably to a vote to terminate Berman's employment  with carefully scripted questions, statements, and findings by the attending board members.  For the first time, a Cinium board meeting was transcribed.

74.     The directors voting at the October 25, 2013, board meeting emphasized many times the extent to which they were relying on Cinium's "independent" auditor (BDO).  By providing the board's self-interested directors with the appearance of legitimate accusation by a supposedly independent auditor, BDO deliberately made itself an essential element of the wrongful termination of Berman's employment.

**The Unlawful Plan to Seize the Cinium Stock of Avon Road Rock Hill**

75.     In furtherance of their scheme to use Berman's firing to seize Cinium stock, Camp, Asen, Roberts, and Michigami have called a meeting of the Board of Directors of Cinium for April 27, 2014.  The principal items on the distributed agenda are "review of [Cinium] Capital Structure" and "Authorization for Stock Repurchase Pursuant to Securityholders' Agreement After the Termination of Robert Berman's Employment by Cinium."

76.     Cinium has no right under the Cinium Securityholders' Agreement to repurchase stock held by Avon Road Partners, L.P.  That is clear in its explicit language, and Cinium, Camp,

27

Asen, Roberts, and Michigami have been warned by letter from Berman's counsel to counsel for Cinium and for Camp, Asen, and Roberts that the actions they intend have no legal basis.

77.     Section 6(a) of the Cinium Securityholders' Agreement gives Cinium a "Company Call Right" as follows:

> (a) <u>Right to Purchase</u>. Upon the termination of any Employee Stockholder's employment by the Company or its Subsidiaries for any reason, including as a result of the death or Disability of such Employee Stockholder, or for cause or without cause, or as a result of a voluntary resignation by such Employee Stockholder, the Company may elect to repurchase all or any portion of the Stock held by such Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees for the "<u>Employee Termination Price</u>" which will be determined and applied as set forth in Section 6(d) below.

78.     Pursuant to that provision, Cinium can purchase the stock of a terminated "Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees."  Neither entity in which Berman has an interest that is a Stockholder of Cinium, -- that is, neither Avon Road Partners, L.P., nor the Robert A. Berman Family Trust -- is an "Employee Stockholder and his or her Family or Estate-Planning Transferees or Involuntary Transferees."

79.     Berman was not an Employee Stockholder of Cinium, because he has never been a Stockholder of Cinium.

80.     Non-Investor Stockholders are defined in the preamble as the Stockholders of the Company named on the signature page of the Securityholders' Agreement and any other persons who become Stockholders and party to the Agreement.  Berman is not one of the Non-Investor Stockholders named on the signature page.  The inclusion of the Robert A. Berman Family Trust and of Avon Road Partners, L.P., of which Berman is a General Partner, does not include Berman as an individual.

28

81.     Avon Road Partners, L.P. is not a "Family or Estate-Planning Transferees or Involuntary Transferees," which is defined in the preamble to the Cinium Securityholders' Agreement as follows:

> "<u>Family or Estate-Planning Transfer</u>" means, with respect to any Non-Investor Stockholder who is a natural person, a transfer[ee] of Stock held by such Non-Investor Stockholder (a) to a trust under which the distribution of such Stock may be made only to such Non-Investor Stockholder and/or Family Members of such Non-Investor Stockholder, (b) to a charitable remainder trust, the income from which will be paid to such Non-Investor Stockholder during his or her life, (c) to a corporation, the stockholders of which are only such Non-Investor Stockholder and/or Family Members such Non-Investor Stockholder, (d) to a partnership or limited liability company, the partners or members of which are only such Non-Investor Stockholder and/or Family Members of such Non-Investor Stockholder, or (e) by will or by the laws of interstate succession, to such Non-Investor Stockholder's executors, administrators, testamentary trustees, legatees or beneficiaries, provided in the case of the foregoing clauses (a) – (d) that such Non-Investor Stockholder has sole control of the entity referred to. "<u>Family or Estate-Planning Transferee</u>" shall have a corresponding meaning.

82.     The definition of a Family or Estate Planning Transferee does not apply to any of the Stockholders on the Agreement because they are not the transferees of a natural person who was a Non-Investor Stockholder.  They are not transferees of any Stockholder at all, whether natural or not, because they are the initial Stockholders, not transferees.

83.     Additionally, Section 6(b) requires that any exercise of an election to purchase stock pursuant to Section 6(a) be exercised by notice "within 90 days after the termination of such Employee Stockholder's employment."  Since the Cinium Board terminated Berman's employment effective immediately on October 25, 2013, the ninety-day period within which it could exercise an election to purchase his stock – if that were appropriate under Section 6(a) – has expired.

84.     Accordingly, even if Berman had been lawfully terminated as Chief Executive Officer of Cinium (and, as shown above, he was not), Cinium would still have no right to purchase the shares of any Stockholder of Cinium as a result of the termination.

1993747

## FIRST COUNTERCLAIM
### (By Berman against Cinium for Breach of the Employment Agreement)

85.     Berman repeats and realleges paragraphs 1 through 84 above as if fully set forth herein.

86.     By reason of the foregoing, Cinium breached Berman's Employment Agreement.

87.     By reason of the foregoing, Berman has been damaged in an amount not currently ascertainable and to be determined by the trier of fact, and the threatened breach of the Securityholders' Agreement threatens additional and irreparable harm.

## <u>SECOND COUNTERCLAIM</u>
### <u>(By Berman against Camp, Asen, Roberts, Michigami, and BDO for<br>Tortious Interference with Berman's Employment Agreement)</u>

88.     Berman repeats and realleges paragraphs 1 through 84 above as if fully set forth herein.

89.     By reason of the foregoing Camp, Asen, Roberts, Michigami, and BDO intentionally interfered with Berman's Employment Agreement and induced Cinium's breach of it.  The individual directors did so with malice, for personal gain or otherwise to serve interests other than those of the corporation.  In doing so they acted outside the scope of any employment or status as directors and through wrongful means.  BDO did so without economic justification and contrary to its professional duties to the corporation.

90.     But for the actions of each of Camp, Asen, Roberts, Michigami and BDO, Cinium would not have breached Berman's Employment Agreement.

91.     By reason of the foregoing, Berman has been damaged in an amount not currently ascertainable and to be determined by the trier of fact; the threatened breach of the Securityholders' Agreement following the wrongful termination threatens irreparable harm.

WHEREFORE, defendants and counterclaim plaintiff respectfully request that the Court enter judgment as follows:

A.     Dismissing the complaint with prejudice;

B.     Awarding Berman compensatory damages on his counterclaims in an amount to be determined by the trier of fact;

C.     Awarding Berman punitive damages against all counterclaim for their deliberate, malicious, fraudulent scheme against Berman, in an amount to be determined by the trier of fact;

D.     Awarding Berman prejudgment interest on his counterclaims according to law;

E.     Awarding defendants and counterclaim plaintiff their costs and attorneys' fees; and

F.     Awarding defendants and counterclaim plaintiff such other and further relief as may be just and equitable under the circumstances.

## JURY TRIAL DEMAND

Defendants and counterclaim plaintiff demand trial by jury of all issues so triable.

Dated:  April 25, 2014

_____
Kim J. Landsman
Beth Nagalski
GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP
437 Madison Avenue
New York, NY 10022
Tel: (212) 907-7368

*Attorneys for Defendants and*
*Counterclaim Plaintiff Robert Berman*

1993747

# EXHIBIT A

October 29, 2013

**CINIU**NI

**VIA OVERNIGHT MAIL**

John Green, CPA
Partner
BDO USA, LLP
100 Park Avenue
New York, NY 10017

Cinium Financial Services
Corporation

Re:      BDO Report to the Audit Committee

Dear Mr. Green:

This letter shall serve as a response to your Report to the Audit Committee of
Cinium Financial Services Corporation ("Cinium") dated October 17, 2013, a
copy of which I was provided on October 25, 2013, apparently a full week after
certain other Cinium Board members received it and after you submitted it to the
New York State Department of Financial Services ("DFS") and met with the
DFS along with previously displaced representatives of Cinium, without notice to
me or Dennis Vacco as members of the Cinium Board.

I presume that your report was issued without bias and independent of any
advance review of its release and not edited by any purported Cinium Board
member or officer, including John Crowe or other counsel. I am sending a copy
of this letter to BDO's CEO so that BDO's legal counsel may respond on this
point. However, I note for the record that Jeff camp, CFO of Cinium, paid BDO,
**WITHOUT MY KNOWLEDGE OR AUTHORIZATION AS CEO OF
CINIUM, BY TRANSFERRING $110,000 ON OCTOBER 11, 2013 TO
BDO.**  I trust this was not an incentive to the issuance of your report prior to
completion of the Audit Committee's investigation or your participation in recent
meetings at DFS accusing me of improprieties and stating that BDO will resign if
I continue as CEO. The latter is a very surprising comment from any auditor and
begs the question of the scope and extent of your participation in a fraudulent
effort by certain members of the Board and others who have aligned with the
senior lender in a conspiracy to terminate me and acquire my family's interests in
Cinium.

