**GOLENBOCK EISEMAN ASSOR BELL & PESKOE** LLP

ATTORNEYS AT LAW | 437 MADISON AVE., NEW YORK, NY 10022-7020
T (212) 907-7300 | F (212) 754-0330 | WWW.GOLENBOCK.COM

Kim J. Landsman
Direct Dial No.: (212) 907-7368
Email Address: klandsman@golenbock.com

February 23, 2015

**VIA ECF**

Hon. Kenneth M. Karas
United States District Court
United States Courthouse
300 Quarropas St., Chambers 533
White Plains, NY 10601-4150

      Re:    *Jeffrey Camp et ano v. Robert Berman et al.,* No.14-CV-1049 (KMK)
             *Tow Sur, LLC et al. v. Robert Berman et al.,* No.14-CV-2705 (KMK)

Dear Judge Karas:

      We represent Defendants and Counterclaim Plaintiff Robert Berman in the above-captioned actions.[1] We write pursuant to Local Civil Rule 37.2 to request a pre-motion conference to compel discovery from BDO. Copies of our document requests to BDO are attached as Exhibit 1, and BDO's responses are Exhibit 2. A copy of our subpoena for the deposition of BDO by John Green in the *Tow Sur* case is attached as Exhibit 3.

**I.**      **NATURE OF THE CLAIM AGAINST BDO**

      Berman has sued BDO for tortious interference with his employment contract as CEO of Counterclaim Defendant Cinium Financial Services Corporation ("Cinium"), which allowed for termination prior to July 2018 only for "cause." The other counterclaim defendants are four Cinium directors who plotted to oust Berman for various self-interested reasons, including their belief that firing him would allow Cinium to seize stock of entities owned by Berman's family, which they have since done. BDO willingly and maliciously participated in the scheme by preparing a knowingly false and incomplete "report" that the counterclaim defendants used as the pretext for the "cause" to fire Berman.[2] Claiming to rely on BDO's spurious report that had essentially been ghost-written by two of them, four Cinium directors voted to terminate Berman for "cause" on October 25, 2013.

---

[1] Mr. Berman is also a defendant and counterclaim plaintiff in an action brought by Jeffrey Camp that is pending before Judge Lenard in the S.D. Fla. We moved to transfer that case because it is closely related to the first-filed action here. BDO USA LLP ("BDO"), which is a counterclaim defendant here and in S.D. Fla., also moved to transfer the counterclaim against it to this Court. Both motions are sub judice before Judge Lenard.

[2] A copy of the Report is included as Exhibit A to Berman's Amended Answer with Counterclaims [Doc. 14].

Hon. Kenneth M. Karas
February 23, 2015
Page 2

As part of the scheme, BDO also submitted the report to New York's Department of Financial Services ("DFS"), which regulates Cinium's insurance company subsidiary ("UHNIC"), and took sides in the dispute between the directors by threatening to withdraw its audits and resign if Berman was not fired.

Some examples of statements BDO knew were false or would have known to be false had it conducted any reasonable investigation include the following:

(1) BDO's report stated: "The Company has been carrying the investment in RH Land at the lower of Cost or Market. According to appraisals provided, management has represented that the land is worth far more than cost." It concluded, however, that "[t]he value [of the property] for GAAP purposes at this time is also zero because the Company has failed to provide the appropriate supporting documentation to justify the carrying value at anything else but zero," and asserted that its prior audit showing a value for the RH Land investment needed to be withdrawn.

In fact, BDO had an appraisal from March 2008 showing a value of $9.6 million. John Green (the partner in charge of Cinium's audit at both the prior accounting firm and BDO), had accepted that valuation in a May 2011 memo, which was repeated almost verbatim in an April 2012 memo. It noted that the company had received an appraisal that "indicated a value in excess of the purchase price of $1.1 million" that "would further increase once some permits and zoning issues were resolved. (See Exhibit 4.) The referenced appraisal, which was in the auditor's permanent file (see page 1 of Exhibit 4), stated that it was done for Bear Stearns Commercial Mortgage, Inc. "and the intended use is for loan underwriting purposes." (See Exhibit 5[3]).

If there was no more current appraisal, that was because the Audit Committee composed of Camp and Asen decided not to get one because they knew that the appraisal would support the valuation. (See Exhibit 6.) Moreover, as relayed in an e-mail from Camp to Asen on July 31, 2013 (attached as Exhibit 7), Green had previously told the Audit Committee that the choice of writing down the value or restating the audit was for the client to decide, not an auditing imperative: "With respect to the UHNIC audit, he [John Green of BDO] said that we can address the issue of RH Land by writing the asset down on the statutory accounts to the legal limit of 1% of assets and that a restatement of the audit was not necessary at this time unless CFSC [Cinium] wanted to do so for some reason."

(2) BDO's report stated that "[p]rior to September 16, 2013, the existence of a mortgage on the property - albeit one that has been in default since 2009 - was not disclosed to the auditor," and that "[t]he question as to whether the mortgage is recourse to UNIC has not been answered."

---

[3] In the interest of saving some paper, we are attaching the cover letter dated May 30, 2008, the Table of Contents, and the first section (5 pages) of this lengthy document.

Hon. Kenneth M. Karas
February 23, 2015
Page 3

In fact, Cinium's auditor always knew about the mortgage. As discussed above, the 2008 appraisal expressly stated that it was prepared for Bear Stearns, which was the lender on the mortgage. Moreover, attached as Exhibit 8 are copies of FIN46(R) reports prepared by the auditor in 2011 and 2012 that discuss the mortgage and that it was non-recourse to UHNIC: "Independent mgt.; no debt obligations guarantees by UHH; no controlling interest in or held by UHH; no contractual mgt. relationship with UHH".