I trust you are aware that Mr. Camp was able to transfer $110,0000 to BDO,
unilaterally and without my knowledge or consent, because he took control of
significant bank accounts of Cinium and its subsidiaries and consolidated cash
balances in these accounts where he serves as sole signatory without my
authorization as CEO of Cinium or that of the Board. By email dated August 13,
2013, Mr. Camp wrote to Messrs. Asen and Roberts:

Corporate Headquarters
195 Lake Louise Marie Road
Rock Hill, NY 12775-8005
(T) 845.791.6700
(F) 845.794.5333

Florida Office
444 Brickell Avenue
Suite 701
Miami, FL 33131
(T) 786.353.0301
(F) 305.675.2434

Pennsylvania Office
200 Union Square Drive
New Hope, PA 18938
(T) 215.693.1288
(F) 215.693.1194

www.cinium.com

> *"I have converted all user access to our accounting system to "Read Only" for any user based in any office other than Miami. This results in checks being able to be generated only from the Miami office where I am the signatory. Second, while a wire can be generated by one user in PA (DAppel) from our bank accounts, that wire would need to be approved by either myself or our corporate controller who also sits in Miami and has been instructed not to approve any wires. I am also removing some people not based in Miami as signatories on our accounts."*

Before I address point-by-point the accusations raised in your report, I question the actions taken by you and BDO and whether such actions were completed with full impartiality and thorough review and diligence. As you have been made aware, there exist disputes amongst the stakeholders of Cinium as well as the members of the Board of Directors. Your report not only perpetuates the "witch hunt" that the Audit Committee has undertaken, but it also excludes key issues which you have been asked to investigate by other members of the Board. Furthermore, your report shows that you have not conducted a thorough and unbiased review of your own work as the audit partner at Marcum LLP, which performed the audits of Cinium and Upper Hudson National Insurance Company ("UHNIC") for the years ended 2010 and 2011.

The circumstances of a "witch hunt" against me and other stakeholders in Cinium have now been further confirmed by evidentiary proof recently discovered from the Cinium company emails of Mr. Camp—that Messrs. Asen, Roberts and Camp had made a unanimous decision in June 2013 to eliminate me from Cinium and thereafter prepared an elaborate **"TIMELINE PLAN",** under which they agreed to work together through the Audit Committee to commence an investigation on July 14, 2013, the purpose of which was to terminate my Employment Agreement and trigger the redemption of the shares of my family entity, Avon Road Partners, L.P. ("Avon Road"). What you may not know, and as we have now discovered from the Camp emails, Messrs. Asen, Roberts and Camp were using the Audit Committee investigation as a "fishing expedition," with your assistance, to determine what claims **they and their investors would have against Cinium**  the fox was indeed watching the chicken coop! In an email on July 2, 2013 to Mr. Roberts and Mr. Camp, Mr. Asen wrote:

> *"Thanks [sic] you the information which you have provided tot eh [sic] Audit Committee of CFSC... 2) To be clear, the issues that you have enumerated in your e-mails are NOT all-inclusive of the issues my investment group has and/or may have presently and/or in the future with CFSC, its predecessor companies and/or its predecessor company Manager(s), Robert Berman and/or Dennis and/or officers, managers, employees, representatives, attorneys, accountants, consultants, etc. Joel Asen Chairman of CFSC Audit Committee"*

Even before the Audit Committee commenced its "witch hunt," these gentlemen had already exchanged emails preparing to report me to the IRS, the New York Attorney General and other authorities for all kinds of alleged criminal violations they had drummed up. As later confirmed by Mr. Camp in an email to Mr. Roberts,

> *"I pretty much want to know if anyone so much a[s] got a glass of water at the house of someone's cousin who worked at a company for a day in which someone who owned just one share of CFSC had even a fleeting interest."*

These matters have been addressed in a lawsuit detailing the conspiracy filed by me, Dennis Vacco and other plaintiffs on October 18, 2013 in the Supreme Court of New York in Sullivan County.

Now allow me to begin my response to your report with a listing of the individuals involved with the preparation and audit of the financial statements of Cinium and UHNIC. I do this because in your email

questionnaire that was sent to me, you incorrectly assert that me and Robert Wong were the only two members of management that you worked with on the 2010 audits. As you confirmed on our recent telephone conversation, that call was the second time that we had ever spoke to each other (the first time being less than a month earlier). In fact, we have never met personally. The persons involved with the audits were as follows:

| YE 2010 | |
| --- | --- |
| Auditor: | Marcum LLP; John Green, Partner |
| Audit Committee: | Joel Asen (Chair) & Jeff Camp |
| Management: | Robert Berman (CEO), Alan Mansfield (CFO & Treasurer), Jeff Camp (CFO, successor to Alan Mansfield), Robert Wong (COO & President of UHNIC) & Donald Appel (Treasurer of UHNIC) |

| YE 2011 | |
| --- | --- |
| Auditor: | Marcum LLP; John Green, Partner |
| Audit Committee: | Joel Asen (Chair) & Jeff Camp |
| Management: | Robert Berman (CEO), Jeff Camp (CFO & COO), Robert Wong (President of UHNIC) & Donald Appel (Treasurer of UHNIC) |

| YE 2012 | |
| --- | --- |
| Auditor: | BDO LLP; John Green, Partner |
| Audit Committee: | Joel Asen (Chair) & Jim Roberts |
| Management: | Robert Berman (CEO), Jeff Camp (CFO), Robert Wong (COO & President of UHNIC), Raul Miranda (Corporate Controller) & Donald Appel (Treasurer of UHNIC) |

You have asserted in your report that management misstated the financial statements for the years ended 2010 and 2011 and failed to respond to requests for information. You have also asserted that BDO is not able to complete the audits for the year ended 2012. **<u>BECAUSE YOUR REPORT SIMPLY SUMMARIZES YOUR CONCLUSIONS AND FAILS TO PROVIDE ANY SPECIFIC EVIDENCE TO SUPPORT YOUR ASSERTIONS, I CANNOT ADDRESS ANY SPECIFIC ALLEGATIONS OF INAPPROPRIATE ACTIONS OR ACTIVITIES BY ANY OF THE MEMBERS OF THE MANAGEMENT TEAM.</u>**However, never at any time were any members of management under any orders by me to withhold information, misstate the financial statements in any manner, or not fully cooperate with the audit work of BDO, Marcum, or any prior auditors. Furthermore, I have no knowledge of any members of management having committed any of the aforementioned actions.

I offer the following responses to the issues raised in your report (presented in the order as they appeared). Again, without any details or supporting evidence in your report, I will respond to the best of my knowledge and ability.

## VALUATION OF INVESTMENT IN RH LAND LLC

Management has consistently reported to its auditors that the value of UHNIC's investment in RH Land Development LLC ("RHLD") has been recorded at its cost basis. This investment was made by UHNIC in April of 2008. Management has provided to you (during Marcum's audit of the 2010 financial statements) a copy of the appraisal by Integra Realty Resources dated March 18, 2008 performed for and addressed to Bear Stearns Commercial Mortgage, Inc., the then <u>existing lender</u> on RHLD's project. The market value cited in that appraisal exceeded the combined basis of the mortgage and the total equity invested— appraised value of $11.3 million against a combined cost basis in RHLD to date of $10.8 million, which <u>includes</u> the $4.6 million mortgage.

As was stated in the management representation letters to you and Marcum for the 2010 and 2011 audits of Cinium and its predecessor, Upper Hudson Holdings LLC ("UHH"),

> *"29. Real estate held for investment has been recorded at cost, which we believe is less than the fair value of the property based on a formal appraisal obtained in 2008. Because of market conditions, there is uncertainty as to the amount the Company would realize if the Company were required to sell the asset in the near future. We believe that the investment will ultimately be sold for an amount that exceeds book value."*
>
> *(This representation also appeared as # 21 in the 2010 and 2011 management representation letters for UHNIC.)*

In addition, all of the capital calls made by UHNIC since its initial investment were made available to you and Marcum. These capital calls at all times showed the cumulative capital balances made to date by each and every one of the members of RHLD.

In further support of the valuation of UHNIC's investment, one can look to the valuation of the membership interest at which Mr. Camp's own entity, JC Real Estate Fund I, LLC, made its investment in RH Land in February of 2010. UHNIC paid $750,000 for a 15.674% membership interest in RHLD in April 2008. JC Real Estate Fund invested $500,000 for a 5.85% membership interest two years later. These investments equated to $47,850 and $85,470 per one percentage point of membership interest, respectively. By this measure, the investment held by UHNIC nearly doubled in value from April 2008 to February 2010.

As to your question as to whether the mortgage on RHLD is recourse to UHNIC or Cinium, this has been previously addressed. The loan documents are recourse to RHLD as the borrower, not to the members of RHLD. A reference to recourse in K-1's submitted to UHNIC for 2008 and each year thereafter means the loan is recourse to RHLD for income tax purposes and allocation of debt to the members under principles of tax law. As you should know, there is a distinction between recourse and nonrecourse mortgage loans under the Internal Revenue Code, with nonrecourse loans being those that encumber only the mortgage assets, with no deficiency judgment obtainable against the borrower. Moreover, the RHLD federal income tax returns (Form 1065), in each taxable year after the mortgage was obtained by RHLD, have reflected the total mortgage balance. Indeed, as part of your audit at Marcum, you reviewed the RHLD tax returns and K-1's issued to UHNIC since 2008, each of which indicate, respectively, the total debt of RHLD and the share of mortgage loans and other liabilities of RHLD allocated to UHNIC and other members of RHLD. All K-1's issued to UHNIC since 2008 have been made available and reflect UHNIC's share of the loan balances of RHLD.