(3) BDO stated that a litigation brought by Kaniewski (the former president of UHNIC) against Cinium in 2011 "was not disclosed to the auditors until October 2013 despite numerous members of management and the Board knew about the lawsuit."

In fact, the auditor was aware that the lawsuit was discussed at an October 19, 2011, meeting of the UHNIC board, as shown in an e-mail on May 22, 2012, in which the auditor asked for an "update on the status of the case discussed at the October board meeting." (See Exhibit 9.) The lawsuit was also included in a schedule of litigation that was in the auditor's files. (See Exhibit 10.)

II.     ISSUES REQUIRING JUDICIAL INTERVENTION

After an in-person meeting and exchanges of letters to comply with the meet-and-confer obligations of the Federal and Local Rules, the issues below remain in dispute.

A.     **Documents Concerning BDO's Compensation**

Our Requests 34 and 42 are for "All documents concerning any work or services performed by or compensation of BDO and/or Green for or on behalf of Cinium, the Plaintiffs, or any of the other Counterclaim Defendants" and "All documents concerning the provision of any money, gifts, or anything else of value to BDO and/or Green by or on behalf of Cinium, the Plaintiffs, or any of the other Counterclaim Defendants."

BDO has objected and agreed to produce only "billing information sufficient to determine the fees charged by BDO to Cinium and UHNIC from September 12, 2012, to November 5, 2013." There are several problems with that limitation. First, as to the dates, there should be no automatic cutoff; whenever services were performed, invoices went out, or payment was received, documents should be produced. If that happens to coincide with those dates, fair enough, but the relevant consideration is services performed, not specific dates. Second, the requests call for documents not just about what invoices were appropriate, but about how BDO was compensated.

As the Court may recall from BDO's motion to dismiss, Berman has alleged that part of BDO's motive to participate in the unlawful scheme, and part of the proof that BDO did not act in accordance with professional standards, concerns its demand and acceptance of payment for services yet to be performed, which exceeded the estimates in its engagement letters and violated Cinium's internal payment controls, which controls BDO knew about because they

2223524

Hon. Kenneth M. Karas
February 23, 2015
Page 4

were adopted at the auditor's urging.  In particular, on October 11, 2013, less than a week before BDO issued the report [that was used by the directors to fire Berman], Camp authorized a Cinium payment to BDO of $110,000 within 47 minutes of John Green's email request.  (See Exhibit 11.)   Moreover, the email chain shows that BDO intentionally sought to keep this payment secret from Berman, notwithstanding that Berman's approval was necessary to comply with Cinium's invoicing procedures.  John Green inadvertently copied the request for payment to Berman's lawyer, immediately asked Berman's lawyer to delete it, and then apologized to Camp for this mistake.  The only reason that BDO would actively seek to keep the payment secret from Berman was that BDO was knowingly involved in the scheme to oust Berman.

Accordingly, all aspects of what work was performed, how it was billed, and how it was paid are very much at issue, and the documents relevant to those issues, and not just "billing information sufficient to determine the fees charged by BDO," should be produced.

    **B.**    **Documents from BDO's Audit File**

BDO has objected to "the production BDO-created documents from the Audit File" for UHNIC/Cinium and refuses to produce any document that "does not contain original client financial data."  Essentially, BDO says that it will just produce "documents that were provided to BDO by the client." (Exhibit 12 at 4).  This is an outrageous restriction of their discovery obligations in light of the fact that the claim against BDO is not just a matter of what it knew from UHNIC/Cinium, but what its thought processes, analyses, and motivations were.

For example, why did BDO conclude that an entire audit needed to be withdrawn or restated relating to the investment in RH Land when (1) BDO had a 2008 appraisal it had never questioned, must have known that the Audit Committee had declined to obtain an updated appraisal, and (2) it had previously told the Audit Committee that the only impact of the RH Land investment was that UHNIC's surplus would have to be written down (though not to zero), **not** because it had no value, but only because its value exceeded insurance regulations about what percentage of an insurance company's surplus could be held in real estate.  The obvious question is when and why this changed from being Cinium's choice in July to BDO's decision in October 2013 that placing any value on the investment rose to a material misstatement.

    **C.**    **Deposition of John Green**

While we are willing to make some accommodations to Mr. Green's schedule, we are not willing to wait until late April to take his deposition.  Nor do we think it necessary to wait for complete document production.  We have asked BDO's counsel to provide one or more dates within the next few weeks for him to appear.  While we are willing to work any time needed by counsel for co-defendant Vacco into our allotted time for the deposition, we do not believe we should have to split the seven hours of his deposition with counsel for BDO's co-defendants on the counterclaim.

2223524

Case 1:14-cv-01049-KBF   Document 58   Filed 02/23/15   Page 5 of 5

Hon. Kenneth M. Karas
February 23, 2015
Page 5

      In summary, we request an order requiring BDO to (1) produce all documents responsive to Requests 34 and 42; (2) produce its complete Audit Files for Cinium and UHNIC; and (3) produce John Green for a deposition no later than March 15, with the seven hours of time permitted by Fed. R. Civ. P. 30(d)(1) allocated to defendants (or, in the alternative, leave for the deposition to last longer than 7 hours).

      Respectfully yours,

      *Kim J. Landsman*

      Kim J. Landsman

cc:   Timothy Hoeffner, Esq. (by ECF)
      Keith Fleischman, Esq. (by ECF)

2223524