Note also that, pursuant to #32 on the 2010 management representation letter to you and Marcum, all related parties were disclosed, including RH Land Development, LLC, Avon Road Bermase I LLC, Route 17B Holdings, LLC, and Vista Development, LLC.

As part of Marcum's FIN46(R) analysis, a copy of which is attached, management disclosed to you the existence of a mortgage on the property held by RHLD. Management advised you that the mortgage was a non-recourse loan and that there is no liability to UHNIC.

At the time the 2010 and 2011 audits were performed, I am not aware of you or Marcum requesting any investigation of UHNIC's investment in RHLD or of any refusal or resistance by any member of management in providing you any such additionally requested information.

The issue of the RHLD investment and alleged nondisclosure of the Bear Stearns mortgage has been raised by Cinium directors Joel Asen and Jim Roberts, sitting as the Audit Committee, along with CFO Jeffrey Camp, as part of their conspiracy to terminate my Employment Agreement and to redeem all of the shares of Avon Road, the owner of the majority of the voting common shares of Cinium. Their purpose was to enhance the percentage equity position of all of the conspirators pro rata by the shares redeemed from Avon Road. Mr. Asen represents REL-REM Holdings, Inc., Tow Sur LLC, and Trombone LLC, and Mr. Roberts serves on the Cinium board as representative of the senior lender, CastlePoint Insurance Company, and its parent, Tower Group, Inc. (together, "Tower").

I must point out to you that your accusation of my hiding the mortgage or a mortgage default by RHLD is totally misplaced and defamatory. On **February 15, 2011,** Mr. Camp, CFO of Cinium, and at the time a member of the Cinium Audit Committee along with Mr. Asen, and with whom the Cinium Audit Committee has been conducting the recent investigation along with you, received the following email from me that I received from Blackrock, as representative of the lender:

*Response to BDO Report, 10/29/13, p. 6*

---

**Robert Berman**

---

From:                    Robert Berman
Sent:                    Tuesday, February 15, 2011 1:00 PM
To:                      jeff@jodocuscapitalcom
Subject:                 Fw: RH Land - Draft Forbearance Agreement
Attachments:             RH Land - Forebearance Agreement_6.DOC


Fyi, give me a call I have not looked at this


**From:** Leese, Reggie rmailto:Reacne.LeeseOblackroml
**Sent:** Tuesday, February 15, 2011 12:17 PM
**To:** Robert Berman
**Subject:** RH Land - Draft Forbearance Agreement

**Attached please find a draft of the Forbearance Agreement with respect to the RH Land transaction.**
**Please note the attached remains subject to the review and comment of Lender in all respects.**
**Furthermore, this email and the attached documents are subject to the terms of that certain Pre-Negotiation Letter Agreement dated December 18, 2009, by and between the Glen Wild Land Company, LLC and Lender, as accepted and agreed to by RH Land Development, LLC and Robert Berman.**


Reginald S. Leese
BlackRock Solutions
Financial Markets Advisory
One Financial Center, 31st Floor
Boston, MA 02111
617-357-1251
reme.leeseoblackrock.com


THIS MESSAGE AND ANY ATTACHMENTS ARE CONFIDENTIAL, PROPRIETARY, AND MAY BE PRIVILEGED. If this message was misdirected, BlackRock, Inc. and its subsidiaries, ("BlackRock") does not waive any confidentiality or privilege. If you are not the intended recipient, please notify us immediately and destroy the message without disclosing its contents to anyone. Any distribution, use or copying of this e-mail or the Information it contains by other than an intended recipient is unauthorized. The views and opinions expressed in this e-mail message are the author's own and may not reflect the views and opinions of BlackRock, unless the author is authorized by BlackRock to express such views or opinions on its behalf. All email sent to or from this address is subject to electronic storage and review by BlackRock. Although BlackRock operates anti-virus programs, it does not accept responsibility for any damage whatsoever caused by viruses being passed.


It would appear that Mr. Camp has failed to recall his own understanding that there was a mortgage and a default at RHLD, no doubt a reflection of amnesia in his overzealous attempt to drive me out of Cinium and take over as CEO, with the blessing of Tower and other Board members. In fact, on June 1, Mr. Camp forwarded a confidential Board email to his ex-wife, indicating the Board was setting it up for him to fire me in three years. That program was accelerated in late June 2013 as part of the overall conspiracy

between Mr. Camp, other members of the Board and Tower. Mr. Camp had been seeking Cinium General Counsel's advice (John Crowe) as far back as February 2013 as to the redemption of Avon Road's interest in Cinium upon my termination as CEO. (John Crowe's partner, David Plunkett, is a long-time friend of Mr. Camp, and John Crowe had a serious conflict of interest advising Mr. Camp on such a matter.)

Mr. Camp was a stakeholder in Cinium until the sale of all of his common and preferred shares for the nominal sum of **$100** on August 22, 2013, which I had asked you to investigate, given Mr. Camp paid $12 **million** for this interest in 2010. Repeated requests I have made of BDO, orally and in writing, to determine the underlying relationship between Cinium's CFO, who is also Chairman and President of UHNIC, fell on deaf ears, thwarted by overriding instructions given to BDO by you and members of the Audit Committee. I had asked you to investigate this matter as you had sent me a similar request prepared for you to send me by Mr. Camp. You honored Mr. Camp's request, but not mine. You should be aware that Mr. Camp (as CFO of Cinium and Chairman and President of UHNIC) may be in violation of his fiduciary duties to UHNIC, and to Cinium and its shareholders, if he maintains any undisclosed side agreements with Tower or its affiliates, in any manner.  **BOTH MR. CAMP AND TOWER HAVE REFUSED TO MAKE THIS DISCLOSURE, AFTER *REPEATED* REQUESTS.**

It is completely disingenuous that Messrs. Asen and Roberts now investigate RHLD when at the time of their affiliates' respective investments in Cinium, neither cared to conduct any due diligence whatsoever on the RHLD investment. That was because their investment decisions were not predicated or impacted by the existence of UHNIC's investment in RHLD. In fact, both parties agreed, along with all shareholders of Cinium, that the RHLD asset be distributed out to the existing Cinium shareholders, to be replaced with cash. This is evidenced by an email sent by Mr. Asen to Cinium management on January 30, 2011, which states,

> *"Looks correct. Of $2,620 [$2.62 million] working capital uses, $1,500 [$1.5 million! is for the land "exchange" and $1,120 [$1.12 million] is for CFS Working Capital, correct?"* [Emphasis supplied]

A portion of the $2.62 million balance remaining from Mr. Asen's affiliates' investment was earmarked for Cinium to acquire UHNIC's investment in RHLD for cash. Once the RHLD asset was out of UHNIC and in Cinium, it was to be distributed to the existing shareholders of Cinium. UHNIC would then be holding cash instead of the real estate asset.

The Securityholders' Agreement *that* was executed as part of the transaction with Tower *in* June 2012 provided another subsequent mechanism for this disposition:

> *"... the following distributions or dividends may be declared by the normal act of the Board of Directors without a Supermajority Vote: (a) any distribution structured to effect the transfer of the membership interests or stock of RH Land Development LLC and Global Pari-Mutuel Service Inc. to the Non-Investor Stockholders [emphasis added], at any time, so long as after giving effect to such distribution, the amount of capital and surplus in UHNIC will not impair UHNIC's operating and underwriting activities or cause a material adverse effect to UHNIC's ability to retain the insurance licenses it then holds;..."*

It appears Messrs. Asen and Roberts are now raising concerns with the RHLD investment for the sole purposes of intentionally keeping the 2012 Cinium audit open and overstretching to use it as a basis for their conspiracy against me and other directors and stakeholders. This is further evidenced by your recent demand that I be terminated in order for BDO to continue with its audit.

## MILLER MATTER

First and foremost, the matter concerning Mr. W. Raymond Miller has been fully disclosed to all parties involved. In February 2008, the New York State Department of Financial Services, along with other regulatory agencies, was immediately notified by UHNIC of the Miller fraud. UHNIC also fully disclosed the Miller matter in its 2007 statutory and audited financial statements. This matter was very public in nature, and in fact, UHH and UHNIC filed a RICO case against Mr. Miller in February 2008. Most recently, the Miller litigation was disclosed to Jim Roberts and Tower, as evidenced by the attached litigation schedule, which was provided to them as part of Tower's due diligence process in making their senior loan to Cinium.

UHH, which again was the predecessor to Cinium, and UHNIC fully cooperated with the multiple governmental authorities in the prosecution and conviction of Mr. Miller. UHH and UHNIC were victims of the fraud perpetrated by Mr. Miller, and UHH incurred significant monetary damages. In December of 2008, Mr. Miller was convicted and sentenced to serve over ten years in federal prison.

Contrary to your report, **NO ASSET FORFEITURE ACTION HAS EVER BEEN UNDERTAKEN AGAINST UHH, CINIUM, UHNIC, ANY OF THEIR AFFILIATES, OR ANY OF THEIR RELATED PARTY INDIVIDUALS, INCLUDING ANY OFFICERS, DIRECTORS OR PRINCIPALS.** This has been supported by your own conversations with Dennis Vacco, former New York State Attorney General and U.S. Attorney for the Western District of New York, who currently serves on the Board of Cinium.

As you pointed out in your report, UHH carried the $2.75 million deposit made by Miller on its 2007 financial statements as a liability. Upon the conviction of Mr. Miller in 2008, this liability was converted to income and equity distributions to the members of UHH. While you call into question the tax treatment of these funds, you fail to cite in your report that my personal tax returns from 2007 through 2009 were not affected by any characterization of the income and that my 2007-2009 returns were audited by the U.S. Internal Revenue Service, including a review of company returns. The IRS issued a no change letter for these taxable years. This was brought to the attention of all members of the Cinium Board by a letter dated October 21, 2013 by my attorney, Mr. Joseph Bernstein.

Similar to the RHLD investment matter, Messrs. Asen, Camp and Roberts has chosen to now call into question the Miller matter in an effort to support their conspiracy against me and other directors and stakeholders of Cinium. Again, given the very public nature of the Miller case and various lawsuits, and the disclosure to the all parties involved, there was no hiding of anything here.

## KANIEWSKI MATTER

The lawsuit filed by Scott Kaniewski et al. against me, Avon Road, and UHNIC in September of 2011 was fully disclosed to the board of directors of UHNIC in its board meeting held on October 19, 2011. At a minimum, the minutes of this and other board meetings were provided to you and Marcum as part of your audit work (see attached copy of the minutes from this meeting). The lawsuit emanates from a partnership separation between me, Mr. Kaniewski and our respective family affiliates in August of 2008. Mr. Kaniewski was seeking reimbursement of credit card charges which he claimed to be the responsibility of the defendants.

UHNIC management assessed the complaint filed by Mr. Kaniewski and determined that less than $1,200 was being claimed for charges related to UHNIC. Given the immaterial amount, and because the lawsuit

was related to the separation between me and Mr. Kaniewski, I decided to bear the legal costs for this case personally.

I am not aware of any intention by me or management of Cinium or UHNIC to withhold this lawsuit from anyone. As stated above, it was disclosed to the UHNIC board after it was served, and as evidenced by the attached disclosure statement, it was provided to Jim Roberts and Tower as part of their due diligence in December of 2011. Again, Mr. Roberts serves as a member of Cinium's Audit Committee.

## LORRAINE WHITE MATTER

This matter, as you have noted in your report, has absolutely no relevance to the audits of Cinium, UHH or UHNIC. It is simply another example of the baseless "witch hunt" being conducted by Messrs. Asen, Camp and Roberts and their conspiracy to usurp my authority and the economic interests held by me, my family and other Cinium stakeholders.

It is my belief that this matter was brought to the attention of Mr. Asen by Scott Kaniewski, who again is a party suing UHNIC. The fact that Mr. Asen has chosen to give merit to this irrelevant matter, especially given that it came from a person with ulterior motives, further goes to show that Mr. Asen has not been acting in his capacity as Chairman of the Cinium Audit Committee, but as a member of a fishing expedition designed to find anything the Committee might find I did wrong, even sharing a "glass of water" with someone, as Mr. Camp noted in his email above.

## FAILURE OF BDO TO MAINTAIN INDEPENDENCE AND ACT IMPARTIALLY

While you have so readily passed judgment on the issues raised by Messrs. Asen and Roberts, including some that have no relevance to the audit work at hand, you have chosen to ignore a multitude of concerns that have been brought to your attention by other members of the Cinium board, including subsequent events. These include, but are not limited to, the following:

1. The sale of virtually all of Jeff Camp's Cinium stock holdings to Tower for $100.
2. The investigation into Jeff Camp's conduct as CFO and former member of Cinium's Audit Committee as it relates to his involvement in the audits and his knowledge of the allegations you have made against Cinium management in your report.
3. The investigation into the ultimate ownership of and providers of capital for Tow Sur LLC, Trombone LLC, and REL-REM Holdings, Inc. You will recall that Marcum raised the 10% regulatory control threshold issue with Joel Asen and Tow Sur LLC (f/k/a JAF-CFS LLC) in its audit work for Cinium's 2010 financial statements.
4. The investigation into whether related party transactions and/or conflicts of interest exist by and between the following parties: (a) Joel Asen and his affiliates, including PLASE Capital Group, which is backed by an invesntment entity affiliated by the Apollo private equity firm; (b) Jim Roberts and Tower; (c) Jeff Camp and his affiliates; (d) Scott Kaniewski, the party suing UHNIC; and (e) Jack Garraty, who manages an entity in which Cinium has made an investment.
5. Review of the lawsuit filed by Cinium et al against Tower et al.
6. The review of Cinium' investment in December Investors, LLC.

As responded to above, the allegations and conclusions drawn by you and the BDO Report to the Ciniium Audit Committee are unfounded, misleading and inaccurate. We have no reason to believe at this time that Marcum LLP did not perform its audits appropriately and professionally. I do, however, seriously

question whether your recollection of the work performed by Marcum is accurate and why you have chosen to so grossly misplace your current allegiances and to not perform your duties and responsibilities with the utmost professionalism and objectivity.

Yours truly,

Robert Berman
Chairman & CEO


*cc:*      Wayne Berson, CEO, BDO USA LLP, via overnight mail
        Jeffrey Weiner, Managing Partner, Marcum LLP, via overnight mail
        James Meehan, Marcum LLP, via overnight mail
        NYS DFS:    James Davis, Paul Cohen, Rolf Kaumann, Michael Sheiowitz,
                Eugene Benger, & Theresa Ogudebe, via email
        Dennis Vacco, via email


Attachments:
    1.  BDO Report to the Audit Committee
    2.  Marcum 2010 FIN46(R) Analysis
    3.  Joel Asen Email
    4.  Litigation Disclosure Schedule to Tower
    5.  UHNIC Board Meeting Minutes 10-19-11

Cinium Financial Services, Inc. and Upper Hudson National Insurance Company

# REPORT TO THE AUDITCOMMITTEE

October 17, 2013



The following communication was prepared as part of our audit, has consequential limitations, and is intended solely for the information and use of those charged with governance (e.g., Board of Directors and Audit Committee) and, if appropriate, management of the Company and is not intended and shall not be used by anyone other than those specified parties.



BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.





Tel:            212-885-8174        100 Park Avenue
Fax:            212-697-1299        New York, NY  10017
www.bdo.com

October 17, 2017

Those Charged with Governance
Cinium Financial Services Corporation
Upper Hudson National Insurance Company

We have been asked by the Audit Committee of Cinium Financial Services Corporation and Upper Hudson National Insurance Company to prepare a report on the financial statement consequences of the information provided to us on or after September 16, 2013.  Our audit of Upper Hudson National Insurance Company for the year ended December 31, 2012 was completed on May 31, 2013 and our audit on the 2012 financial statements of Cinoum Financial Services Corporation and Subsidiaries is not complete.

This communication is intended to elaborate on the significant findings from our audit procedures performed on this information and to provide you with our preliminary conclusions, including our views on the qualitative aspects of the Company's accounting practices and policies, management's judgments and estimates, financial statement disclosures, and other matters.

BDO USA, LLP

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

# Discussion Outline

| | |
|---|---|
| Status of Our Audit | 4 |
| Preliminary Results of Our Audit Procedures | 5 |
| Internal Control Over Financial Reporting | 6 |
| Results of Our Inquiries and Procedures Since September 16, 2013 | 8 |
| Other Required Communications | 11 |
| Independence Affirmation | 13 |





# Status of Our Audit

We have not completed our audit of the consolidated financial statements of Cinium financial Services Corporation as of and for the year ended  December 31, 2012. Our audit is being conducted in accordance with auditing standards generally accepted in the United States of America. This audit of the financial statements does not relieve management or those charged with governance of their responsibilities.

## Discussion Point

- The objective of our financial statement audit was to obtain reasonable - not absolute - assurance about whether the consolidated financial statements are free from material misstatements.
- While the scope of our work was substantially the same as previously communicated to you, there were changes to our planned audit strategy and/or significant risks initially identified, including related party risk, disclosure controls, contingent liabilities, encumbrances on assets, and litigation.
- We do not know when our audit of Cinium Financial Services Corporation for the year ended December 31, 2012 might be completed, if ever.
- Our responsibility for other information in documents containing the Company's audited financial statements does not extend beyond the financial information identified in the engagement letter, and we are not required to perform procedures to corroborate such other information. However, in accordance with professional standards, we will read the information included by the Company and consider whether such information, or the manner of its presentation, is materially consistent with its presentation in the financial statements. Our responsibility also includes calling to management's attention any information that we believe is a material misstatement of fact. **We have identified material inconsistencies and we have preliminary concluded that the financial statements of both Upper Hudson National Insurance Company and Cinium Financial Services Corporation (and the predecessor Upper Hudson Holdings LLC) are materially misstated going back to at least 2008.**
- It appears that records and information requested by BDO were not made available to us.
- We  cannot conclude that we received full access to all information requested while performing our audit, and we  cannot comment at this time on the level of cooperation extended to us by all levels of Company personnel throughout the course of our work.





# Preliminary Results of Our Audit Procedures

**ACCOUNTING PRACTICES, POLICIES, ESTIMATES AND SIGNIFICANT UNUSUAL TRANSACTIONS**

Significant estimates are those that require management's most difficult, subjective, or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. The Company's significant accounting estimates, including a description of management's processes and significant assumptions used in development of the estimates, are disclosed in of the financial statements.

| Significant accounting estimates include: |
| --- |
| Valuation of Level 3 Investments |
| Loss Reserves |
| Contingent Liabilities |
| Equity transactions |





# Internal Control Over Financial Reporting

In planning and performing our audit of the financial statements, we considered the Company's internal control over financial reporting (internal control) as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we do not express an opinion on the effectiveness of the Company's internal control.

Our consideration of internal control was for the limited purpose described above and was not designed to identify all deficiencies in internal control that might be significant deficiencies or material weaknesses.

We are required to communicate, in writing, to those charged with governance all material weaknesses and significant deficiencies that have been identified in the Company's internal controls over financial reporting. The definitions of material weakness, significant deficiencies and control deficiencies follow:

| Category | Definition |
|---|---|
| Deficiency in Internal Control | A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. |
| Significant Deficiency | A deficiency or a combination of deficiencies in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. |
| Material weakness | A deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. |

In conjunction with our audit of the financial statements, we believe that material weaknesses exist.





# Internal Control Over Financial Reporting

- The following material weaknesses were identified:

| Material Weakness | Comments |
|---|---|
| *Disclosure Controls* | The Company's financial statements do not contain all the disclosures required under Generally Accepted Accounting Principles and/or New York State Statutory Accounting Principles |
| *Valuation of Investments* | The Company did not properly substantiate the amount recorded for a level 3 investment in a related party LLC |
| *Analysis of, and Disclosure of, Contingent Liabilities and Litigation* | The Company did not properly evaluate the need to accrue and/or disclose certain contingent liabilities |





# Results of Inquiries and Analysis Since September 16, 2013

| Requirement | Discussion Points |
|---|---|
| Valuation of Investment in RH Land Development LLC | The Company has been carrying the investment in RH Land at the lower of Cost or Market.  According to appraisals provided, management has represented that the land is worth far more than cost.  Prior to September 16, 2013, the existence of a mortgage on the property - albeit one that has been in default since 2009 – was not disclosed to the auditor.<br><br>• Conclusion – the existence of the mortgage alone, for amounts that exceed the equity of RH Land Development LLC, requires this investment to be a non-admitted asset for regulatory purposes, which means it has no value.  The value for GAAP purposes at this time is also zero because the Company has failed to provide the appropriate supporting documentation to justify the carrying value at anything else but zero.  The question as to whether the mortgage is recourse to UNIC has not been answered.  If the mortgage is recourse to UNIC, then a liability may need to be recorded.  We have not received appropriate evidence to further conclude on the accounting and disclosures on this investment. |
| Obtain information from those charged with governance relevant to the audit | There were several matters noted relevant to the audit, including, but not limited to: violations or possible violations laws or regulations; risk of material misstatements, including fraud risks; or tips or complaints regarding the Company's financial reporting that we were made aware of as a result of our communications between us and those charged with governance.   Descriptions of these matters and our preliminary conclusions are as follows: |

Miller

• *Disclosure Issues:* The existence of an asset forfeiture proceeding against the Company and certain officers and directors by the Federal Government that commenced in 2008 was not previously disclosed to the auditors.  At a minimum, the circumstances of this matter require disclosure in the financial statements.  We do not have sufficient information to conclude on the current the status of this matter including whether the statute of limitations has run.





# Results of Inquiries and Analysis Since September 16, 2013

| Requirement | Discussion Points |
| --- | --- |

**Miller**  *(Continued)*

● *Tax Issues*.  Information provided indicates Miller deposited approximately $2.75 million into Upper Hudson Holdings LLC in 2007  as part of a stock purchase agreement and that in 2008 these funds, or what remained of these funds, was taken into income by Upper Hudson Holdings LLC as a long term capital gain and distributed to certain members of the LLC.  While the characterization of these funds as long term capital gains is questionable, our role as auditors is limited to financial statement matters.  Because Upper Hudson Holdings LLC is a pass-through entity scoped out of the provisions of ASC 718, Cinium Financial Services Corporation has no liability for uncertain tax positions.

● *Liability Issues*. In 2008 an offer to settle the government's claim to certain assets of the Company was discussed in documents provided.  We are unsure if all the relevant documents have been provided to us, but liability of  at least $500,000 should have been recorded on the books of either UNIC or Cinium in 2008 because that amount was offered as a settlement of the claim.  We do not have sufficient information to conclude if this liability should remain on the books or should have been reversed in the years 2009 through 2012.

● *Management Integrity and Competence.*  Whether intentional or unintentional, management did not provide all the relevant information about the Miller matter to the auditors and did not disclose this matter in the Company's financial statements starting in 2008 as required by both New York State statutory accounting requirements and GAAP.

**Kaniewski**

● In 2011, Scott Kaniewski filed a lawsuit against the Company.  This matter was not disclosed to the auditors until October 2013 despite numerous members of management and the Board knew about the lawsuit.

● Legal Fees and Capital Contributions.  Vacco was retained by Robert Berman, CEO and Chairman, for reasons that  do not make sense, to defend the Company and him.  The legal fees were paid by Berman personally (although there are outstanding balances) in amounts that have not been provided.  The payment of legal fees personally for matters involving the Company are capital contributions with corresponding legal expense.





# Results of Inquiries and Analysis Since September 16, 2013

| Requirement | Discussion Points |
|---|---|
| **Lorraine White Matter** | |
| • We were asked to make inquiries about a matter noted in documents provided that was described as the Lorraine White matter.  Based on our limited inquiry, we believe this matter has beyond the scope of our engagement to audit the company. | |





# Other Required Communications

| Requirement | Discussion Points |
|---|---|
| Material Misstatement of Previously Issued Financial Statements | Although we have not concluded on the issued described in this report, it is apparent that the Company's previously issued financial statements of Cinium Financial Services, Inc. (and its predecessor, Upper Hudson Holdings, LLC) and Upper Hudson National Insurance Company going back to at least 2008 are materially misstated and can no longer be relied upon.  The Company has a responsibility to notify the NYDFS, the prior auditors, and any person or entity that received the financial statements.  If the Company fails to notify the NYDFS, then we have an obligation to make that notification.<br><br>Please provide us with documentation that the NYDFS and the prior auditors of the Company's financial statements back to at least 2008 are properly notified of the material misstatements. |





# Other Required Communications

| Requirement | Discussion Points |
|---|---|
| Fraud and potential illegal acts involving senior management and those that cause a material misstatement of the financial statements | As previously described, information known by members of management that was material to the financial statements was not provided to us. |
| If applicable, other matters significant to the oversight of the Company's financial reporting process, including complaints or concerns regarding accounting or auditing matters | It was noted that the status of the Company's litigation was not discussed at the meetings of the Board of directors.  It is suggested that litigation be added to each board agenda and that the Board receives updates from counsel regularly and these updates should be memorialized in the minutes. |





# Independence Communication

Our engagement letter dated September 27, 2012 describes our responsibilities in accordance with professional standards and certain regulatory authorities with regard to independence and the performance of our services. This letter also stipulates the responsibilities of the Company with respect to independence as agreed to by the Company. Please refer to that letter for further information.





Upper Hudson Holdings, LLC
FIN46(R) Analysis

| Entities Related to Avon Road Partners, L.P. | FEIN | Description | Analysis |
|---|---|---|---|
| Avon Road Bermase I LLC | 27-4297568 | Holder of GPRM common stock | Independent mgt.; no debt obligations/guarantees by UHH; no controlling interest in or held by UHH; no contractual mgt. relationship with UHH |
| RH Land Development, LLC | 87-0743471 | Real estate investment | Independent mgt.; no debt obligations/guarantees by UHH; no controlling interest in or held by UHH; no contractual mgt. relationship with UHH |
| Upper Hudson Holdings, LLC | 36-4555304 | (subject of audit) | (subject of audit) |
| Watermark Communications, LLC | 83-0406775 | Owner of radio stations | Independent mgt.; no debt obligations/guarantees by UHH; no controlling interest in or held by UHH; no contractual mgt. relationship with UHH |
| Watertone Holdings, LP | 06-1453057 | Inactive investment entity | Inactive; no debt obligations/guarantees by UHH; no controlling interest in or held by UHH; no contractual mgt. relationship with UHH |

**Robert Berman**

| | |
|---|---|
| **From:** | Joel Asen <joelasen@gnnail.com> |
| **Sent:** | Sunday, January 30, 2011 3:07 PM |
| **To:** | Alan Mansfield |
| **Cc:** | Robert Wong; Robert Berman; Jeff Camp |
| **Subject:** | Re: sources and uses |

Looks correct. Of $2,620 working capital uses, $1,500 is for land "exchange" and $1,120 is for CFS Working Capital, correct?

On Jan 30, 2011, at 2:55 PM, Alan Mansfield<amansfield@upperhudson.com>wrote:

<Source and Use of Funds.xls>

SCHEDULE OF LITIGATION
CINIUM FINANCIAL SERVICES CORPORATION
& SUSIDIARIES


1.  Upper Hudson National Insurance Company (as Plaintiff)
            *vs.*
    William R. Miller, II, AMS Surety Holdings Corp., AMS Capital Holdings Corp.
    et al. (as Defendants)

    Filed Feb. 19, 2008; No. MJG-08-CV-0440
    U.S. District Court for the District of Maryland Northern Division

    *Status:*
    Civil complaint that has been dismissed without prejudice.

    *Counsel Contact*:

    Dennis C. Vacco
    Lippes Mathias Wesler Friedman LLP
    665 Main Street, Suite 300
    Buffalo, NY 14203-1425
    (716) 853-5100
    dvacco@lippes.com

2.  Upper Hudson National Insurance Company, Upper Hudson Holdings, LLC et al.
    (as Plaintiffs)
            *vs.*
    William R. Miller, II, AMS Surety Holdings Corp., AMS Capital Holdings Corp.
    et al. (as Defendants)

    Filed Mar. 21, 2008; No. 13-C-08-072670
    Circuit Court of Maryland Howard County

    *Status:*
    Contract complaint where order of default was granted to Plaintiff.

    *Counsel Contact*:

    Dennis C. Vacco
    Lippes Mathias Wesler Friedman LLP
    665 Main Street, Suite 300
    Buffalo, NY 14203-1425
    (716) 853-5100

dvacco@lippes.com

3.  Hudson Insurance Company (as Plaintiff)
          *vs.*
    Upper Hudson National Insurance Company & Upper Hudson Holdings, LLC (as Defendants)

    Filed Jan. 21, 2011; No. 7:11-CV-00459-CS
    U.S. District Court for the Southern District Court of New York, White Plains Division

    *Status:*
    Trademark infringement action that has been settled and voluntarily dismissed by the Plaintiff.

    *Counsel Contact*:

    None

4.  Scott Kaniewski, Stacy B. Kaniewski et al. (as Plaintiffs)
          *vs.*
    Avon Road Partners, LP, Robert A. Berman & Upper Hudson National Insurance Company (as Defendants)

    Filed Sep. 29, 2011; No. 2011-2719
    Supreme Court of the State of New York, County of Sullivan

    *Status:*
    Civil complaint seeking $95,246.31 that the Defendants believe is without merit. Motion for dismissal has been filed by Defendant.

    *Counsel Contact*:

    Dennis C. Vacco
    Lippes Mathias Wesler Friedman LLP
    665 Main Street, Suite 300
    Buffalo, NY 14203-1425
    (716) 853-5100
    dvacco@lippes.com

**UPPER HUDSON NATIONAL INSURANCE COMPANY**
**MINUTES OF THE SPECIAL MEETING OF THE**
**BOARD OF DIRECTORS**
**October 19, 2011**

The special meeting of the Board of Directors was held at 2:00 pm on Wednesday, October 19, 2011 at 4446 State Route 42, Suite B, Monticello, New York.

The following Directors were present:

> Donald Appel
> Andrew Wohl
> Robert Wong

The following Directors participated by telephone:

> Robert Berman
> Jeff Camp
> Lewis Klugman

Apologies:

> Dennis Vacco, Esq.

Also present was invited guest:

> Jeanne McKean

Establishing that a quorum was present, Chairman Robert Wong called the meeting to order at approximately 2:06 pm.

**Ratification of Minutes from December 7, 2010 Board Meeting**

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED,** that the minutes of the Meeting of the Board of Directors held on December 7, 2010 be and hereby are approved as previously circulated.

**Waiver of Notice of Special Meeting**

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED,** that the notice of the Special Meeting of the Board of Directors held on October 19, 2011 be and hereby is waived and all business considered and conducted at such meeting be adopted as determined by the Board.

**Reduction of Size of Board**

The Board discussed making the Board more manageable and efficient by reducing the size from thirteen to seven Board members.  New York insurance law has reduced the minimum number of board members for insurance carriers from thirteen to seven.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

>    **RESOLVED,** that the Officers of the Company be and hereby is authorized to amend the Company's by-laws to reduce the minimum number of directors from thirteen to seven.

>    **FURTHER RESOLVED**, that amendment of the by-laws shall be done in accordance with consent of the sole shareholder of the Company.

**Appointment of Jeanne McKean as Corporate Secretary**

The Board discussed the appointment of Jeanne McKean as Corporate Secretary.  Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

>    **RESOLVED,** that Jeanne McKean be and hereby is elected to the office of Secretary of the Company to serve at the pleasure of its Board of Directors until her successor is elected and qualify.

**Review of Business & Financial Reports**

Chairman Wong advised the Board of the changes that have occurred with the Company's sole shareholder— Upper Hudson Holdings, LLC ("UHH").  UHH has merged with a newly formed entity named Cinium Financial Services Corporation.  A wholly-owned subsidiary named Cinium Insurance Holdings, Inc. was created as a pass through entity to own 100% of the Company.  Robert Shapiro, regulatory counsel for the Company, has advised the New York State Insurance Department of the changes to the Company's sole shareholder.  The creation of Cinium Financial Services Corp. was done to change the entity structure from a limited liability company to a corporation in anticipation of capital raising activities.  In addition, Chairman Wong advised that the changes will allow the parent company to create and consolidate its corporate branding and identity for its bonding programs that are being marketed.

Chairman Wong advised that marketing began for both the commercial bond program and Contractor Credit Program (CCP) in March 2011, with an official launch date of April 1st.  The launch was supported by significant advertising efforts following development and fine tuning of both programs in 2010.  Both programs are being marketed by the Company's affiliate agency, Cinium Underwriter Services Group, LLC

(dba Ox Bonding Insurance Services).  Ox Bonding is emphasizing direct marketing, including utilization of radio, online, and other advertising.

Commercial bonds, such as license, permit and miscellaneous bonds, are being handled out of the Company's Miami office.  Contract bonds, including bid, payment and performance bonds, are underwritten and issued out of the Company's Monticello office.  Cinium Risk Management, LLC, another affiliate of the Company, serves as the funds administrator for the Company's CCP Program and handles the funds control that is mandatory for payment and performance bonds.  Funds administration on contract bonds functions as a key risk mitigation tool for the Company and allows the Company's affiliates to also provide additional support services to the clients, thus increasing customer retention.

Chairman Wong advised that both bonding programs have performed very well since their launch in March.  Gross written premium (GWP) has been more than doubling every quarter from $154,000 in the 1st quarter to $435,000 in the 2nd quarter and $873,000 in the 3rd quarter.  Through October 2011, the Company has written approximately $1.6 million in premium as compared to roundly $190,000 for the same period in 2010.  The Company expects to write over $2 million in GWP during 2011, which significantly exceeds the $242,370 written in 2010.

Chairman Wong advised that the Company's audited financial reports have been completed and filed.  To date, there have been no paid losses.  The Company has been reserving for IBNR and LAE at 15% of premium and 35% of IBNR, respectively.  Perr & Knight has completed an actuarial review and issued an actuarial opinion for 2010 that supported the Company's reserves.

Year end 2010 surplus was slightly above $6 million and has been maintained through the 2nd quarter.  Since the end of last year, $834,000 of surplus has been contributed to the Company by its parent.  Total assets at the end of last year were $7.2 million, increasing to $7.5 million at the end of the 2nd quarter.

During early 2011, the Company has strengthened its balance sheet by disposing of a common stock, mortgage, and other investment for cash.  As a result, cash and short-term investments increased from $4.0 million at 12/31/10 to $5.6 million at 6/30/11.  Director Camp advised that there are no plans to make any significant changes to the investments held through the end of the year.

Chairman Wong advised the Board that the cost sharing and tax allocation agreements have been completed and approved by the New York State Insurance Department.  These agreements cover the Company, its parent and other subsidiaries of the parent.

Chairman Wong also advised the Board that the Company's directors and officers liability insurance coverage has been renewed under the same terms as the previous year.

**Appointment of Auditor**

The Board discussed continuing the engagement of Marcum LLP as its independent auditor.  Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED,** that Marcum LLP be and hereby is appointed to serve as the Company's independent auditor for the fiscal year ending December 31, 2011.

**Appointment of Actuary**

The Board discussed continuing the engagement of Perr & Knight as its independent actuary.  Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED,** that Perr & Knight be and hereby is appointed to serve as the Company's independent actuary for the fiscal year ending December 31, 2011.

**License Expansion**

The Company's licenses are in the process of being expanded in eight states which include Arizona, Colorado, Connecticut, District of Columbia, North Carolina, Nevada, South Carolina and Texas.  The Company's licenses in the states of Florida and Oregon have been expanded to include surety, and rate filings have been approved in Florida. Rates have been filed Oregon which should be approved within the next 30-60 days.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED,** that the Officers of the Company be and hereby are authorized to complete and submit applications for certificates of authority in states in which the Company does not already hold a certificate of authority and to undertake any actions necessary to secure the approval and granting of such certificates of authority.

> **FURTHER RESOLVED**, that the Officers of the Company be and hereby are authorized to appoint and designate registered agents for service of process in states requiring such appointments.

**Pending Lawsuit**

The Board discussed a lawsuit that was recently served against the Company, Director Robert Berman and Avon Road Partners, LP, a shareholder of the Company's parent. The complaint was filed by Scott Kaniewski and his related entities in regards to a $95,000 claim for credit card charges arising out of a separation between Kaniewski et al. and Avon Road Partners, LP et al in 2008.  Mr. Kaniewski previously served as an officer

of the Company, and his affiliates held an ownership interest in the Company's parent until the aforementioned separation.  Director Dennis Vacco's law firm, Lippes Matthias et al., is handling the complaint.  The Company views this as a frivolous case involving a matter that dates back over 3 years and is moving to dismiss the complaint.

**Prospective Business Transactions & Relationships**

The Board discussed the Company and its parent pursuing opportunities to increase distribution channels since the Company is currently limited to writing in twelve states, is not rated by A.M. Best, and is not a U.S. Treasury listed surety.  The Company is looking to gain access to A-rated paper via fronting and other avenues in order to grow its books of business.  Directors Berman and Camp advised the Board that the parent has been in discussions with the following companies:

1. Atradius
2. Tower
3. Grange Mutual
4. Knightbrook
5. Lexon

Atradius is a Dutch reinsurance company that is exploring a modified reinsurance structure for the Company.  Tower, Grange Mutual, Knightbrook and Lexon are considering fronting and partnership opportunities.

**Reinsurance**

Chairman Wong confirmed for the Board that the reinsurance discussed at the previous board meeting has been effectuated.  The Board also discussed modifying the Company's reinsurance to include a layer of quota share to provide for balance sheet and surplus support.  The Company would also pursue a reduction in the cost of the excess of loss coverage.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

> **RESOLVED**, that the Officers of the Company be and hereby are authorized and directed to take the appropriate actions necessary to complete a restructuring of the Company's reinsurance coverage.

**Audit Committee**

In conjunction with the reduction in the size of the Board, the Board discussed reappointments for its Audit Committee.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

**RESOLVED**, that the following nominations for the audit committee be and hereby are elected to serve on the Audit Committee of the Board of the Company.

**<u>Audit Committee</u>**
Jeffrey Camp
Lewis Klugman
Robert Wong

**Ratification of Disaster Response Plan**

Chairman Wong advised the Board that a Disaster Response Plan has been completed in accordance with state regulatory requirements.

Upon motion duly made, seconded and unanimously carried, the following resolution was adopted by the Board:

**RESOLVED**, that the Disaster Response Plan of the Company be and hereby is ratified.

**FURTHER RESOLVED,** that the Officers of the Company be and hereby are authorized to amend and update the Disaster Response Plan of the Company to fulfill the purpose of the plan and to maintain compliance with regulatory requirements.

**Adjournment**

No additional business was discussed.

Chairman Wong called for a resolution to adjourn which was duly made, seconded and carried.  The meeting was adjourned at 2:57 pm.

_____
Secretary

# EXHIBIT B



## Lippes Mathias Wexler Friedman LLP

*Dennis C. Vacco*
Partner
dvacco@lippes.com

November 6, 2013

**Via Electronic &
UPS Overnight Delivery**
Mr. John Green
Partner, BDO
100 Park Avenue
New York, New York 10017
jgreen@bdo.com

**Re:**     BDO USA ("BDO") Report to the Audit Committee of Cinium Financial
Services     Corporation (CFSC)

Dear Mr. Green:

I am in receipt of your October 17, 2013 BDO Report ("Report") to the CFSC Audit
Committee.  I also have received a copy of correspondence from BDO to Messrs. Asen,
Berman and Camp dated November 5, 2013 (enclosed).  In this correspondence, which
was not signed by any official of BDO, the aforementioned individuals were informed
that "BDO resigns from (the) engagement because of the lack of independence due to
(the) threat of imminent litigation."  In this same letter BDO informed CFSC that it was
withdrawing the audit report dated December 31, 2012.  I am writing to now demand that
BDO withdraw its October 17th Report.  My demand is based on several reasons which I
will address below.  Taken together the conduct of BDO described below leads me to the
conclusion that BDO lost its independence long before the threats of litigation from Mr.
Berman and his attorney, Mr. Bernstein.  Indeed it was the lack of BDO independence
which lead to the threat of litigation.

MILLER MATTER:
On page 8 of your Report, in a section labeled Disclosure Issues you state, "The existence
of an asset forfeiture proceeding against the Company and certain officers and directors
by the Federal Government ....commenced in 2008 was not previously disclosed to the
auditors."  Your reference to a "forfeiture proceeding" is either an unprofessional attempt
to mislead the audit committee or a purposeful falsehood to advance a pre-determined
outcome.

You might recall that on October 11th you and I had a telephone conversation which
lasted nearly an hour.  During that call I gave you an extensive explanation of the so-
called Miller matter and my contact with the federal prosecutors in Florida concerning the
prosecution of Miller.  During this portion of the discussion I informed you that there was
never a formal claim or proceeding initiated  by the federal government against Upper



Hudson National Insurance Company (UHNIC), Robert Berman, Scott Kaniewski or any other entity or individual associated with them. It was evident that you had reviewed the federal court filing system known as PACER, because you disagreed with my assertion that Miller had agreed at the time of his conviction to a forfeiture of 23 million dollars. (For your information I have enclosed a copy of Miller's plea agreement wherein the 23 million dollars forfeiture is referenced.) You asserted that Miller only agreed to forfeit about 3 million dollars claiming you had reviewed a document which disclosed this amount. I disagreed with your assessment and have subsequently reviewed PACER. The document which you were apparently referring to (also enclosed) is an order directing restitution in the amount of $3,243,890.62, but the fact remains that the plea agreement clearly states that Miller agreed to forfeit to the federal government 23 million dollars.

I raise this exchange with you for several reasons. First during our discussion on the topic of forfeiture you clearly revealed you had done independent due diligence on the topic but it is clear from the fact that you were unaware of the plea document that your due diligence was incomplete. The other reason I raise this exchange is that if you were sophisticated enough to employ PACER, then it would have been easy for you to have continued your research to determine that no forfeiture proceeding had ever been initiated against UHNIC, Berman or anyone else associated with the company. On the other hand, if your statement about the forfeiture proceeding was based upon what some other source, besides me, told you, then it is equally clear that you failed to substantiate that information through independent due diligence.

Lastly, regarding Miller, you addressed the question of a statute of limitations wherein you wrote: "We do not have sufficient information to conclude on (sic) the current the status of this matter including whether the statute of limitations has run". By taking this position you totally ignored a legal memorandum prepared by my law firm and shared with Joel Asen, the audit committee and John Crowe on July 12, 2013. Either you did not review the audit committee records or you choose to omit reference to this memorandum which asserted, as I did in our conversation on October 11th, that the statute of limitations for a forfeiture proceeding against UHNIC or related individuals had expired. Again I have to wonder if your work product is sloppy or intentionally misleading, because it does not accurately state the facts in regard to the forfeiture proceeding or the statute of limitations.

KANIEWSKI LEGAL FEES:
Under the heading of Kaniewski/Legal Fees and Capital Contributions you make a ridiculous and unprofessional statement about my representation of Robert Berman and the company. Again repeating what you wrote: "Vacco was retained by Robert Berman, CEO and Chairman, for reasons that do not make sense to defend the Company and him. I have reread your report carefully several times and this sentence is the first time you refer to me, albeit in an unprofessional and casual manner as "Vacco"! You were well aware at the time of our conversation on October 11th that I was the Attorney General of New York State in the 1990's and a former United States Attorney. You also were informed that I was a member of the Board and a shareholder in CFSC. Your casual reference to me as simply "Vacco" is undignified and leads me to wonder if your position



on joint representation wasn't personally motivated. In our conversation on October 11th you asked me whether there was a conflict of interest in the joint representation and I told you no. At the time you even recognized the delicate nature of your question because you apologized for having to ask it. Nonetheless, I told you there was no conflict because the interests of UHNIC and Berman were aligned in the litigation commenced by Kaniewski. It is startling to me that you chose not to offer a legal opinion about the statute of limitations, yet you felt qualified enough to comment on the question of a legal conflict. Not only did you fail to reference our conversation in this regard, but without any further due diligence or reference to other sources you chose to accuse me of unethical conduct. If there is any unethical conduct associated with this matter is being perpetrated by you and BDO.

Disturbingly, contemporaneously with the issuance of your Report, you and Jeff Camp arranged for an immediate payment of BDO's fees. I wonder if your misstatement of the foregoing facts and other misstatements in the report were affected by the fact that shortly before you contacted me on October 11 to discuss the Miller matter, you requested payment of $110,000 "**immediately**" from the CFO of CFSC, Mr. Jeffrey Camp. In an email to Mr. Camp, you wrote: "Thanks for your cooperation and understanding. I'm about to get on the phone with Vacco. I'll let you know how it goes." Mr. Camp rushed the payment of $110,000 to you from CFSC in less than one hour, without review or authorization of the Board of CFSC, nor of Mr. Berman as CEO, apparently in order to obtain your continuing cooperation in issuing a report to the CFSC audit committee based on unsubstantiated facts that were apparently provided to you by Mr. Camp and other persons working with him. The email exchange with Mr. Camp about an immediate payment of BDO fees coupled with the aforementioned misleading statements in your report simply highlight your lack of independence, unprofessionalism, undue influence and bias in connection with the issuance of the report. The below emails (annexed as Exhibit A) are additional evidence of your and BDO USA's "clandestine" dealings with Mr. Camp and others working with him in an unlawful scheme to remove Mr. Berman from his rightful position as CEO of CFSC, including by presenting the report to other members of the Board of CFSC to the exclusion of Mr. Berman and me, and meeting with the New York Department of Financial Services to condemn Mr. Berman without providing Mr. Berman or me a copy of the report or courtesy notice of the meeting with DFS.

## $110,000 PAYMENT TO BDO USA

The two email threads below on October 11, 2013 - one between you and Mr. Camp, and the other between you and Mr. Joseph Bernstein, legal counsel to Mr. Berman, (Exhibit A) indicate that Mr. Camp transferred $110,000 from CFSC to BDO *within less than one hour of receiving your invoice by email, without review or authorization of the CEO or the consent of the Board*, and without sufficient time to review the amount and propriety of the invoice and backup to total amounts billed. I have confirmed that the $110,000 payment was transferred by CFSC to BDO USA on October 11th.

At 9:31 a.m. on October 11, you sent an email to Mr. Camp enclosing your invoice. You copied Mr. Bernstein on this email



At 9:37 a,m., realizing you mistakenly copied the Camp email to Mr. Bernstein, you sent an email to Mr. Bernstein asking him to delete the first email, which he confirmed he would at 10:03 a.m., but Mr. Bernstein had already forwarded your email to Mr. Berman before you made the deletion request.

At 9:46 a.m., you apologized to Mr. Camp for the mistake and informed him you had intended to send a copy of the original email to Mr. Joel Asen: "My apologies – this is the problem with trying to do things quickly. I was trying to cc Joel (which in retrospect was probably not necessary anyway) Dennis, of course, pushed the call back to 2:30." (That you were trying to cc Joel Asen clearly means Mr. Asen was part of whatever arrangements you, Mr. Camp and Mr. Asen had concluded in consideration of the immediate, in full payment of your $110,000 invoice.)

At 10:18 am, only 47 minutes after your email sending the invoice, Mr. Camp emailed you that, "This was taken care of."

At 10:20 a.m., you sent an email to Mr. Camp to thank him for the money and to inform him that Mr. Bernstein had agreed to delete the email: "Thanks. Bernstein agreed to delete the email. Hopefully he's honorable. Sorry for the headache."

While it is clear you mistakenly sent Mr. Bernstein the invoice email, it is curious why you would be so concerned about him and by extension, Mr. Berman knowing about the request for payment. It is obvious to me that you did not want Mr. Berman, myself of any other principals of CFSC, not aligned with Messrs. Asen, Camp and Tower, to know that you had requested an immediate payment of $110,000 just prior to the issuance of the Report. It is my understanding that you have a long history of working with CFSC and UHNIC therefore you should have known that Mr. Berman was the person, through Avon Road Partners, who was approved as the controlling person by DFS. Again your failure to provide the invoice to the person authorized to be in control and your cover-up once you realized your email mistake, go to the heart of why you and BDO lost its independence long before the threat of litigation.

I again demand the complete retraction of the October 17, 2013 BDO USA report to the CFSC audit committee, absent which we will move forward accordingly.

Sincerely,

LIPPES MATHIAS WEXLER FRIEDMAN LLP

Dennis C. Vacco

Enc.



cc:     Wayne Berson (via electronic mail)
        Jeffrey Weiner (via electronic mail)
        James Meehan (via electronic mail)
        Eugene Benger (via electronic mail)
        Paul Cohen (via electronic mail)
        Rolf Kaumann (via electronic mail)
        James Davis (via electronic mail)
        Theresa Ogudebe (via electronic mail)
        Leonard Purzner (via electronic mail)
        Robert Oseitutu (via electronic mail)
        Michael Campanelli (via electronic mail)
        Timothy Hoeffner (via electronic mail)
        Robert Berman (via electronic mail)
        Joel Asen (via electronic mail)
        Jeffrey Camp (via electronic mail)

# Exhibit A

**EXHIBIT A – John Green's Emails With Joseph Bernstein and Jeffrey Camp**
**Between 9:31 a.m. and 10:20 a.m. on October 11, 2013**

**From:** John Green <jgreen@bdo.com>
**Date:** Friday, October 11, 2013 10:20 AM
**To:** Jeffrey Camp <JCamp@cinium.com>
**Subject:** RE: Latest Invoice for Cinium

Thank you.

Bernstein agreed to delete the email.  Hopefully he's honorable.

Sorry for the headache.



**From:** Joseph Bernstein [mailto:joebernstein@me.com]
**Sent:** Friday, October 11, 2013 10:03 AM
**To:** John Green
**Subject:** Re: Latest Invoice for Cinium

Sure

Joe Bernstein
iPhone: 917.365.3651
Fax: 847.589.3877

1

On Oct 11, 2013, at 9:37 AM, John Green <jgreen@bdo.com> wrote:

Joe,

I sent this to you in error.  Would you please delete.

Thank you for your assistance

<image701882.GIF>


**From:** John Green
**Sent:** Friday, October 11, 2013 9:31 AM
**To:** 'Jeff Camp'
**Cc:** 'Joseph Bernstein'; Raul Miranda
**Subject:** Latest Invoice for Cinium

Jeff,

As we discussed earlier this week, the time is rapidly accumulating on Cinium.  Attached is an invoice for our time through September 30 as well as the expected time to complete our work on the matters with RH land and the various litigation matters and report to the audit committee and the board.  In terms of the time on the cinium audit, the actual time spent through September 30 is approximately $100,000.  We were accumulating at 80% of standard and I took another 20% off.

Given the circumstances, we need to have this invoice paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work.  There are wire instructions on the invoice for your convenience.

Thanks for your cooperation and understanding.  I'm about to get on the phone with Vacco.  I'll let you know how it goes.

Regards,


**John Green**
Partner
212-885-8174 (Direct)    305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

IMPORTANT NOTICES

The contents of this email and any attachments to it may contain privileged and confidential information from BDO USA, LLP. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to BDO USA, LLP or destroyed and, in either case, this e-mail and all attachments to this e-mail must be immediately deleted from your computer without making any copies hereof. If you have received this e-mail in error, please notify BDO USA, LLP by e-mail immediately.

***To ensure compliance with Treasury Department regulations, we wish to inform you that, unless expressly stated otherwise in this communication (including any attachments) any tax advice that may be contained in this communication is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.***


<Cinium Financial Svcs #000381829.pdf>


**From:** Jeff Camp [mailto:JCamp@cinium.com]
**Sent:** Friday, October 11, 2013 10:18 AM
**To:** John Green
**Subject:** RE: Latest Invoice for Cinium

John,

This was taken care of

Jeff

Jeffrey Camp, CFA
Chief Financial Officer

T (786) 353-0301 x6030
F (305) 675-2434
E jcamp@cinium.com

Cinium Financial Services Corporation
444 Brickell Avenue | Suite 701
Miami, FL 33131



**From:** John Green <jgreen@bdo.com>
**Date:** Friday, October 11, 2013 9:46 AM
**To:** Jeffrey Camp <JCamp@cinium.com>
**Subject:** Invoice

Jeff,

My apologies – this is the problem with trying to do things quickly.  I was trying to cc Joel (which in retrospect was probably not necessary anyway)

Dennis, of course, pushed the call back to 2:30.


**John Green**
Partner
212-885-8174 (Direct)    305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com





BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.
BDO is the brand name for the BDO network and for each of the BDO Member Firms.

**From:** John Green [mailto:jgreen@bdo.com]
**Sent:** Friday, October 11, 2013 9:31 AM
**To:** Jeff Camp
**Cc:** Joseph Bernstein; Raul Miranda
**Subject:** Latest Invoice for Cinium

Jeff,

As we discussed earlier this week, the time is rapidly accumulating on Cinium.  Attached is an invoice for our time through September 30 as well as the expected time to complete our work on the matters with RH land and the various litigation matters and report to the audit committee and the board.  In terms of the time on

the cinium audit, the actual time spent through September 30 is approximately $100,000.  We were accumulating at 80% of standard and I took another 20% off.

Given the circumstances, we need to have this invoice paid along with the outstanding $10,000 immediately or my compliance department will instruct us to stop work.  There are wire instructions on the invoice for your convenience.

Thanks for your cooperation and understanding.  I'm about to get on the phone with Vacco.  I'll let you know how it goes.

Regards,


**John Green**
Partner
212-885-8174 (Direct)    305-8174 (Internal)
516-238-2430 (Mobile)
jgreen@bdo.com

**BDO**
100 Park Avenue
New York, NY 10017
UNITED STATES
212-885-8000
www.bdo.com



Joe Bernstein
iPhone: 917.365.3651
Fax: 847.589.3877